## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES JACKSON, | ) | Case No. 1:21-cv-1679 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>OPINION AND ORDER</u>

Plaintiff Charles Jackson spent over 27 years in prison for a crime he did not commit.  In this civil action, he comes into federal court seeking to recover damages for the constitutional violations he alleges resulted in his wrongful conviction.  One Defendant he names in his complaint is the prosecutor who, according to the complaint, withheld exculpatory information when responding to a public records request in 2016.  He also names her employer, Cuyahoga County, as a Defendant. These Defendants move to dismiss the complaint against them, arguing that Plaintiff fails to state a claim as a matter of law based on absolute immunity, qualified immunity, and the statute of limitations.  For the reasons more fully explained below, the Court **GRANTS IN PART** and **DENIES IN PART** the motions.

## STATEMENT OF RELEVANT FACTS

Taking the facts alleged in the complaint as true and construing them in Plaintiff's favor, as the Court must on the motions before it, Plaintiff bases his claims against the two Defendants who move to dismiss on the following relevant facts.

In 1991, Charles Jackson was convicted for a murder he did not commit.  (ECF No. 1, ¶ 1, PageID #2.)  He spent over 27 years in prison before his exoneration in 2019.  (*Id.*, ¶ 2.)  In 2016, counsel for Mr. Jackson made identical requests for public records relating to the murder to the Cleveland police, which investigated the crime, and to the Cuyahoga County prosecutor's office, which handled the trial at which Mr. Jackson was convicted.  (*Id.*, ¶¶ 63 & 66, PageID #11.)  As assistant prosecutor in the office, Barbara Marburger handled the request for her office according to the County's policies, practices, and customs.  (*Id.*, ¶¶ 67 & 76, PageID #11–12.)  Specifically, the complaint identifies the policy, practice, or custom at issue as the County's direction to the Cleveland police not "to disclose exculpatory police reports and files in response to public records requests."  (*Id.*, ¶ 76, PageID #12.)

In August 2016, she produced a set of documents so heavily redacted that the prosecutor's office effectively removed all substantive information from the records produced.  (*Id.*, ¶¶ 68 & 70, PageID #11.)  According to the complaint, Ms. Marburger knew that Mr. Jackson maintained his innocence and that he needed the information in the records requested to support his efforts to obtain post-conviction remedies.  (*Id.*, ¶ 317, PageID #54.)  At the time, information in a prosecutor's file did not qualify as a public record under Ohio's Public Records Act.  *State ex rel. Steckman v. Jackson*, 70 Ohio St. 3d 420, 432, 639 N.E.2d 83, 92 (1994).

Several months later, the Cleveland police produced the same documents without redactions.  (ECF No. 1, ¶ 69, PageID #11.)  These documents contained extensive exculpatory information not previously produced.  (*Id.*, ¶¶ 71–72, PageID

#11–12.)  By the time of this production, the Ohio Supreme Court limited the exemption for a prosecutor's file from the Public Records Act to the completion of trial. *State ex rel. Caster v. City of Columbus*, 151 Ohio St. 3d 425, 2016-Ohio-8394, 89 N.E.3d 598, ¶ 47.  After the Cleveland police produced the documents unredacted, the prosecutor's office did so as well.  (ECF No. 1, ¶ 75, PageID #12.)  These records ultimately led to Mr. Jackson's exoneration.  (*Id.*, ¶ 80, PageID #13.)

## STATEMENT OF THE CASE

Based on these allegations involving Ms. Marburger and Cuyahoga County, Plaintiff asserts two counts against these Defendants.  In Count 6, Plaintiff brings a claim for denial of access to the courts under the Constitution against Ms. Marburger in her individual capacity.  (*Id.*, ¶¶ 316 & 317, PageID #54; *see also id.*, ¶ 14, PageID #5.)  In Count 10, Plaintiff brings a claim under Section 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), against Cuyahoga County relating to Ms. Marburger's failure to produce the exculpatory materials when requested.  (*Id.*, ¶ 357, PageID #60.)

These Defendants move to dismiss for failure to state a claim.  (ECF No. 11; ECF No. 12.)  Ms. Marburger claims absolute and qualified immunity and argues that Plaintiff failed to exhaust remedies in State court and brought his claim against her outside the statute of limitations.  Cuyahoga County argues for dismissal of the *Monell* claim against it both because Ms. Marburger did not commit a constitutional violation for the reasons she argues and for failure to allege an applicable policy,

practice, or custom that resulted in a deprivation of Mr. Jackson's constitutional rights.

Each Defendant attaches the following three documents to its motion to dismiss:

(1)     A letter dated August 19, 2016 from Ms. Marburger to Mr. Jackson's counsel at the time transmitting the redacted records produced in response to the public records request described in the complaint.  (ECF No. 11-1; ECF No. 12-1.) That letter invokes the Ohio Supreme Court's decision in *Steckman* as a basis for removing or redacting certain documents and information.  (ECF No. 11-1, PageID #154–55; ECF No. 12-1, PageID #188–89.)

(2)     A letter dated June 23, 2017 from Mr. Jackson's counsel to Ms. Marburger requesting the same records previously sought based on the Ohio Supreme Court's decision in *State ex rel. Caster v. City of Columbus*.  (ECF No. 11-2; ECF No. 12-2.)

(3)     A letter dated August 3, 2017 from Nora Graham, an assistant prosecutor, to Mr. Jackson's counsel responding to the letter of June 23, 2017 and transmitting the records requested.  (ECF No. 11-3; ECF No. 12-3.)

Generally, these documents provide the back-up or context for the allegations Plaintiff makes in the complaint regarding Ms. Marburger's role in initially withholding or redacting materials in response to Plaintiff's public-records request before her office ultimately produced them.  (*See* ECF No. 1, ¶¶ 68 & 69, PageID #11.)

## ANALYSIS

To withstand a motion to dismiss, Plaintiffs must allege facts that "state a claim to relief that is plausible on its face" and raise their "right to relief above the speculative level." *Cook v. Ohio Nat. Life Ins. Co.*, 961 F.3d 850, 855 (6th Cir. 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

When analyzing a complaint under this standard, the Court construes factual allegations in the light most favorable to the plaintiff, accepts them as true, and draws all reasonable inferences in the plaintiff's favor. *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015). But a complaint must offer more than "labels and conclusions" because "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quotation omitted). Rule 8, along with *Twombly* and *Iqbal*, requires a plaintiff to "plead enough factual matter to raise a plausible inference of wrongdoing." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (cleaned up). This inference "depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *Id.* (citations omitted). To survive a motion to dismiss, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability." *Twombly*, 550 U.S. at 555.

On a motion under Rule 12(b)(6), the Court's inquiry is limited to the content of the complaint, although it may also consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to or made part of the complaint. *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001). In this case, Defendants attach three letters to their motions to dismiss, presenting a peculiar problem under the basic principles under which courts consider motions at the pleading stage. On the one hand, the letters themselves are not specifically described in, exhibits to, or quoted in the complaint. In this sense they are extraneous material the Court should ordinarily not consider. *See Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 657 n.2 (6th Cir. 2021). On the other hand, Defendants attach these letters to put Ms. Marburger's actions alleged in the complaint in their broader context against the legal backdrop for her actions. Generally, whether specifically pled or not, such matters of law may be appropriate for consideration.

Plaintiff does not expressly oppose consideration of the three letters Defendants attach to their motions. In analyzing Defendants' motions to dismiss, the Court considers these letters for two reasons. First, they largely provide context about the state of the law at the time of Ms. Marburger's relevant conduct, which would otherwise be part of the Court's consideration in any event. Second, although not specifically referenced or described in the complaint, their existence is implied and confirms the relevant sequence of underlying events giving rise to Plaintiff's claims against these Defendants.

## I.    Absolute Immunity

When acting within the scope of her prosecutorial duties, a State prosecutor enjoys absolute immunity from civil liability. *Imbler v. Pachtman,* 424 U.S. 409, 420 (1997); *Howell v. Sanders*, 668 F.3d 344, 349–50 (6th Cir. 2012).  Defendants bear the burden of establishing absolute immunity. *Burns v. Reed*, 500 U.S. 478, 486 (1991); *Howell*, 668 F.3d at 350.  Absolute immunity remains "the exception rather than the rule, and has traditionally been reserved for those actors 'intimately associated with the judicial phase of the criminal process.'" *Spurlock v. Satterfield*, 167 F.3d 995, 1003 (6th Cir. 1999) (quoting *Imbler*, 424 U.S. at 430).   Generally, "qualified immunity rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns*, 500 U.S. at 486–87; *Spurlock v. Thompson*, 330 F.3d 791, 796 (6th Cir. 2003).  For these reasons, courts have "refused to extend [absolute immunity] any further than its justification would warrant." *Burns*, 500 U.S. at 487.

### I.A.    Disclosure of Exculpatory Evidence

At the outset, Ms. Marburger and the County advance two reasons they are entitled to absolute immunity as a matter of law.   First, they maintain that a prosecutor does not have an obligation to provide exculpatory information following conviction.   For this argument, Defendants rely on two cases:  *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52 (2009), and *Gavitt v. Born*, 835 F.3d 623 (6th Cir. 2016).

In *Gavitt*, the plaintiff brought a claim under Section 1983 following his release from prison after he served 26 years for felony murder in connection with a house fire

that claimed the lives of his wife and two children.  After developments in the field of fire science undermined the scientific basis for his conviction, the plaintiff claimed that the State's investigators misrepresented their efforts to determine the cause of the fire and that the prosecutor failed to disclose information about the reliability and error rate of the investigators.  The district court interpreted these allegations as a claim that the prosecution failed to disclose *Brady* material after the science changed years after the conviction.  On appeal, the Sixth Circuit upheld dismissal of the claim that Michigan failed to disclose *Brady* material on the basis of *Osborne*.  835 F.3d at 647–48.  Beyond that, the decision offers little more than an explanation of *Osborne* itself, and Defendants cite it for the proposition that a prosecutor has no obligation to disclose exculpatory material following conviction.  Therefore, evaluation of this argument turns on the Supreme Court's decision in *Osborne*.

In *Osborne*, the Supreme Court held that the Constitution does not confer a right, enforceable through an action under 42 U.S.C. § 1983, to post-conviction DNA testing.  557 U.S. at 55.  In reaching this conclusion, the Supreme Court explained that, following conviction, a State "has more flexibility in deciding what procedures are needed in the context of post-conviction relief" for a person to develop evidence supporting a claim of innocence.  *Id.* at 69.  Unlike before trial, when the accused enjoys the presumption of innocence, following conviction "due process does not dictate the exact form" a State's procedure for access to information or development of evidence must take.  *Id.*  That is, a convicted person continues to "have a liberty interest in demonstrating his innocence with new evidence under state law."  *Id.*

However, the Constitution does not circumscribe the particular requirements for disclosure or development of such evidence as it does before trial under *Brady v. Maryland*, 373 U.S. 83 (1963). "*Brady* is the wrong framework." *Osborne*, 557 U.S. at 69.

For this reason, Defendants' argument that there is *no* duty with respect to exculpatory information following conviction sweeps too broadly and finds no support in *Osborne*. To be sure, the Supreme Court recognized that *Brady* does not have application following a conviction, and the Sixth Circuit upheld this principle in *Gavitt*. But neither court holds that a prosecutor has *no* duty after conviction. To the contrary, the Supreme Court affirmed a person's liberty interest in demonstrating his innocence under procedures secured through State law. For this reason, Defendants' reliance on these authorities misses the mark. Further, unlike in *Gavitt*, Plaintiff does not plead a *Brady* claim against Ms. Marburger or the County. Instead, he asserts that their actions deprived him of access to the courts. Therefore, absolute immunity turns on whether Ms. Marburger acted within the scope of her duties in responding to Plaintiff's records request.

### I.B.    Functional Analysis

To determine whether a prosecutor acts within the scope of her prosecutorial duties, the Supreme Court uses a functional approach. *Buckley v. Fitzsimmons,* 509 U.S. 259, 269 (1993); *Burns,* 500 U.S. at 486. In this analysis, "the critical inquiry is how closely related is the prosecutor's challenged activity to his role as an advocate intimately associated with the judicial phase of the criminal process." *Ireland v. Tunis*, 113 F.3d 1435, 1443 (6th Cir. 1997) (quotation omitted). Prosecutorial duties

involve "initiating and pursuing a criminal prosecution." *Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011) (quoting *Imbler*, 424 U.S. at 410).  Under the functional approach, courts look to "'the nature of the function performed, not the identity of the actor who performed it' when assessing whether conduct is prosecutorial." *Id.* at 402 (quoting *Buckley* 509 U.S. at 269).  Investigative or administrative functions do not confer absolute immunity.  *Id.*

When Ms. Marburger responded to the public records request counsel made on behalf of Mr. Jackson, no legal proceedings were pending.  Under the law of this Circuit, "[t]he analytical key to prosecutorial immunity . . . is *advocacy*—whether the actions in question are those of an advocate." *Spurlock*, 330 F.3d at 798 (quoting *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (en banc)).  Responding to a public records request is not "intimately associated with the judicial phase of the criminal process" sufficient to confer absolute immunity. *Ireland*, 113 F.3d at 1443. It does not involve presenting the testimony of witnesses in court, arguing a motion, or otherwise performing the sorts of tasks of an advocate in the courtroom.  Indeed, prosecutors do not receive absolute immunity when providing legal advice to police during a pretrial investigation, *see Burns*, 500 U.S. at 494–96, or fabricating evidence before indictment, *see Buckley*, 509 U.S. at 274–76.  Accordingly, it is difficult to see how they have absolute immunity for actions taken when responding to a public records request.

Because Mr. Jackson's counsel made the request for public records, Defendants argue that Ms. Marburger knew that he was engaged in a form of post-conviction

advocacy that entitles her to absolute immunity.  Indeed, Plaintiff alleges that Ms. Marburger knew Mr. Jackson sought the police file as a precursor to post-conviction proceedings of one kind or another.  (ECF No. 1, ¶ 317–19, PageID #54.) In the functional analysis governing the inquiry, that allegation fails to transform Ms. Marburger's conduct into the type of advocacy entitling her to absolute immunity at the pleading stage.  In the end, the (alleged) fact that Mr. Jackson's records request occurred at a time when no proceedings were pending precludes absolute immunity.

## II.    **Qualified Immunity**

Qualified immunity protects public officials against lawsuits for civil damages where their conduct does not violate a plaintiff's clearly established constitutional rights.  *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (quotation omitted).  "To survive the motion to dismiss on qualified-immunity grounds, the plaintiff must allege facts that plausibly make out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right."  *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (quoting *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (cleaned up)).  Plaintiff bears the burden of establishing that qualified immunity does not bar suit.  *Id.*

In evaluating a claim of qualified immunity, the Sixth Circuit directs that a district court undertake two inquiries, in no particular order.  First, a court determines whether the facts alleged make out a violation of a constitutional right. *Id.* (citing *Martin*, 712 F.3d at 957).  Second, the court asks if the right at issue was clearly established at the time such that a reasonable person would know that his

conduct violated that right. *Id.* A plaintiff must satisfy each of these steps for his claim to proceed. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Under the law of this Circuit, "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015). Although insubstantial claims should be decided at the earliest stage of litigation possible, that point usually arises at summary judgment. *Id.* 433–34.

### II.A. Violation of a Constitutional Right

In 2002, the Supreme Court recognized that a plaintiff with a nonfrivolous legal claim has a constitutional right of access to the courts to bring that claim. *Christopher v. Harbury*, 536 U.S. 403, 414–15 & n.12 (2002). Like Section 1983, an access-to-courts claim creates no substantive rights; it provides an opportunity to remedy violations of rights created elsewhere. *Id.* at 415. Such claims may be backward- or forward-looking. *Id.* A forward-looking claim charges that a governmental actor has created or is maintaining some frustrating condition standing between the plaintiff and the courthouse door and seeks to remove that barrier. *Id.* at 413. In a backward-looking claim, like the one here, the plaintiff alleges that the government bars access to courts by concealing or destroying evidence so that the plaintiff cannot obtain an adequate remedy on the underlying claim. *Id.* at 413–14.

### II.A.1. Elements

An access-to-courts claim has four elements: (1) Plaintiff had a nonfrivolous underlying claim; (2) State actors took obstructive actions; (3) those actions caused

substantial prejudice to the underlying claim, for which a State court cannot provide a remedy; and (4) Plaintiff would have sought relief on the underlying claim that is otherwise now unattainable. *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013). As a pleading matter, "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint." *Christopher*, 536 U.S. at 415. In other words, the complaint must plead the underlying cause of action and the remedy lost. *Id.* at 416.

Defendants challenge Plaintiff's ability to satisfy the elements for an access-to-courts claim as a matter of law for two reasons. First, Defendants fault Plaintiff for failing to plead a nonfrivolous underlying claim that Mr. Jackson lost through Ms. Marburger's alleged concealing of evidence. But the complaint avers that Mr. Jackson sought to file "motions for new trial and petitions for post-conviction relief alleging the violation of his due process rights based on the withholding of the police reports containing material, exculpatory evidence." (ECF No. 1, ¶ 320, PageID #55.) Further, it alleges that Mr. Jackson "lost post-conviction litigation which he pursued from 1991 to 2013 without the police exculpatory reports." (*Id.*, ¶ 322.) Accordingly, the complaint states a plausible access-to-courts claim.

Defendants argue that Mr. Jackson did not permanently lose these remedies; indeed, the complaint points out that the State initially acquiesced in Mr. Jackson's motion for a new trial and eventually moved to dismiss the charges. (*Id.*, ¶¶ 80 & 81, PageID #13.) In other words, Defendants rely on the fact that Mr. Jackson (belatedly) obtained relief to defeat this cause of action as a matter of law. This argument

confuses backward-looking and forward-looking claims and the aim of each. Further, it seeks effectively to eliminate the cause of action, which the Court may not do.

Second, Defendants maintain that damages will adequately compensate Mr. Jackson for his delayed release and exoneration, foreclosing the claim as a matter of law. Put another way, an access-to-courts claim may not proceed where it seeks to recover the damages a plaintiff would recover on civil-rights claims. But Plaintiff's claims against Ms. Marburger and the County seek to vindicate different rights and interests than those against the other Defendants. As a result, the damages flowing from these alleged harms differ. In this respect, Defendants' reliance on *Hunt v. City of Cleveland*, 563 F. App'x 404, 410 (6th Cir. 2014), is misplaced.

### II.A.2. Exhaustion

Defendants rely on *Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997), to argue that an access-to-courts claim fails as a matter of law where a plaintiff fails to make any attempt to access the courts to remedy the harm complained of. Put another way, Defendants maintain that Ms. Marburger's actions, as pled, did not bar the courthouse doors because Mr. Jackson had other options available to him to remedy the withholding of the records sought.

In *Swekel*, two speeding cars hit and seriously injured the victim, who passed away nearly three weeks later. The officer who initially responded was removed from the case, police log sheets disappeared, police did not interview the victim before he died, and the police failed to pursue leads that the second driver was the son of a high-ranking police officer. The decedent's widow claimed that the police deprived her of the right to pursue a wrongful death suit against the high-ranking officer's son

14

because she was unable to learn his identity within the limitations period.  Because the widow could have pursued a John Doe suit in State court, the district court granted summary judgment on the access-to-courts claim, and the Sixth Circuit affirmed.  On appeal, the Sixth Circuit described the actions of the defendants as "reprehensible" but agreed that the decedent's widow had the opportunity to access the State courts through a John Doe action and had made no effort to do so.  119 F.3d at 1264.

Here, in contrast, the complaint alleges that Ms. Marburger's actions were intended to frustrate Mr. Jackson's efforts at exoneration through post-conviction litigation in some form and had their intended effect.  (*See, e.g.*, ECF No. 1, ¶ 317, PageID #54.)  Unlike the widow in *Swekel*, Mr. Jackson did not sleep on his rights.  Moreover, the complaint alleges that Mr. Jackson previously attempted to obtain relief through the courts, to no avail.  (*Id.*, ¶ 322, PageID #55.)  And, as Defendants note, there is no exhaustion requirement, meaning that Plaintiff did not have to pursue mandamus or other relief in State court before asserting his access-to-courts claim in this action.

### II.B.  Clearly Established Right

For a right to be clearly established, it "must be sufficiently clear [such] that every reasonable official would have understood that what [s]he is doing violates that right."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotations omitted) (cleaned up).  In other words, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  Rather than defining a clearly

established right at a high level of generality, clearly established law must be particularized to the facts of the case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). In this way, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Pauly*, 137 S. Ct. at 551.

Backward-looking access-to-courts claims "are much less established than forward-looking claims." *Hunt*, 563 F. App'x at 410. Even after the events at issue, the Sixth Circuit described the claim as "a work in progress." *Green v. City of Southfield, Mich.*, 925 F.3d 281, 288 (6th Cir. 2019). At least as of 2013, however, the Sixth Circuit "has recognized" such claims and defined its elements with particularity. *Flagg*, 715 F.3d at 173; *see also Hunt*, 563 F. App'x at 410. Although the claim might remain a work in progress nationally, as noted in *Green*, such is not the case in this Circuit.

Defendants argue that, when Ms. Marburger responded to Mr. Jackson's public records request, no decision from the Supreme Court or the Sixth Circuit had held that failure to disclose exculpatory evidence in response to a post-conviction public records request violated the right of access to the courts as a prelude to post-conviction litigation. But clearly established law does not require "a case directly on point." *al-Kidd*, 563 U.S. at 741. Instead, existing precedent must place the question

beyond debate, as the law of this Circuit did before the events at issue here. To the extent Defendants argue that *Arrington-Bey* places a burden on Plaintiff to identify a specific case with a similar fact pattern, that ruling and the discussion in *Pauly* on which it relies both involve police officers responding in a matter of moments to life-threatening situations. Here, in contrast, Ms. Marburger took nearly two months to respond to Mr. Jackson's public records request. (ECF No. 1, ¶¶ 65 & 68, PageID #11.) She is a trained and experienced lawyer responding in an office setting over a considerably longer period of time. Unlike a police officer responding to a dynamic scene in real time, Ms. Marburger had time to consider whether withholding exculpatory information might violate Mr. Jackson's rights or prejudice his efforts at exoneration. At bottom, the inquiry turns on whether a reasonable person would know her conduct was unlawful. *Arrington-Bey*, 858 F.3d at 993. At this stage of the proceedings, Plaintiff has stated a claim that Ms. Marburger knowingly violated his rights. *See Pauly*, 137 S. Ct. at 551.

Additionally, Defendants maintain that Ms. Marburger responded to Mr. Jackson's public records request pursuant to State law, which governed the request and the response of the prosecutor's office. Plaintiff does not base his claim on State law. Nor does compliance with State law excuse an alleged violation of rights the Constitution and laws of the United States secure. Moreover, Plaintiff alleges that Ms. Marburger withheld information from the Cleveland police's investigatory file specifically to frustrate his access to the courts in a preemptive effort to defeat post-conviction litigation in which Mr. Jackson sought to establish his innocence.

* * *

Discovery might bear Plaintiff's claim out, in which case Ms. Marburger would not be entitled to qualified immunity. Alternatively, a jury could fairly determine that a reasonable person responding to Mr. Jackson's public records request under Ohio law as it existed at the time would act the way Ms. Marburger did. Contrary to Defendants' arguments, these issues do not present pure legal questions capable of neat resolution at the pleading stage. In this case, there is no reason to deviate from the general rule in this Circuit that qualified immunity is best decided at summary judgment. *Wesley*, 779 F.3d at 433. Because Plaintiff has stated a claim against Ms. Marburger, the County is not entitled to dismissal for any constitutional violation she might have committed.

## III. *Monell* Claim

To be liable under *Monell*, the entity, "through its deliberate conduct," must have been "the 'moving force' behind the injury alleged" and have "intentionally" deprived the plaintiff of a federally protected right. *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404–05 (1997). Local governing bodies can be sued under Section 1983 only where an official policy or custom causes the alleged constitutional violation. *Johnson v. Hardin Cnty.*, 908 F.2d 1280, 1285 (6th Cir. 1990) (citing *Monell*, 436 U.S. at 690–91).

An official policy includes "a policy statement, ordinance, regulation, or decision officially adopted and promulgated . . . ." *Johnson*, 908 F.2d at 1285 (quoting *Monell,* 436 U.S. at 690). In contrast, a custom "has not received formal approval through . . . official decisionmaking channels." *Id.* (quoting *Monell* at 690–91).

18

"Before a custom can be the basis for a civil rights violation, the custom must be 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 1004 (6th Cir. 1994) (quoting *Feliciano v. Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (quoting *Monell*, 436 U.S. at 691)). Under *Monell* and its progeny, there are four ways a plaintiff can demonstrate a policy, practice, or custom that could allow for municipal liability:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

### III.A. Conclusory Allegations

The County argues that Plaintiff fails to plead a *Monell* violation under any of these available theories. Plaintiff asserts that he has stated a claim under each. Therefore, the Court addresses each in turn.

*First*, the County argues that Plaintiff fails to plead anything other than conclusory assertions that do little more than recite the applicable legal standards. Not so. Plaintiff's complaint identifies the specific "policies, practices and customs" of the County and the prosecutor's office as the "widespread practice, custom and unwritten policy directing members of the [Cleveland police] to not disclose exculpatory police reports and files in response to public records requests." (ECF No. 1, ¶ 76, PageID #12.) Moreover, the complaint alleges that this unwritten policy,

19

practice, or custom was well established. (*Id.*, ¶ 360, PageID #61.) Therefore, Plaintiff sufficiently pleads the existence of an official policy.

*Second*, the County argues that the complaint contains no allegation that an official with final decision-making authority ratified illegal actions under the policy, practice, or custom at issue. But the complaint targets the actions of Ms. Marburger, giving rise to an inference that she is such a person or, alternatively, that she was not acting on her own authority or initiative. In making this determination, the Court takes no account of the conclusory allegation that the policies, practices, and customs complained of "were approved, encouraged, and/or ratified by policymakers for the Defendant County and [Cleveland police] with final policy making authority." (ECF No. 1, ¶ 357, PageID #60.)

With respect to each of these theories, the County maintains that the letters attached as exhibits to its motion show that Ms. Marburger redacted the exculpatory information in the police files requested pursuant to the Ohio Public Records Act, not pursuant to some unwritten policy, practice, or custom. That might well prove to be the case. At the pleading stage, however, those letters might constitute a pretext, particularly given Plaintiff's allegations. Such a claim, at least, is not implausible. Further, as a matter of law, it is difficult to see how the Ohio Public Records Act can justify or excuse an otherwise actionable violation a person's constitutional rights.

### III.B. Deliberate Indifference

Regarding the other two methods of pleading a *Monell* claim—inadequate training and supervision and tolerance or acquiescence in violations of federal rights—the parties debate whether Plaintiff pleads deliberate indifference on the

part of the County such that a claim may proceed on these theories. A governmental body's "fail[ure] to act in response to repeated complaints of constitutional violations by its officers" constitutes deliberate indifference for an inadequate training claim. *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999). And deliberate indifference in the "tacit approval of the unconstitutional conduct" can "amount to an official policy of inaction." *Arendale v. City of Memphis*, 519 F.3d 587, 599-600 (6th Cir. 2008). "'Deliberate indifference' is the reckless disregard of a substantial risk of serious harm; mere negligence or even gross negligence, will not suffice." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013).

Plaintiff's complaint contains only conclusory allegations of inadequate training on the part of the County. The first mention of inadequate training comes 213 paragraphs into the complaint. (ECF No. 1, ¶ 213, PageID #32.) This particular allegation is wholly lacking in factual support, as Rule 8 requires. Although the complaint goes on to allege a pattern and practice of inadequate training dating back to the early 1970s and continuing since then, these allegations focus on the City of Cleveland and its police department. (*Id.*, ¶¶ 214–45, PageID #33–42.) None of these allegations relates to the County or the particular policy, practice, or custom Plaintiff maintains violated his rights. Plaintiff argues that his allegations in Paragraph 76 of the complaint state a claim for inadequate training, but the facts alleged there do not mention training or instruction at all or give rise to an inference that the violation alleged results from inadequate training or supervision. (*See id.*, ¶ 76, PageID #12–13.)

As for acquiescence in violations of federal rights, the complaint references the same or similar policy, practice, or custom that was at issue in other litigation, contrary to the County's claim.  (*Id.*)  At the pleading stage, conduct pursuant to an alleged policy, practice, or custom of "directing members of the [Cleveland police] to not disclose exculpatory police reports and files in response to public records requests" might surpass even gross negligence and plausibly rise to the level of reckless disregard for a substantial risk of serious harm.  *Santiago*, 734 F.3d at 591.  In the current procedural posture, Plaintiff as the non-moving party enjoys the benefit of the inference that such conduct occurring in more than one case amounted to a persistent and widespread policy, practice, or custom.

*　　*　　*

For these reasons, Plaintiff's complaint states a claim on three of the four methods *Monell* provides for pursuing liability on the part of the County.  To the extent that the County argues that the complaint alleges Ms. Marburger, not the County itself, was the moving cause of the alleged violations of Mr. Jackson's rights, the County overlooks that a party may plead in the alternative.  Fed. R. Civ. P. 8(d)(3).

## IV.    Statute of Limitations

Section 1983 does not provide a statute of limitations.  Therefore, federal courts borrow the applicable limitations period from the most analogous one available under State law.  *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).  Further, the Supreme Court's decisions in *Wilson v. Garcia*, 471 U.S. 261, 275 (1985), and *Owens v. Okure*, 488 U.S. 235, 250 (1989), direct use of Ohio's residual two-year limitations period for personal injuries in Section 2305.10(A) of the Ohio Revised Code.

22

Federal law governs when Plaintiff's federal claims against Defendants accrues. *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *see also Green v. City of Southfield*, 759 F. App'x 410, 414 (6th Cir. 2018) (citing *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)). "The statute of limitations commences when the plaintiff knows or has reason to know of the injury which is the basis of h[is] action." *Green*, 759 F. App'x at 414 (quoting *Sevier*, 742 F.2d at 273) (cleaned up). "[A] plaintiff has reason to know of [his] injury when [he] should have discovered it through the exercise of reasonable diligence." *Id.*

Under the law of this Circuit, *see Sampson v. Garrett*, 917 F.3d 880, 881 (6th Cir. 2019), an access-to-courts claim is subject to *Heck v. Humphrey*, 512 U.S. 477, 487 (1994), which bars suit under Section 1983 where a successful claim "would necessarily imply the invalidity of [a State prisoner's] conviction and sentence." In other words, "*Heck* modified the general rule of accrual of § 1983 actions by 'delay[ing] what would otherwise be the accrual date of a tort action until the setting aside of an *extant conviction* which success in that tort action would impugn.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 384 (6th Cir. 2014) (citing *Wallace*, 549 U.S. at 393). Under *Heck*, the legal bar to filing suit is lifted once the underlying conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 487.

According to the complaint, Mr. Jackson's conviction was vacated on November 28, 2018 (ECF No. 1, ¶ 80, PageID #13), but it was not until August 29, 2019 that the

State moved to dismiss the charges against Mr. Jackson (*id.*, ¶ 81).  Between these two dates, the complaint alleges that the State intended to re-try Mr. Jackson.  (*Id.*, ¶ 80.)  The parties debate on which of these dates the statute of limitations begins to run.  Generally, *Heck* requires termination of a prior criminal proceeding in favor of the accused before the limitations period begins to run.  512 U.S. at 484–85; *see also McDonough v. Smith*, 139 S. Ct. 2149, 2157 (2019).

Although *Heck* does not reach some claims where a conviction is merely anticipated, *Wallace*, 549 U.S. at 393 (false arrest), Plaintiff's claims here are not of that variety.  Indeed, Mr. Jackson faced the threat of prosecution until August 29, 2019, and his parallel civil action depends on the invalidity of his underlying conviction—a fact not determined until 2019.  Therefore, because *Heck*'s favorable-termination requirement did not commence the running of the limitations period until dismissal of the charges, Plaintiff's claims are timely.  Defendants concede that the same analysis governs the access-to-courts claim against Ms. Marburger and Section 1983 claim under *Monell* against the County.  (ECF No. 12, PageID #183.)

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Ms. Marburger's motion to dismiss (ECF No. 11) and **GRANTS IN PART** and **DENIES IN PART** the County's motion to dismiss (ECF No. 12).  Specifically, the complaint states a *Monell* claim except that it does not state a claim for inadequate training or supervision.

**SO ORDERED.**

Dated:  February 22, 2022

_____

J. Philip Calabrese
United States District Judge
Northern District of Ohio