## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES JACKSON, | ) | Case No. 1:21-cv-01679 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Jonathan D. Greenberg |
| CITY OF CLEVELAND, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff Charles Jackson spent over 27 years in prison for a crime he did not commit. That much the parties agree on. Their agreement ends in the sprawling record, dating back more than 30 years, relating to Plaintiff's claims that the police officers who investigated the case resulting in his conviction and the City of Cleveland, which employed them, violated his constitutional rights, and in the parties' competing claims of misconduct in discovery. Plaintiff seeks a summary judgment that Defendants violated his constitutional rights. For their part, Defendants move for summary judgment on the grounds that they did not and are entitled to qualified immunity in any event. For the reasons that follow, and because genuine disputes of material fact preclude resolution of these issues without a trial, the Court **DENIES** Plaintiff's motion for summary judgment and **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.

**ORAL ARGUMENT**

After review of the summary-judgment record, the Court exercises its discretion not to hold oral argument.  During pretrial management of this case, the Court held status conferences and hearings that provided it with ample familiarity with the parties' respective claims and defenses.  Further, the parties' extensive briefing adequately frames the issues for review.  On this record, the Court finds that ruling without oral argument better serves the interest of judicial economy by preserving the resources of the Court and the parties.  In fact, based on the Court's review of the record, the parties' disagreements about nearly every fact and argument would not aid in the disposition of the pending motions or bring any greater clarity to the state of the record or the parties' respective positions.

**STATEMENT OF FACTS**

The murder giving rise to this federal civil rights lawsuit occurred in 1991.  And the record implicating the practices, policies, and procedures of the Cleveland police stretches back even farther.  Following his conviction in 1991, Mr. Jackson was sentenced to 20 years to life in prison for the murder of Joe Travis and 7 to 25 years for the attempted murder of Ronald Lacey.  After years of appeals and post-conviction proceedings, exculpatory evidence emerged, resulting in Mr. Jackson's exoneration in 2018.

On the parties' cross-motions for summary judgment, the Court construes the facts in Defendants' favor in ruling on Plaintiff's motion for summary judgment, and in Plaintiff's favor on Defendants' motion for summary judgment.  The parties

2

sharply dispute much of the evidence. Where the record presents material disputes or competing versions of the facts, the Court so notes. On summary judgment, the record consists of nearly 300 pages of briefs and more than 21,000 pages of evidentiary materials (not including a few dozen additional pages briefing ancillary issues that arose in connection with summary judgment or the hundreds of pages of materials in the record related to these issues).

Additionally, counsel have not helped matters. The parties' citations to the record were often incorrect, mischaracterized the evidence, or failed to support the facts cited. At times, they referenced an entire report or deposition without directing the Court to specific pages—in many such cases the documents were not text searchable. Such practices amount to a failure to provide support under Rule 56. *See* Fed. R. Civ. P. 56(c)(1)(A) & (3); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Subject to these caveats, the record on summary judgment shows the following facts.

### A. Orientation to the Record

To help understand the parties' respective claims and defenses, the Court begins with a brief overview of the different types of materials in the record that bear on the issues in dispute and the facts at this stage of the proceedings. Even here, the parties contest much about the retention of and access to the files.

### A.1. The Case File

Three different versions of the case file figure into the parties' respective claims and defenses: (1) the homicide file, also referred to as the police investigation file (ECF No. 115-26; ECF No. 115-27); (2) the statement unit file (ECF No. 115-28; ECF

No. 115-29); and (3) the prosecutor's archived file (ECF No. 104-4, PageID #2922–3380).

### A.1.a. Homicide File

As one might suspect from its name, the homicide detectives who worked on the case used and created the homicide file.  (ECF No. 115-26; ECF No. 115-27.) When detectives worked on a case, they kept three different copies of the homicide file:  (1) a work copy, (2) a file copy, and (3) the original copy.  (ECF No. 115-1, PageID #6082–83.)  The original copy contained the originals of documents in the file, the ones completed in "blue and black ink."  (*Id.*, PageID #6083; *see also* ECF No. 108-2, PageID #3774.)  The work copy was a copy of the original file given to the next assigned detective as different detectives worked on the case.  (ECF No. 115-1, PageID #6083; *see also* ECF No. 108-2, PageID #3775.)  Finally, the file copy was kept under lock and key at the office, available should any detective learn additional information, receive new information, or need to corroborate or confirm information. (*Id.*, PageID #6083–84; ECF No. 108-2, PageID #3803.)

These files included various reports that detectives filled out during an investigation.  A Form 1 report was used to provide information to a supervisor, including information received at the scene of a crime.  (ECF No. 116-2, PageID #6975.)  When a superior officer directed or the policy of the Cleveland police required a homicide detective to make a written report, homicide detectives made a supplemental report on Form 10.  (*Id.*, PageID #6964–65; *see also id.*, PageID #6963–65.)

Also, the homicide unit maintained a property log containing a complete list of the evidence recovered from the crime scene.  (ECF No. 128-4, PageID #12729–40.)

### A.1.b. The Statement Unit File

In 1991, to present a case to the prosecutor, the Cleveland police provided the file copy that was sent to the statement unit.  (ECF No. 115-1, PageID #6084 & #6088.)  Following a suspect's identification or arrest, the Cleveland police provided copies of its files and reports, including the homicide file, to the statement unit, which then provided those materials to the prosecutor's office.  (*Id.*)  A copy of the file copy along with any statements from victims, suspects, or witnesses were provided to the statement unit.  (*Id.*)  Accordingly, the prosecutor's office should receive the file copy containing all reports plus the statements that the statement unit had.  (*Id.*, PageID #6085–86 & #6088.)

In this case, a copy of at least portions of the statement unit file was transferred from the police to the prosecutor's office and is included in the prosecutor's archived file.  (*See* ECF No. 115-27, PageID #6647; ECF No. 115-28, PageID #6722; ECF No. 104-4, PageID #3243.)  The statement unit file contains 53 pages—121 fewer pages than the homicide file.  (*Compare* ECF No. 115-28 & 115-29, *with* ECF No. 115-26 & ECF No. 115-27.)

### A.1.c. The Prosecutor's Archived File

The prosecutor's archived file should contain the homicide file and the statement unit file.  (ECF No. 104-4, PageID #2922–3381.)  In 2018, the file from this case was digitized and now exists as a 449-page digital file.  (ECF No. 140-4, ¶¶ 5 & 7, PageID #2932.)

*     *     *

At the outset, it is important to note that some reports, documents, and statements appear in one or two of these files but do not appear in the other(s).

### A.2.    The Scientific Investigation Unit

Investigators collected physical evidence from the apartments at 13902 Othello Avenue where Joe Travis was murdered.  The parties dispute the chain of custody for that evidence.  By way of background, during the relevant times, evidence from a crime scene was collected and taken to the scientific investigation unit of the Cleveland police.  (ECF No. 104-2, PageID #1650.)  The "scientific investigation unit" or "SIU" was a colloquial reference to the crime scene and records technical section of the Cleveland police.  (*Id.*, PageID #1650–51.)  To complicate matters further, individual police officers and detectives often referred to the unit using different terminology.  (*Id.*, PageID #1651.)  Within this unit, there were three principal areas: (1) a forensic lab; (2) a photography lab; and (3) the crime scene and record section, which included fingerprint examiners.  (*Id.*, PageID #1613.)  In 1991, a handgun registration unit also existed but was eventually dissolved.  (*Id.*, PageID #1655–56.)

### A.2.a. Forensic Laboratory

When evidence was brought to the forensic laboratory, evidence technicians who were specially trained police officers attached a unique six-digit number to the evidence, entered that number into a logbook, and created a laboratory report card with that six-digit number.  (*Id.*, PageID #1623 & #1806; *see also id.*, PageID #1669.)  In the logbook, the unique six-digit number identified the name of the person to whom the evidence belonged, the type of evidence it was, and when the lab received it,

among other information.  (*Id.*, PageID #1623; *see also id.*, PageID #1669.)  Then, an analyst typed that information onto the matching laboratory report card with the same six-digit number and other identifying information.  (*Id.*; *see also id.*, PageID #1670.)

In addition, the analyst maintained a three-by-five index card of the person with whom the evidence was associated, the six-digit lab number, what the evidence was, and the crime.  (*Id.*, PageID #1624–25; *see also id.*, PageID #1670–71.)  That index card was then placed in a name file.  (*Id.*, PageID #1625; *see also id.*, PageID #1670.)  For example, if someone wanted information on the evidence submitted for "Joe Smith" from the year 2000, lab personnel looked up "Joe Smith" for that date in the name file and pulled the index card, which listed the laboratory numbers associated with that person.  (*Id.*)  Then, the person would go to the laboratory report card file and retrieve those cards, which contained all the lab results for Joe Smith on that date.  (*Id.*)

With the laboratory numbers, employees could pull the laboratory report card files and access all the lab results.  (*Id.*)  The name file and the forensic laboratory reports were kept in the same room but in different locked filing cabinets.  (*Id.*, PageID #1626.)  Only laboratory employees, including some police officers who were firearms examiners, had access to the filing cabinets.  (*Id.*)  Homicide detectives did not have access to these filing cabinets.  (*Id.*, PageID #1626–27.)  Though it is difficult to remember, and largely unfamiliar to the law clerks assisting with this ruling, things worked this way before computers and the digital revolution that came later.

*　　　*　　　*

After the evidence was properly processed, a technician performed the prescribed analysis. (*Id.*, PageID #1670.)  When detectives brought evidence to the laboratory, they helped direct the analysis. (*Id.*, PageID #1681–82.)  For example, in the case of a stabbing, a detective might tell the technician to look for blood or holes in clothing or, in the case of a rape, request tests for semen. (*Id.*, PageID #1682.)  In other cases, technicians knew what to look for. (*Id.*, PageID #1675–76.)  For example, in drug cases, technicians knew to determine the amount and type of drug. (*Id.*)

With respect to specific types of evidence, the technical unit received blood for analysis but did not have the capability for DNA testing in 1991. (*Id.*, PageID #1688.)  Sometimes, blood evidence was sent to the medical examiner's office instead. (*Id.*)  Detectives made the decision where to send the blood for analysis. (*Id.*, PageID #1689.)

When analysis was complete, technicians documented the results on the laboratory card and sealed the evidence. (*Id.*, PageID #1671.)  The technician did not call the results out because, given the volume of the scientific investigation unit's work, "[i]t would be impossible to call everybody that had evidence submitted to [the SIU]." (*Id.*, PageID #1687.)  Then, the evidence was taken to the Cleveland police property room, where officers behind the counter signed for the evidence to take custody of it. (*Id.*)  The officer who took custody of the evidence signed the laboratory card. (*Id.*)

The parties dispute who had responsibility to check on test results, particularly after a case was presented to the prosecutor.  However, the record is clear that the technician could and did present test results to any detective or prosecutor who asked for the results.  (*See id.*, PageID #1621–22; *see also id.*, PageID #1697 & #1744.)  If a detective who brought the evidence to the laboratory requested a phone call when the testing was done, the technician would call to advise that work on the evidence was completed.  (*Id.*, PageID #1682.)  This practice did not happen in every case or with all evidence but "wasn't uncommon."  (*Id.*, PageID #1683.)  When that happened, the technician provided the results and made a copy of the report if requested.  (*Id.*, PageID #1684.)  In any case, detectives knew that the laboratory report was available for their review (*id.*), and it was "not unusual" for homicide detectives to call the scientific investigation unit to get "verbal reports on test results" (*id.*, PageID #1780).  After a homicide file went to the prosecutor, inquiries to the scientific investigation unit usually came from the prosecutor's office.  (*Id.*, PageID #1780; *see also* ECF No. 104-4, PageID #2868.)

### A.2.b. Fingerprint Examination

When a crime scene detective from the technical section arrived at a scene, he collected and documented evidence, including lifting any fingerprints and gathering any trace evidence.  (ECF No. 104-2, PageID #1630.)  When the detective returned, he filled out a supplementary report (also known as a Form 10 report), listing the crime scene number for the specific location.  (*Id.*)  That report listed the number of photographs taken, stated whether he lifted any fingerprints, and identified other items from the crime scene.  (*Id.*)  Any fingerprints taken at a crime scene received a

latent print number in a logbook. (*Id.*; *see also id.*, PageID #1633.) Latent prints were then placed into a lockbox. (*Id.*)

The following morning, fingerprint analysts would review fingerprint evidence to determine if they were of sufficient quality to submit to the Automated Fingerprint Identification System, also known as AFIS. (*Id.*; *see also id.*, PageID #1676.) This computer system came online in 1990 and stored fingerprints in something of a library, which included both latent prints from different crime scenes and fingerprints taken from people at booking, for example. (*Id.*, PageID #1635.) Fingerprints put in the system might match those from another crime scene or a person. (*Id.*) If the fingerprints matched others in the system, the fingerprint examiner called the detective to advise him of the results. (*Id.*, PageID #1634.) If the results from AFIS did not match the suspect in a case, analysts generally did not report that information to detectives unless specifically asked; however, if a detective requested comparison to a suspect, the result was communicated. (*Id.*, PageID #1636–37.) If the prints were "of no value," meaning they were not of sufficient quality for a potential match, the fingerprints were not entered into AFIS and were stored in a file cabinet. (*Id.*, PageID #1634.)

Aside from reviewing the quality of fingerprints and entering fingerprints into the AFIS database, analysts also compared fingerprints. (*Id.*, PageID #1676–77.) If an officer requested a print comparison, the fingerprint analyst documented the request and the results on the envelope containing the latent prints. (*Id.*, PageID #1676–78.) As with the forensic laboratory, the parties dispute who had the

10

responsibility to check on the test results from fingerprint comparisons, particularly after a case was presented to the prosecutor.

### A.2.c. Photography Lab

In a detective's supplementary report, a Form 10 report, he identified how many photos were taken at the crime scene. (*Id.*, PageID #1630.) When crime scene photos came to the technical unit for analysis, film was stored overnight then processed in the morning. (*Id.*, PageID #1641.) In 1991, the photography lab had a dark room and used 35mm film. (*Id.*, PageID #1640.) Three civilians worked in the photography lab to develop and print the film. (*Id.*) While the photography lab technicians developed and analyzed crime scene film, mugshots and some victim photos were maintained in the lab as well. (*Id.*, PageID #1641–42.)

### A.3.   Other Logbooks

During the relevant times, the Cleveland police used various logbooks to track information and evidence. There is a logbook for the property unit. (ECF No. 128-4, PageID #12748–13164.) The record also contains logbooks for signing out evidence from the property unit (*id.*, PageID #13165–68) and a logbook of the homicide unit's property (*id.*, PageID #12725–40).

### A.4.   Policies, Practices, and Procedures

At the relevant times, the Cleveland police required officers to report on all matters that they investigated, either orally or in writing. (ECF No. 116-5, PageID #7121.) All required written reports, including progress made on the investigations handled that day, had to be made before officers went off duty. (*Id.*; *see also* ECF No. 116-2, PageID #6964–65.) The Cleveland police assigned two homicide detectives to

11

an investigation as the lead detectives who followed through on any leads.  (ECF No. 116-1, PageID #6826–27.)  Department policy at the time required detectives to investigate all matters thoroughly and pursue all open leads.  (*Id.*, PageID #6833.)  Superior officers bore responsibility for maintaining the case file and ensuring proper documentation.  (*Id.*, PageID #6827–28 & #6831–32.)

In 1991, it was common practice for personnel in the scientific investigation unit to give verbal reports on test results to homicide detectives and prosecutors.  (ECF No. 104-2, PageID #1779–80.)  The unit's policy was "to have all of our results available to prosecutors and detectives" that wanted them.  (*Id.*, PageID #1697.)  Prosecutors often requested additional testing or analysis for trial, such as comparing latent fingerprints or printing various photographs.  (*Id.*, PageID #1782.)  When personnel from the scientific investigation unit testified in court, they brought evidence and original reports with them and maintained custody over them.  (*Id.*, PageID #1672–73 & #1712–13.)  Then, they returned those materials to their proper repositories and left copies of reports for the court record.  (*Id.*)

### A.5.   Introduction to the Key Players

| Key Player | Role |
|---|---|
| Joe Travis | Murder victim at the Othello apartments. |

12

| | |
|---|---|
| Ronald Lacey | At the Othello apartments with Joe Travis when Travis was killed.  The suspect put a gun to Lacey's head and pulled the trigger, but he survived because he dropped to the ground and the bullet ricocheted off a metal buckle on his hat.  Identified the suspect as a man he knew as Sweetman.<br><br>Made two statements to police.  First, to Detectives Gedeon and Nolan, prompting the photographic identification of the suspect.  Second, to Detectives Masilonis and Taliano, including a verbatim statement that he signed and another photographic identification of the suspect.<br><br>At trial, identified Mr. Jackson as the suspect. |
| Thomas Salvano | At the Othello apartments the night of the murder to buy drugs from Omelia "Rita" Tucker when he got into an argument with Charles "Dog" Davis.<br><br>Later, made several statements to police and attested that he did not see who fired the shots, but that Mr. Jackson did not.  Refused to testify against Mr. Jackson, telling detectives that Mr. Jackson was not the shooter. |
| Charles "Dog" Davis | At the Othello apartments the night of the murder when he punched out a window and threatened to shoot up the building.  Fired several shots inside the building and then left. |
| Omelia "Rita" Tucker | At the Othello apartments the night of the murder.  Called police after the incident with Charles "Dog" Davis and spoke to the police when they arrived.<br><br>After Joe Travis was killed, Tucker found his dead body and called the police.  When the police arrived, said that she could not identify the suspect but that he got into a gray automobile after the shooting.<br><br>At trial, identified Mr. Jackson as the suspect. |

13

| | |
|---|---|
| Don Davis | Brother of Charles "Dog" Davis.  At the Othello apartments the night of the murder.  Several hours after Charles "Dog" Davis left the apartment building, Don Davis entered the apartment building with another man, the suspect. |
| "Sweetman" | Suspect in the murder of Joe Travis. |
| James Morris | Nephew of Charles "Dog" Davis.  Looked like Mr. Jackson. |
| Bobby Rodgers | Interviewed by Detective Gray on the day of the murder.  Said that the nephew of Charles "Dog" Davis killed Joe Travis and that the brother of Charles "Dog" Davis was also there.  Identified a man named "Ron" who saw the shooting. |
| Charles Jackson | Wrongfully convicted for the murder of Joe Travis.  Served 27 years in custody.  Had the nickname Sweetman in the neighborhood. |

Police:

| | |
|---|---|
| Joseph Masilonis | Lead Detective.  Homicide unit.  Took Lacey's second statement and conducted a photographic identification with Lacey. |
| Michaelene Taliano | Lead Detective.  Homicide unit.  Took Lacey's second statement and conducted a photographic identification with Lacey. |
| Henry Tekancic | Lieutenant.  Oversaw the investigation. |
| Edward Gray | Detective.  Interviewed Bobby Rodgers on the day of the murder. |
| Parker Adrine | Detective.  Interviewed Tucker and Joe Travis's mother, among others, in the days after the murder.  Testified before the grand jury. |
| Samuel Reese | Detective.  Interviewed Tucker and Joe Travis's mother, among others, in the days after the murder. |

14

| Frank Gedeon | Detective.  Strike force unit.  Took Lacey's first statement and conducted a photographic identification with Lacey. |
| William Nolan | Detective.  Strike force unit.  Took Lacey's first statement and conducted a photographic identification with Lacey. |
| John Healy | Detective.  Presented the case to the prosecutor to take to the grand jury.  Interviewed Tucker and Lacey.  Arrested Mr. Jackson. |
| Robert Moore | Detective.  Did some work at the Othello apartments with Detective Adrine regarding drug activity there. |
| Bruce Taylor | Detective.  Ran firearm tests at the forensics lab.  Testified at trial. |
| Donald Malloy | Detective.  Scientific investigation unit.  Collected evidence at the crime scene, including photographs, latent prints, a cigarette pack, a broken bottle top, 9-millimeter casings, blood, and a tire.  Testified at trial. |

Prosecutors:

| Mary Hollern | Police prosecutor.  Reviewed papers and statements related to the case.  Determined that probable cause existed to charge Mr. Jackson with aggravated murder and attempted aggravated murder. |
| Winton Grays | Prosecutor.  Principally handled the case.<br><br>Talked with Lacey.  Did not talk to Tucker.  Requested photos from the photography lab.  Represented at trial that there is no exculpatory evidence in the case against Mr. Jackson. |
| Thomas Rein | New prosecutor at the time.  Sat second chair. |

### B.     The Murder of Joe Travis (April 7, 1991)

In the early morning hours of April 7, 1991, Joe Travis was shot and killed at an apartment building located at 13902 Othello Avenue.  (ECF No. 109-5, PageID #4356.)  Throughout the late hours of April 6, 1991, and the early hours of April 7, 1991, various people entered and exited the three-story apartment building at that address.  (*See* ECF No. 104-1, PageID #1372.)  Thomas Salvano visited the Othello apartments to buy crack cocaine from Omelia Tucker, known as Rita.  (ECF No. 159-1, ¶ 4.a., PageID #24552; ECF No. 104-1, PageID #1376.)  On the way to Tucker's apartment, Salvano ran into Charles "Dog" Davis.  (ECF No. 159-1, ¶ 4.b., PageID #24552; ECF No. 104-1, PageID #1375.)  Ronald Lacey, Joe Travis, and someone named Jerome were also in the hallway at this time selling drugs.  (ECF No. 104-1, PageID #1372 & #1374.)

An argument occurred between Salvano and Davis, and witnesses remember events differently.  Salvano claims that he declined to buy crack cocaine from Davis, then Lacey, Travis, and Jerome teased Davis, angering him.  (ECF No. 159-1, ¶¶ 4.b. & 4.c., PageID #24552–53.)  This account differs from the statement that Salvano made in his initial interview with police—that he came to the Othello apartments to pick up his sister.  (ECF No. 115-27, PageID #6673; ECF No. 115-28, PageID #6750; ECF No. 104-4, PageID #3369.)  At trial, Lacey testified that Davis was drunk and confronted Salvano, accusing him of running someone over.  (ECF No. 104-1, PageID 1373.)

Whatever the case, Davis punched out a window and threatened to shoot up the building.  (ECF No. 115-28, PageID #6710 & #6713; ECF No. 104-4, PageID

16

#3378; ECF No. 104-1, PageID #1373–74.)  Davis "told everybody to get out of the hallway[ ] because he was about to shoot the building up."  (ECF No. 115-28, PageID #6710 & #6713; ECF No. 104-4, PageID #3378; *see also* ECF No. 104-1, PageID #1374.)  Then, Davis fired several shots inside the apartment building.  (*Id*.)  Some individuals heard second hand and disclosed to the police that Tucker returned fire at Davis.  (ECF No. 115-27, PageID #6661; ECF No. 115-28, PageID #6711 & #6714; ECF No. 104-4, PageID #3379; *see also* ECF No. 115-27, PageID #6668.)  Davis left the building, driving away in either a beige or brown Nova or Skylark.  (ECF No. 115-28, PageID #6710 & #6713; ECF No. 104-4, PageID #3378.)  Tucker called the police and spoke to them about the incident when they arrived.  (ECF No. 115-27, PageID #6672; ECF No. 115-29, PageID #6749; ECF No. 104-4, PageID #3368.)

A few hours later, two men entered the Othello apartments.  (ECF No. 104-1, PageID #1375; ECF No. 115-28, PageID #6710 & #6713; ECF No. 104-4, PageID #3378; ECF No. 159-1, ¶ 4.h., PageID #24553.)  At this point in the narrative, the accounts of what happened substantively diverge.  At trial, Lacey testified that Charles "Dog" Davis's brother Don Davis and an individual nicknamed "Sweetman" entered the building.  (ECF No. 140-1, PageID #15252; *see also* ECF No. 115-28, PageID #6710 & #6713; ECF No. 104-4, PageID #3378.)  Plaintiff alleges that the two men who entered the Othello apartments were Don Davis and James Morris, the nephew of the Davis brothers.  (ECF No. 161, PageID #24573.)  On the facts and circumstances presented, the Court refers to this second individual as the suspect.

17

When the two men entered the Othello apartments, Lacey and Travis stepped into the hallway to see who they were. (ECF No. 115-28, PageID #6710 & #6713; ECF No. 104-4, PageID #3378; ECF No. 104-1, PageID #1375–76.) The two men approached Lacey and Travis and asked what happened to the window, which Charles "Dog" Davis punched out, before continuing around the corner to Tucker's apartment. (*Id.*) After the two men walked past Lacey and Travis, Lacey testified that he heard a gun reloading. (ECF No. 104-1, PageID #1376.) Then, he heard the suspect say, "you know me, . . . , I'll shoot up anything." (*Id.*, PageID #1377; *see also* ECF No. 115-28, PageID #6710 & #6713; ECF No. 104-4, PageID #3378.) Lacey had his back to the two men and stood on the second-floor landing across from his mother's apartment. (ECF No. 115-28, PageID #6710 & #6713; ECF No. 104-4, PageID #3364 & #3378.) Travis was standing on the landing between the first and second floors. (*Id.*) At trial, Lacey testified that he and Travis were looking out the window that Charles "Dog" Davis punched out earlier that morning. (ECF No. 104-1, PageID #1378.)

As Don Davis walked past Lacey, the suspect approached Lacey from behind, put a gun to the back of his head, and pulled the trigger. (ECF No. 104-1, PageID #1378.) Lacey fell down and played dead because, miraculously, the bullet ricocheted off a metal buckle on the back of his hat. (ECF No. 115-28, PageID #6710 & #6713; ECF No. 104-4, PageID #3364 & 3378.) The suspect jumped down the steps to the landing where he shot and killed Travis. (*Id.*; *see also* ECF No. 104-1, PageID #1379.) The two men exited the building, leaving the scene in a gray automobile. (ECF No.

18

115-27, PageID #6672; ECF No. 115-29, PageID #6749; ECF No. 104-4, PageID #3368.)

Lacey's account of what he did next varies over time, but the record is clear that Lacey did not speak to the police about the incident until April 26 or 27, 1991—nearly three weeks after the murder.  (ECF No. 104-1, PageID #1380–83; ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377.)  When he initially spoke to the police, Lacey stated that, after the suspect left the building, he ran to apartment #8 and stayed there because he was shaking.  (ECF No. 115-28, PageID #6710 & #6713; ECF No. 104-4, PageID #3378.)  At trial, he testified that he laid on the ground until a car pulled up, his mother and Tommy came out of her apartment and dragged Lacey inside of the apartment, and when he heard the car leave, he ran into apartment #8.  (ECF No. 104-1, PageID #1380.)  When the police arrived on the scene, Lacey did not leave apartment #8 and did not talk to the police.  (*Id.*, PageID #1381)  After the police left, Lacey went to apartment #4, grabbed clothes, and went to his uncle's house across town.  (*Id.*)

C.    **The Investigation**

Early in the morning on April 7, 1991, Cleveland police began the investigation.  Detectives Joseph Masilonis and Michaelene Taliano were the lead detectives assigned to the case, visited the crime scene on April 7, 1991, and created the original nine-page investigation report.  (ECF No. 115-27, PageID #6669–78; ECF No. 115-29, PageID #6746–54; ECF No. 104-4, PageID #3366–74.)  In this case, the crime scene was assigned number 71931.  (*See, e.g.*, ECF No. 104-2, PageID #1803.)

19

Sections of the original investigation report document the morgue, arrests, suspects, the suspect's auto, weapon, evidence, witnesses, interviews, the crime scene, investigation, and requests. (ECF No. 115-27, PageID #6669–78; ECF No. 115-29, PageID #6746–54; ECF No. 104-4, PageID #3366–74.) The suspects section reads:

> Possible suspect Black Male, 25 years old, 5'11 165 lbs. dark skin, talks southern, first name Charles, nick name Charles Dog, last name unknown, wears white dirty tennis shoes with shoe strin [*sic*] these strings are always untied, wears a dark green jacket with letters on the back G.O.O.S.E. in red. and on the inside of the jacket there is the words triple goose. This male drives the below described beige Nova.
>
> Possible suspect Black Male no further description get into the below described gray auto.

(ECF No. 115-27, PageID #6670; ECF No. 115-29, PageID #6747; ECF No. 104-4, PageID #3371.)

According to the interview section, Omelia "Rita" Tucker stated that "[s]he looked out her apartment window and saw a male get into the rear seat on the drivers [*sic*] side of a gray auto which was parked in the middle of the street" and "this male appeared to be hold [*sic*] a gun." (ECF No. 115-27, PageID #6672; ECF No. 115-29, PageID #6749; ECF No. 104-4, PageID #3368.) "She had no further description of the gray auto or the male that got into the gray auto" and "[s]he stated that she could not identify the man that got into the gray auto after the shooting but could identify the man Charles" from the earlier incident with the broken windows. (*Id*.) Thomas Salvano stated that he was "in the apartment and didn't see anything." (ECF No. 115-27, PageID #6674; ECF No. 115-29, PageID #6750; ECF No. 104-4, PageID #3369.) Later, in 2024, Salvano attested that he "couldn't see exactly" who fired the

shots but that Charles Jackson did not.  (ECF No. 159-1, ¶¶ 4.k & 4.l., PageID #24553.)  The original investigation report also documents a request to "[a]ttempt to locate Ron Lacey . . . to see if he has any information or might have something to do with this homicide."  (ECF No. 115-27, PageID #6678; ECF No. 115-29, PageID #6754; ECF No. 104-4, PageID #3374.)

The original investigation report appears in both the homicide file (*id.*, PageID #6669–78) and the prosecutor's archived file (ECF No. 104-4, PageID #3366–74).  Only the version in the prosecutor's archived file contains handwritten notations.  (*Id.*)  The notations include circles around the crime scene number and Thomas Salvano's name in the interviews section (*id.*, PageID #3367 & #3369); the numbers "11-21" next to Salvano's interview (*id.*, PageID #3369); and underlining of Tucker's personal information, the man named Charles who got into a beige automobile after the windows incident, and the man who got into a gray automobile after the shooting (*id.*, PageID #3367 & #3368).

At 5:30 p.m. on April 7, 1991, Detective Edward Gray conducted an interview of Bobby Elliot Rodgers who was at the Othello apartments earlier that morning.  (ECF No. 115-27, PageID #6668; ECF No. 115-29, PageID #6745.)  (His last name is variously spelled "Rogers" in the record.)  Rodgers disclosed that he "heard a male, whom he only knows as CHARLES AKA CHARLES DOG, yell 'YOUR [*sic*] TRYING TO SHOOT ME, I'LL BE BACK" and that he did not know who Charles was yelling at but "heard it was a female named RITA, who lives in apartment #6."  (*Id.*)  Rodgers also disclosed that "he had heard on the streets that CHARLES [*sic*] NEPHEW

21

KILLED JOE, WITH CHARLES [*sic*] BROTHER ALSO THERE, BECAUSE CHARLES GOT SHOT DURING THE FIRST EXCHANGE." (*Id.*)  During the interview, Rodgers also identified a man named "Ron" who saw the shooting and told Detective Gray that "he would find the name of CHARLES [*sic*] NEPHEW and call" Detectives Masilonis and Taliano. (*Id.*)  This report appears in the homicide file (ECF No. 115-27, PageID #6668) and the statement unit file (ECF No. 115-29, PageID #6745), but not the prosecutor's archived file.  The parties dispute almost everything about this statement.  As discussed below, the Court includes the statement here only to set the stage for those disputes on the merits.

Detective Donald Malloy of the scientific investigation unit of the crime scene technical section also went to the Othello apartments on April 7, 1991. (ECF No. 115-27, PageID #6667 & #6679.)  Detective Malloy prepared a report that included four sections:  latent prints, crime scene, exposures, and trace. (*Id.*)  His report states that latent prints were found on a Newport cigarette pack and a broken bottle top at the crime scene. (*Id.*)  His report appears in only the homicide file. (*Id.*)  In this case, the tracking number for the fingerprints was 64368 (ECF No. 104-2, PageID #1704), and Detective Malloy documented the fingerprints in the latent print and crime scene logbook (*id.*, PageID #1730–31; ECF No. 128-4, PageID #12724).  He documented that thirty-five photos captured the crime scene and that investigators recovered four 9-millimeter casings found outside the apartments and one 9-millimeter casing found in the hallway near the victim. (ECF No. 115-27, PageID

#6667 & #6679; *see also* ECF No. 115-26, PageID #6583; ECF No. 115-27, PageID #6626.)

Other physical evidence retrieved from the scene included suspected blood and a radial tire and rim from a Ford Bronco that was parked in front of the Othello apartments. (*Id.*) The tire, documented in the homicide unit's property logbook (ECF No. 128-4, PageID #12729), belonged to Tucker and had a bullet lodged in it (ECF No. 115-27, PageID #6667 & #6679). After completing his work, Detective Malloy brought the physical evidence to the scientific investigation unit. (ECF No. 104-2, PageID #1703–06.) He stored the fingerprints in the lockbox for further analysis, provided the unprocessed film to the photography lab, and submitted the remaining physical evidence to the homicide unit of the Cleveland police. (*Id.*)

Following normal procedure, one of the prints was later entered into the AFIS system. (*Id.*, PageID #1736.) There is no documentation of a match, and the person designated by the City of Cleveland to testify on its behalf in this civil case, Tina Stewart, did not believe the print matched anything in the database. (*Id.*, PageID #1737.)

### C.1.    The Days After the Murder

While Detectives Masilonis, Taliano, and Gray conducted initial interviews on April 7, 1991, additional detectives assisted the investigating in the following weeks. On April 8, 1991, Detectives Parker Adrine and Samuel Reese received an assignment to investigate the homicide. (ECF No. 115-27, PageID #6665; ECF No. 115-29, PageID #6743; ECF No. 104-4, PageID #3259.) Detectives Adrine and Reese spoke to detectives in the narcotics unit and in the strike force and eventually

23

travelled to the Othello apartments to interview Omelia "Rita" Tucker.  (*Id.*)  From her, detectives learned that Joe Travis hung out in the building often, running errands for people who lived there.  (*Id.*)  Additionally, she explained that Travis sold drugs for the occupants of apartment #8 and recalled an argument between Travis and the female resident of that unit about Travis "messing up some money, and that he better get the money back."  (*Id.*)  Tucker told detectives, again, that "Charles," presumably Charles "Dog" Davis, was at the Othello apartments "earlier in the morning" arguing with someone, throwing bricks, and breaking windows.  (*Id.*)

The report does not document any questions to or statements from Tucker about the suspect.  (*See* ECF No. 115-27, PageID #6665–66; ECF No. 115-29, PageID #6743–44; ECF No. 104-4, PageID #3259–60.)  The copy of this report in the prosecutor's archived file contains handwritten circles around Tucker's name and her front tire, which was flat after the incidents that morning, and underlines of Tucker's statements about Travis being a runner for the building and about the window incident with a male named Charles.  (*Id.*)  Notwithstanding this report, Defendants maintain that Detectives Adrine and Reese did not have contact with Tucker.  (ECF No. 140-1, PageID #15254.)

On April 9, 1991, Detective Adrine and Detective Robert Moore reported a conversation with Detective Falzone of the narcotics unit who worked in the area around the Othello apartments.  (ECF No. 115-27, PageID #6664; ECF No. 115-29, PageID #6742; ECF No. 104-4, PageID #3258.)  Detective Falzone indicated that a woman matching the description of Tucker and her husband sold drugs out of a Ford

24

Bronco.  (*Id*.)  Additionally, Detective Falzone stated that the apartment to which Tucker directed investigators might be "run by the DAVIS BROTHERS" to sell drugs, provided the name "CHARLES aka CHARLES DOG[,]" and "state[d] he will attempt to see if anyone knows this name[.]"  (*Id*.)

On April 11, 1991, in a supplementary report, Detectives Adrine and Moore documented that Detective Rood of the narcotics unit had information about a man who sells drugs out of the Othello apartments with the nickname "G DOG[.]"  (ECF No. 115-27, PageID #6663; ECF No. 115-29, PageID #6734.)  In that same report, Detectives Adrine and Moore documented that Detective Glover previously made an arrest at apartment #9 of the Othello apartments.  (*Id*.)  Detective Glover confirmed that he conducted a search pursuant to a warrant at apartment #5 and would forward copies of his reports to the homicide unit and that he and his colleagues at the vice unit were in the process of obtaining additional search warrants and would notify the homicide unit of the results.  (*Id*.)  This report does not appear in the prosecutor's archived file.

On April 15, 1991, Detectives Adrine and Reese reported speaking with the mother of Joe Travis, Annie Laura Arrington, who provided some information about Tucker.  (ECF No. 115-27, PageID #6661; ECF No. 115-29, PageID #6733.)  Arrington disclosed that her son would have been visiting Tucker and she heard that Tucker "had an altercation earlier in the morning with a male and that she shot this male and he informed RITA [Tucker] that he would be back with his friends."  (*Id*.)  This report does not appear in the prosecutor's archived file.

25

On April 16, 1991, Detectives Adrine and Reese were assigned to further investigate the homicide and reported that Arrington received information that "Alabama Charles" killed her son.  (ECF No. 115-27, PageID #6660; ECF No. 115-28, PageID #6732; ECF No. 104-4, PageID #3376.)  On April 18, 1991, when Detectives Adrine and Reese followed up on that information, Arrington said that she was told that Ronald Lacey was in the hallway on the night of the shooting and that "Alabama Charles" resided in the Othello apartments.  (ECF No. 115-27, PageID #6659; ECF No. 115-28, PageID #6731; ECF No. 104-4, PageID #3375.)

### C.2.    The Interrogation of Ronald Lacey (April 26, 1991)

On April 26, 1991, in a supplementary report, Detectives James Cudo and Gray documented that an "informant" advised Sergeant Haber and Detectives Frank Gedeon and William Nolan that Ronald Lacey was present at the murder of Joe Travis.  (ECF No. 115-27, PageID #6658; ECF No. 115-28, PageID #6730; ECF No. 104-4, PageID #3248.)  That night, and with this information about Lacey, the strike force unit "had occasion to arrest" Lacey for loitering for drug activity.  (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377; *see also* ECF No. 115-27, PageID #6658; ECF No. 115-28, PageID #6730; ECF No. 104-4, PageID #3248.)  Detectives Gedeon and Nolan knew Lacey because they saw him at the Othello apartments before and suspected him of criminal activity there.  (ECF No. 113-1, PageID #5184–85; *see also* ECF No. 151-2, PageID #19357–58 (detailing Detective Gedeon's prior arrest of Lacey at the Othello apartments).)

26

### C.2.a. Lacey's First Statement

Detectives Gedeon and Nolan made a report of preliminary conversations with Lacey, which began at 9:45 pm on April 26, 1991.  (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377.)  Detective Gedeon signed the report.  (*Id.*)  The report begins with a note that Lacey was "well known to us" and was shot at the same time as Travis, "receiving a bullet hole in his cap."  (*Id.*)  After being advised of his rights, Lacey at first was reluctant to speak with investigators, claiming that he had no information regarding the night in question.  (*Id.*)  About 45 minutes after he was booked, however, Detective Nolan returned to Lacey's cell, and Lacey expressed a willingness to discuss the night of April 7, 1991.  (*Id.*)  In his deposition, Detective Nolan testified that he went back to talk to Lacey because he "wanted to see if he [Lacey] changed his mind."  (ECF No. 113-1, PageID #5202.)

After repeating *Miranda* warnings to Lacey, he gave the following account of the night of the murder while he remained in a jail cell.  (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377; *see also* ECF No. 113-1, PageID #5205.)  The report does not appear to be a verbatim retelling of what Lacey said.  On April 7, 1991, Lacey was in the apartment building at 13920 Othello Avenue in the hallway with Joe Travis when a man he knew as Sweetman came into the hallway.  (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377.)  Sweetman pointed a gun at Lacey and cocked it.  (*Id.*)  When the weapon discharged, Lacey dropped to the floor, and the bullet damaged only Lacey's

hat. (*Id.*)  Sweetman fired at Travis and killed him.  (*Id.*)  Because Detectives Gedeon and Nolan "had knowledge of the drug players in the neighborhood, [they] began to question him so as to narrow down the identity of 'Sweetman.'" (*Id.*)  Lacey described Sweetman to Detectives Gedeon and Nolan as someone who "used to be a regular in the neighborhood" and who drove a "78 or 79 Chevy Monte Carlo, brown or maroon in color" with "mag wheels[ ] and 'low-rider' tiers." (*Id.*)  Then, Lacey identified Sweetman as the man in a single photo that Detectives Gedeon and Nolan showed to him. (*Id.*)  When he talked with the police, no one told Lacey that he was a suspect or said that they considered him an accomplice of the murderer.  (ECF No. 104-1, PageID #1390–91.)  In his statement, Lacey did not mention a second person who entered the building with Sweetman, or at least any mention of a second person was not included in the report.

### C.2.b. Photo Identification of the Suspect

The parties dispute the facts surrounding Lacey's identification of the suspect.

### C.2.b.i. The Police's Personal Photos

By way of background, at their depositions, Detectives Gedeon and Nolan testified about their practice of taking photos of arrested suspects for their personal files, one of which was used for Lacey's photo identification of the suspect.  (ECF No. 113-1, PageID #5127–32; ECF No. 114-1, PageID #5535–37.)  Detectives Gedeon and Nolan testified that they had access to cameras in the unit, both a Polaroid and a 35-millimeter, which they used to take a photo of arrested suspects.  (ECF No. 113-1, PageID #5128; ECF No. 114-1, PageID #5518.)  Detective Nolan testified that he and Detective Gedeon used these photos as "their own personal photo[s]."

28

(ECF No. 113-1, PageID #5127.)  They kept these photos "[j]ust for our own personal satisfaction."  (*Id.*, PageID #5130.)  Detective Nolan explained that "[a] lot of times these are repeat offenders and they have a tendency to change their outlooks, color of the hair, facial hair.  They change their appearance a lot of times." (*Id.*)  But they would not use the photo "unless we had to." (*Id.*)  If the unit had no other information on a suspect, "we would go to that folder, look at the folder with his name on it, and take the picture out." (*Id.*)  Similarly, Detective Gedeon testified that, if they "arrested someone or came across a person, and they were a person of interest," they would take a photo so that they knew how a particular person looked." (ECF No. 114-1, PageID #5519.)

Regarding how they stored these photos, the detectives' recollections differ. Detective Nolan testified that he or Detective Gedeon would put the photo in "the folder that went with the arrest" in their personal file and that they would not write down anywhere that they had a photo, "it would just go into the folder[.]" (ECF No. 113-1, PageID #5129.)  Detective Gedeon said that they "kept them in one of the drawers of the desk." (ECF No. 114-2, PageID #5585; *see also*, ECF No. 114-1, PageID #5519.)  Detective Nolan testified that they put the name of the arrested suspect on the outside of the folder, but would not put the name on the photo, itself.  (ECF No. 113-1, PageID #5129.)  Detective Gedeon testified that if they had the name of the person, they "would write the name on the back" of the photo. (ECF No. 114-1, PageID #5520.)  They did not write down information about what the person was

29

doing because, given their police work was mostly drug related, it was "kind of a given." (*Id.*)

### C.2.b.ii. Lacey's Identification of the Suspect

Those differing accounts of the detectives' practices set up the parties' dispute. Lacey described Sweetman to Detectives Gedeon and Nolan. (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377.)  He said that they should be familiar with Sweetman because he was a regular in that neighborhood. (*Id.*)  Also, he said that Sweetman drove a 1978 or 1979 brown or maroon Chevy Monte Carlo. (*Id.*)  This information prompted Detectives Gedeon and Nolan to recall arresting a man fitting that description for a traffic violation, and the man's last name was Jackson.  (*Id.*)  Although Detectives Gedeon and Nolan suspected that Jackson was involved in drug activity, they "had not been able to get him 'dirty[,]'" so when they arrested him for a traffic violation, they "availed [themselves] of the opportunity to take a picture of him" with their private camera. (*Id.*)  After going upstairs to check their personal arrest records, Detectives Gedeon and Nolan found an arrest of a person who was driving a car that fit Lacey's description (ECF No. 113-1, PageID #5141), and determined that the man's name was Charles Jackson (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377).

Detective Nolan testified that the only thing in the file for "Charles Jackson" was a photo of him (ECF No. 113-1, PageID #5146–47), the folder was marked with his name and the make and model of a car (*id.*, PageID #5147–48), and it was the

only one of Detective Nolan's personal folders that was marked with the make or model of a car (*id.*, PageID #5147).  "The only photo" that they had of Mr. Jackson "was the one that [they] took of him" with their private camera (*id.*, PageID #5233), at the booking window of the police station (*id.*, PageID #5164–65).  Detective Nolan has "no idea" when the photo was taken.  (*Id.*, PageID #5235.)  Detective Nolan never saw Mr. Jackson's mugshot.  (*Id.*)

With this single photo of Mr. Jackson in hand from their personal files, Detectives Gedeon and Nolan returned to question Lacey.  According to their report, "[a]t this time we dug out our old picture of Jackson and asked Lacey if Jackson was indeed 'Sweetman.'"  (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377.)  Then, according to the report, Lacey responded, "That's definitely him, you don't forget someone that tries to kill you."  (*Id.*)  However, at his deposition, Detective Nolan testified that he told Lacey, "we're going to show you a picture," showed Lacey the photo, then asked, "do you know who this person is?"  (ECF No. 113-1, PageID #5207.)  Lacey responded "yes, Sweet Man."  (*Id.*)  This discrepancy in the phrasing of the questions to Lacey appears again later with Lacey's second statement to police and sets up the parties' dispute over how the name Charles Jackson became associated with the investigation.

Ultimately, Lacey was charged with a misdemeanor:  loitering for the purpose of engaging in drug-related activity.  (ECF No. 151-2, PageID #19364.)  Lacey's criminal history does not appear in the statement unit file or in the prosecutor's

31

archived file.  Still, because the prosecutor brought those charges, which would be publicly available in any event, the Court assumes for purposes of Plaintiff's motion that the prosecution had this information from an independent source.

### C.2.c. Lacey's Second Statement

After Lacey identified the man in the single photo as Sweetman, Detectives Gedeon and Nolan called the homicide unit because Lacey indicated a willingness to make a written statement.  (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377.)  Detectives Masilonis and Taliano took Lacey's signed statement, which appears in the statement unit file twice (ECF No. 115-28, PageID #6710–11 & #6713–14) and in the prosecutor's archived file (ECF No. 104-4, PageID #3378–79) but not in the homicide file.  Detectives Masilonis and Taliano also made a supplementary report of their interview.  (ECF No. 115-27, PageID #6656–57; ECF No. 115-28, PageID #6728–29; ECF No. 104-4, PageID #3364–65.)  The signed statement captures verbatim what Lacey said.  (ECF No. 104-3, PageID #2254.)  Detective Taliano typed the statement in real-time as Lacey spoke.  (*Id.*)  The top of the signed statement contains an introductory paragraph that Detectives Masilonis and Taliano wrote based on the information provided to them by Detectives Gedeon and Nolan.  (*Id.*)  The middle section is Lacey's verbatim narrative of what happened.  (*Id.*)  And the last section records a question and answer between the detectives (Detectives Masilonis and Taliano) and Lacey.  (*Id.*)

Lacey largely repeated the same story that he gave to Detectives Gedeon and Nolan but included some additional details.  He said that he was at the Othello

apartments with Joe Travis and Jerome, whose last name is unknown, when a man named Charles came in.  (ECF No. 115-28, PageID #6710 & #6713; ECF No. 104-4, PageID #3378.)  Charles accused a friend of Lacey's mother named "Tommy," likely Thomas Salvano, of running someone over.  (*Id.*)  Charles "punched the window out with his hand" and "told everybody to get out of the hallway, because he was about to shoot the building up."  (*Id.*)  Lacey, Travis, and Jerome dispersed into apartments, and Lacey heard several shots.  (*Id.*)  As Lacey looked out the window, he saw "Charles drive past. . . alone" in a beige or brown Nova or Skylark.  (*Id.*)

After Charles left, Lacey, Travis, and Jerome returned to the hallway.  (*Id.*)  After about five minutes, Jerome left because he was sleepy, and Lacey and Travis went into Lacey's mother's apartment.  (*Id.*)  About five minutes later, Lacey and Travis heard the downstairs door open, went out into the hallway, and saw Don—Lacey did not know his last name—and Sweetman coming up the steps.  (*Id.*)  Don asked Lacey and Travis what happened with the window, and they responded that they did not know.  (*Id.*)  Don and Sweetman walked toward Omelia "Rita" Tucker's apartment.  (*Id.*)  Lacey heard Don—presumably Don Davis, the brother of Charles "Dog" Davis—whispering with Sweetman and then heard Sweetman say, "you know me. . . I'll shoot some shit up."  (*Id.*)  Then, Don and Sweetman walked toward Lacey and Travis.  (*Id.*)

Don went down the stairs first, and then Sweetman came around the corner, put a gun to the back of Lacey's head, and pulled the trigger.  (*Id.*)  But the bullet ricocheted off a buckle on the back of his head, and Lacey fell down and played dead.

(*Id.*)  While lying there, Lacey said that he saw Sweetman put the gun to the forehead of Joe Travis and pull the trigger.  (*Id.*)  Sweetman fled the Othello apartments and shot at a truck outside of the building.  (*Id.*)  Lacey ran to apartment #8 and "stayed there. . . shaking," and Tucker called the police.  (*Id.*)

At trial and in his deposition, Mr. Jackson testified that, at the time, he had the nickname "Sweetman," and everyone in the neighborhood knew him by that nickname.  (ECF No. 122-2, PageID #7885–87.)  However, Lacey did not know Sweetman's real name.  (ECF No. 115-27, PageID #6655.)  According to Lacey's verbatim signed statement, a rational trier of fact could find that Detectives Masilonis and Taliano first mentioned the name Charles Jackson.  (ECF No. 115-28, PageID #6710 & #6713; ECF No. 104-4, PageID #3378.)  According to their report, after Lacey's narrative of what happened, Detective Masilonis asked, "[y]ou know Charles Jackson as Sweet-Man and you talk about Charles coming to the apartment building and punching out the window, are these males the same?"  (*Id.*)  Lacey responds, "No, [t]he first Charles is Don's brother and I dont [*sic*] know their last names, and the second Charles is Charles Jackson and I know his [*sic*] as Sweet-Man[.]"  (*Id.*)  After this initial question, the detectives' questions use the name Sweetman, not Charles Jackson.  (ECF No. 115-28, PageID #6710–11 & #6713–14; ECF No. 104-4, PageID #3378–79.)

Later in the question-and-answer portion of the verbatim signed statement, Detectives Masilonis and Taliano ask Lacey, "who is Sweet-Man?"  (ECF No. 115-28, PageID #6711 & #6714; ECF No. 104-4, PageID #3379.)  Lacey responds, "Charles, I

34

dont know his last name." (*Id.*)  Detectives Masilonis and Taliano ask Lacey to describe him, and Lacey gives a physical description. (*Id.*)  Next, Detectives Masilonis and Taliano showed Lacey the same single photo that Detectives Nolan and Gedeon showed him. (*Id.*)  Lacey said "that's the man that shot Joe and tried to shoot me, he's the man that I call Sweet-Man." (*Id.*)

In the context of the record as a whole, it is clear that the man who punched out the window in the first incident was Charles "Dog" Davis and the man who appeared with Sweetman in the second incident was Charles "Dog" Davis's brother, Don Davis.  Lacey identified the gun that Sweetman used as a 9-millimeter and said that Sweetman left in a four-door 1979 or 1980 Cadillac.  (ECF No. 115-28, PageID #6710–11 & #6713–14; ECF No. 104-4, PageID #3378–79.)  Lacey signed each page of the statement, as did Detectives Masilonis and Taliano. (*Id.*)

The detectives' supplementary report regarding Lacey's second statement largely tracks Lacey's verbatim signed statement except for the use of the name Charles Jackson. (*See* ECF No. 115-27, PageID #6656–57; ECF No. 115-28, PageID #6728–29; ECF No. 104-4, PageID #3364–65.)  According to the supplementary report, the detectives "asked him who Sweet Man was and he said Charles Jackson and he looked at a Strike Force photo of Charles Jackson and he said that they [*sic*] was the man who shot Joe Travis" and "[h]e said that Charles Jackson had a 9mm pistol." (ECF No. 115-27, PageID #6657; ECF No. 115-28, PageID #6729; ECF No. 104-4, PageID #3364.)

35

At the end of the supplementary report, Detectives Masilonis and Taliano report that the photo that Lacey used to identify the suspect was entered into the homicide file, police made a report on Form 1 with the information they knew about Mr. Jackson, and the hat that Lacey wore on the night of the murder was taken to the forensic lab for a gunshot residue test.  (*Id.*)

### C.2.d. The Single Photo

The record makes clear that the single photo shown to Lacey was of Mr. Jackson.  Handwritten on the back of the photo are "Charles Jackson" and the initials of "MMT, 383, MJM, 1957" and then the date of "4/27/91" and badge numbers "2413" and "2221."  (ECF No. 113-1, PageID #5234; *see also* ECF No. 115-26, PageID #6565.)  The latter set of badge numbers belongs to Detectives Gedeon and Nolan, respectively.  (ECF No. 113-1, PageID #5234.)  Detective Nolan testified that he or Detective Gedeon wrote their badge numbers when they turned the photo over to the homicide detectives.  (*Id.*)  Detective Gedeon testified that he wrote "Charles Jackson" on the back of the photo.  (ECF No. 114-2, PageID #5586.)  The former set of badge numbers belong to Detectives Taliano and Masilonis, respectively.  (ECF No. 115-27, PageID #6656.)  Detective Masilonis wrote his badge number on it.  (ECF No. 104-3, PageID #2233.)  During his deposition, Mr. Jackson was shown the photo and confirmed that he is the man in a red sweatshirt in the photo.  (ECF No. 122-2, PageID #7868–69.)

### C.2.e. Confirmatory Photo Array

The parties dispute whether Detective Nolan presented Lacey with a confirmatory photo array.  There is no mention of such an array in the report by

36

Detectives Gedeon and Nolan. (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377.) Detective Gedeon testified that the strike force "did not use photo arrays" and that he never used one. (ECF No. 114-1, PageID #5538.) Detective Masilonis testified that Detectives Nolan and Gedeon showed Lacey "one picture, not a photo array." (ECF No. 104-3, PageID #2235.)

However, Detective Nolan testified at his deposition that he tested Lacey's identification of the suspect. (ECF No. 113-1, PageID #5208.) After Lacey's initial identification, Detective Nolan went back upstairs and retrieved other photos from his personal files. (*Id.*) He did so, he says, because when the detectives first talked to Lacey, he lied to them. (*Id.*) He wanted to test if Lacey "could pick out the same individual, or if he was going to lie to us again." (*Id.*) Detective Nolan testified that he handed Lacey a stack of photos, along with the single photo of Mr. Jackson that he had previously shown to Lacey, and Lacey "picked out Jackson's photo." (*Id.*, PageID #5208–10.)

Detective Nolan testified that he did not document the photos that he showed to Lacey and that this was the only time in his career that he used a photo array. (*Id.*, PageID #5132 & #5216.) Detective Nolan testified that he put the photos that he showed to Lacey "in Ronald Lacey's folder." (*Id.*, PageID #5216–17.) He gave the single photo of Mr. Jackson to the homicide unit, but did not turn over the other photos that he used with Lacey. (*Id.*, PageID #5217.) Detective Gedeon testified that the strike force never used photo arrays and that he used a single photo during an

investigation "on one occasion and it involved this case."  (ECF No. 114-1, PageID #5536 & #5538.)  The homicide file contains several photographs (ECF No. 115-26, PageID #6553–82), including an envelope with the words "photo array c/w Joe Travis" written on it (*id.*, PageID #6552).

### C.2.f.  Lacey's Hat

In their supplementary report regarding Lacey's verbatim signed statement, Detectives Masilonis and Taliano reported that "we confiscated" the hat "worn by Ronald Lacey that Sweetman shot the buckle off[,]" which is "to be taken to the [f]orensic lab for a gun residue test" and "[e]ntered into the [h]omicide [u]nit property book."  (ECF No. 115-27, PageID #6657; ECF No. 115-28, PageID #6729; ECF No. 104-4, PageID #3364.)  Lacey's verbatim signed statement with Detectives Masilonis and Taliano does not mention that Lacey was wearing this hat at the time of the interview.  Also, Detective Nolan testified that he never saw the hat that Lacey wore on the night of the murder.  (ECF No. 113-1, PageID #5196.)

On April 29, 1991, Detectives Adrine and Reese "conveyed the cap that was confiscated from RONALD LACEY and turned over to this unit" to the forensic lab to test for gunshot residue.  (ECF No. 115-27, PageID #6654; ECF No. 115-28, PageID #6726; ECF No. 104-4, PageID #3247.)  This report regarding turning over Lacey's hat to the forensic lab to test for gunshot residue appears in the homicide file, the statement unit file, and the prosecutor's archived file.

Although Defendants argue that, at trial, the prosecutors and defense counsel discussed gunshot residue when examining the coroner (ECF No. 174, PageID #26355), the trial transcript makes clear that neither set of lawyers had the forensic

38

test results on Lacey's hat, at least a jury could so find.  The prosecutor's direct examination of the coroner concerned the autopsy (ECF No. 104-1, PageID #1356–58), visual inspection of fouling and stippling on Joe Travis's face (*id.*, PageID #1358, #1361, & #1363), and the toxicology results from Joe Travis (*id.*, PageID #1364–65).  The coroner testified that, "[o]rdinarily[,] the clothing is examined both by inspection and chemically by members of the trace evidence department."  (*Id.*, PageID #1367.)  Both the cross- and redirect examinations involved the coroner's opinions on fouling and stippling on clothing, generally.  At no point during the examination of the coroner did counsel or the coroner mention Lacey's hat or the gunshot residue test results.  (*Id.*, PageID #1367–69.)

### C.3.    Anonymous Tips and Another Photographic Identification

A few days later, on May 2, 1991, an anonymous tip received from Crime Stoppers implicated a Chuck "Sweet Man" in the murder of Joe Travis.  (ECF No. 115-26, PageID #6550.)  This tip claims that "Chuck 'Sweet Man' is the nephew of Don Davis, they both were involved, according to the tipster, and they frequent the St. Clair & E. 140 Area.  Chuck drives a Chevy Monte Carlo, burgandy [*sic*] in color."  (*Id.*)  This tip corroborated the information that Bobby Rodgers provided on the day of the murder, which is missing from the prosecutor's archived file.  (ECF No. 115-27, PageID #6668; ECF No. 115-29, PageID #6745.)  This tip is missing from the statement unit file and the prosecutor's archived file.

On April 29, 1991, three days after Lacey's interview, Detectives Adrine and Reese requested the most recent mugshot of Mr. Jackson from the photography lab, and stated that after receiving these photos, the case would be presented to the

prosecutor.  (ECF No. 115-27, PageID #6654; ECF No. 115-28, PageID #6726; ECF No. 104-4, PageID #3247.)  Sometime in the next week, they received a mugshot labeled CPD #187044.  (ECF No. 115-27, PageID #6653; ECF No. 115-28, PageID #6725; ECF No. 104-4, PageID #3246.)

On May 5, 1991, Detectives Masilonis and Taliano wrote a supplementary report that the photograph from which Lacey identified the suspect and Charles Jackson's mugshot might not be photos of the same person, and he requested a follow-up photo array for Lacey to identify the suspect before taking the case to the prosecutor:

> In looking at the photo of Charles Jackson which Ronald Louis Lacey of 13901 Othello identified at the 6th District as the male that shot Joe Nathan Travis when he made his statement and the mug shot of Charles J. Jackson CPD# 187044 which was obtained from S.I.U..  In looking at the two photos they may not be the same person.  Before we consult the Police Prosecutor for papers for Charles Jackson CPD #187044 in c/w the murder of Joe Nathan Travis we feel for positive identification that the mug shot be shown to Ronald Louis Lacey in a photo spread for positive identification.
>
> Request Before the prosecutor is consulting in regards to the murder of Joe Nathan Travis a photo spread with the mug shot of Charles Jackson CPD# 187044 be shown to Ronald Lacey to make sure we are obtaining papers on the right person.

(*Id*.)  Because Detective Masilonis went off duty after he made the report and because he did not take the case to the prosecutor, he does not know whether anyone else carried out his request for a photo array with Lacey to confirm the identification of the suspect.  (ECF No. 104-3, PageID #2264–65).  He did not follow up because the photo array could have been done and the case taken to the prosecutor during the next shift.  (*Id*.)

On May 7, 1991, Detective Healy reported that the photography lab viewed the "different photos of the suspect, Charles Jackson," under magnification and noted "different facial characteristics" which "appear on all the photos." (ECF No. 115-27, PageID #6647; ECF No. 115-28, PageID #6722; ECF No. 104-4, PageID #3243; *see also* ECF No. 110-1, PageID #4514; ECF No. 104-2, PageID #1766–67.) But the record does not make clear which photographs support this determination or which technician performed that analysis.

Then, on May 8, 1991, the day after Detective Healy presented the case to the prosecutor, Detective Healy interviewed Tucker and Lacey. (ECF No. 115-27, PageID #6641; ECF No. 115-28, PageID #6717; ECF No. 104-4, PageID #3264.) Regarding his interview of Lacey, Detective Healy's report oscillates between using the name "Jackson," "the suspect," and "Sweet Man." Detective Healy reported that "[t]here is no doubt in his mind that it was JACKSON that put the gun to the back of his head. He said that when JACKSON walked up behind him, he felt fear and as soon as he felt something pressed to the back of his head, he collapsed and pretended he was dead." (*Id.*) Then, Detective Healy reports that "RON saw the suspect go up to JOE . . . RON saw the suspect get into a Gray Cadillac and get in the back behind the driver. RON saw several photos of the suspect and identified them as the man known to him as SWEET MAN." (*Id.*)

It is not clear from the report whether Lacey used the name "Jackson" in his interview or whether Detective Healy supplied the name in his report. It is not clear from the report whether Detective Healy showed several photos to Lacey during this

41

interview or whether another detective showed several photos to Lacey on an earlier date.  If Detective Healy showed several photos to Lacey during the interview, it is not clear if the interview occurred on May 8, 1991, the day after he presented the case to the prosecutor, or if he wrote his report later.  Also, it is not clear if the "several photos" were all of Mr. Jackson or if they refer to the confirmatory photo array about which Detective Nolan testified but of which there is no mention in Detective Nolan's report.

### C.4.    The Arrest of Charles Jackson (May 7, 1991)

On May 7, 1991, "[w]ith the above information" about the photography lab from Detective Healy's May 7, 1991 report, police prosecutor Mary Hollern reviewed "papers and statements" relating to the case.  (ECF No. 115-27, PageID #6647; ECF No. 115-28, PageID #6722; ECF No. 104-4, PageID #3242; ECF No. 110-1, PageID #4514–15.)  Based on that information, Prosecutor Hollern determined that probable cause existed to charge Mr. Jackson with aggravated murder and attempted aggravated murder.  (*Id.*)  No affidavit in support of probable cause for the arrest of Mr. Jackson appears in the record.  (ECF No. 115-3, PageID #6272–73.)

### C.4.a. The Basis for the Arrest

The parties dispute what information the prosecutor reviewed before proceeding with charges.  Defendants maintain that "Detective Healy presented the complete investigation file to" the prosecutor.  (ECF No. 140-1, PageID #15256.)  But she has no independent recollection of the events or her decision.  (ECF No. 123-1, ¶ 6, PageID #8042.)  "Typically," she met with the police to discuss the case, who "typically brought documents which could include police reports, supplemental

42

reports, witness statements, and photographs." (*Id.*, ¶ 4, PageID #8041–42.) In 2023, she reviewed "portions" of the homicide file as well as Detective Healy's deposition testimony from 2022. (*Id.*, ¶ 5, PageID #8042.) Specifically, she reviewed five supplementary police reports:

(1)    the April 26, 1991 report by Detectives Gedeon and Nolan regarding their interview of Lacey, including his photographic identification of the suspect;

(2)    the April 27, 1991 report by Detectives Masilonis and Taliano regarding their interview of Lacey, including his photographic identification of the suspect;

(3)    the April 29, 1991 report by Detectives Adrine and Reese regarding their request for forensic testing on Lacey's hat, their attempt to re-interview Tucker, and their note that the case will be presented to the prosecutor after receiving photos of Mr. Jackson;

(4)    the May 5, 1991 report by Detective Masilonis that the single photo from which Lacey identified the suspect and the mugshot of Mr. Jackson may not be the same person, requesting that Lacey is shown a photo array with the mugshot of Mr. Jackson before consulting the prosecutor; and

(5)    the May 7, 1991 report by Detective Healy that the scientific investigation unit viewed the different photos believed to be of Mr. Jackson under magnification and noted different facial characteristics on all the photos, and that "[w]ith the above information, papers and statements were reviewed" by Prosecutor Hollern who "issued papers against Mr. Jackson."

(*Id.*, PageID #8044–49.)

In her 2023 declaration, Prosecutor Hollern described the documents that the police "typically brought" for her review, "which could include police reports, supplemental reports, witness statements, and photographs." (*Id.*, ¶ 4, PageID #8042.) She attested that, when meeting with police officers, "we would typically

discuss the facts of the case and review pertinent documents.  I would also have the opportunity to ask questions."  (*Id.*)

In addition to the "above information" about the photography lab from Detective Healy's May 7, 1991 report, Prosecutor Hollern reviewed the May 5, 1991 report by Detectives Masilonis and Taliano that requested a photo spread with Mr. Jackson's mugshot be shown to Lacey for positive identification before consulting the prosecutor (ECF No. 115-27, PageID #6653; ECF No. 115-28, PageID #6725; ECF No. 104-4, PageID #3246).  The copy of the report in the homicide file contains handwritten notations, including "papers issued," criminal statutes, Prosecutor Hollern's signature, and the date.  (ECF No. 115-27, PageID #6653.)  Initially, the date "5/6/91" was written, but the "6" was written over to become a "7."  (*Id.*)  Prosecutor Hollern attested that she would not have made a handwritten notation on the report "without reading the typewritten contents."  (ECF No. 123-1, ¶¶ 7, 9, & 10, PageID #8042–43.)  Neither the copy of the report in the statement unit file nor the one in the prosecutor's archived file contains notations.

Plaintiff maintains that Detective Healy "did not show Hollern the entire homicide file with all the information pointing towards the Davis brothers and their nephew."  (ECF No. 161, PageID #24580.)  It is not clear from the record what, as stated in Detective Healy's report, the "papers and statements" that Prosecutor Hollern reviewed are.  Perhaps "papers and statements" refers to the entire homicide file.  Or to the documents that appear in the prosecutor's archived file.  Or to the other four documents that Prosecutor Hollern attached as exhibits to her 2023 declaration.

44

Whatever the case, warrants were issued for the arrest of Mr. Jackson for the murder of Joe Travis and the attempted murder of Ronald Lacey.  (ECF No. 115-27, PageID #6647; ECF No. 115-28, PageID #6722; ECF No. 104-4, PageID #3243.)  The homicide file and statement unit file give no indication that the police or anyone else ever investigated other suspects, including the Davis brothers or James Morris.

### C.4.b. The Arrest at the Casino Bar

On May 7, 1991, Detective Healy, while on duty, received an anonymous tip that Mr. Jackson was seen at the Casino Bar.  (ECF No. 115-27, PageID #6644; ECF No. 115-28, PageID #6718.)  Officers Longstreet and McGraw responded to the scene, and Detective Healy noted, "as they had been with me earlier searching for this subject, they knew what he looked like."  (*Id.*)  When the officers went to arrest Mr. Jackson, he was at the Casino Bar waiting for James Morris, the nephew of Charles "Dog" Davis and Don Davis, to sell drugs.  (ECF No. 122-2, PageID #7919.)  At the time, Mr. Jackson and Morris were friends who hung out together.  (ECF No. 122-1, PageID #7816–17.)  The two men also looked alike.  (ECF No. 122-2, PageID #7919.)

Despite knowing what Mr. Jackson looked like, Officers Longstreet and McGraw initially apprehended Morris.  As Mr. Jackson waited, Morris ran past him to the bathroom, with police chasing him.  (*Id.*, PageID #7919–20.)  The police came out of the bathroom with Morris and brought him to the bar where Mr. Jackson was sitting.  (*Id.*, PageID #7920.)  When the officers compared the two men, they asked Mr. Jackson for his driver's license.  (*Id.*)  Then, after checking his license, the police arrested Mr. Jackson.  (*Id.*, PageID #7920–22; *see also* ECF No. 115-27, PageID #6642–43.)  Officers Longstreet and McGraw arrested Mr. Jackson at "1740,"

45

approximately 5:40pm.  (ECF No. 115-27, PageID #6642.)  When the officers arrested Mr. Jackson, they found a brown pickup truck "match[ing] the description of the vehicle used in the homicide."  (*Id.*, PageID #6645.)  Detective Healy booked Mr. Jackson into jail.  (*Id.*, PageID #6642.)  Mr. Jackson remained in jail through sentencing and for "damn near 30 years."  (ECF No. 122-2, PageID #7923.)

### C.5.  Development of the Case

On May 7, 1991, at "1720" hours, Crime Stoppers reported that, "at the present time," Mr. Jackson was at his mother's house.  (ECF No. 115-27, PageID #6646.)  Plaintiff points to this tip as evidence from the community that Mr. Jackson and Morris looked alike because "someone had seen Mr. Jackson around town even after he was in custody."  (ECF No. 161, PageID #24574 n.2.)  Shortly after his arrest, when he learned of the charges, Mr. Jackson figured that Morris or the Davis Brothers had something to do with the murder.  (ECF No. 122-2, PageID #7918.)

### C.5.a. Witness Statements

Following the arrest of Mr. Jackson, on May 8, 1991, Detective Healy interviewed Omelia "Rita" Tucker and Ronald Lacey.  (ECF No. 115-27, PageID #6641; ECF No. 115-28, PageID #6717; ECF No. 104-4, PageID #3264.)  Tucker did not identify a suspect but said that the suspect left the Othello apartments after the murder "in a gray Dynasty 4-d," sat in the rear seat behind the driver, and wore a bulky jacket.  (*Id.*)  Lacey admitted that he and Travis sold drugs in the hallway where the murder took place.  (*Id.*)  As previously discussed, regarding his interview of Lacey, Detective Healy reported that "[t]here is no doubt in his [Lacey's] mind that it was JACKSON that put the gun to the back of his head. . . JACKSON walked up

46

behind him. . . RON saw the suspect go up to JOE and shoot him in the head.  RON saw the suspect get into a Gray Cadillac and get in behind the driver.  Ron saw several photos of the suspect and identified them as the man known to him as SWEET MAN and this is the one that shot at him and shot JOE." (*Id.*)

### C.5.b. Delivery of the File to the Prosecutor's Office

Detective Healy made copies of the file from the statement unit and delivered one copy to the prosecutor.  (ECF No. 115-1, PageID #6084; ECF No. 115-3, PageID #6289–90.)   According to the date stamp on the prosecutor's archived file, the prosecutor received the file from the statement unit on May 13, 1991.  (ECF No. 104-4, PageID #3238.)

### C.5.c. Forensic Evidence

### C.5.c.i. Gunshot Residue (Lacey's Hat)

Technicians in the forensic lab placed Lacey's hat on trace evidence paper, dampened filter papers with dilute hydrochloric acid, then pressed those filter papers onto the hat.  (ECF No. 104-2, PageID #1742.)  The filter papers were either air dried or dried with a hair dryer.  (*Id.*)  Then, a technician sprayed the filters with sodium rhodizonate.  (*Id.*)  If a pink color appeared on the paper, lead was present.  (*Id.*, PageID #1742–43.)  At the time, the scientific investigation unit did not test for barium or antimony.  (*Id.*, PageID #1791.)

The forensic laboratory report (number 281204) notes the results of the testing: "The black hat was analyzed and found to be NEGATIVE for the presence of lead." (ECF No. 104-4, PageID #3430; *see also* ECF No. 104-2, PageID #1742–43 & #1846.) On May 9, 1991, an inter-office memo, written on Cuyahoga County letterhead from

47

a senior supervisor in the prosecutor's office, directed presentation of the case to the grand jury. (ECF No. 104-4, PageID #3273.) An undated handwritten note on the memo reads, "Lab #281204 Cynthia Lewis." (*Id.*; *see also* ECF No. 104-2, PageID #1748.) Relying on a handwriting expert (*see* ECF No. 136-1, PageID #15160), Defendants argue that Prosecutor Grays wrote that note, indicating that he was aware of the testing on the hat at the forensic lab. (ECF No. 174, PageID #26355.)

According to the record, including the contemporaneous documentation from the scientific investigation unit and the testimony of the technician who performed the tests, number 281204 refers to the test results, the materials used to perform the tests, and the hat itself. (*See* ECF No. 104-2, PageID #1739; *id.*, PageID #1846; *see also id.*, PageID #1741–42, #1744 & #1756.) Therefore, it is not clear what the handwritten note on the inter-office memo means. Perhaps, as Defendants argue, it shows that the police communicated the test results to the prosecutors. Or, maybe, the prosecutor inquired whether the forensic lab had the hat before taking the case to the grand jury. That note's meaning might be lost to the passage of time. In any event, in light of the parties' disputes about its meaning, that question belongs to a jury.

After the testing, the hat and lab card were transferred to the Cleveland police property room on or about May 17, 1991. (*Id.*, PageID #1744.) The officer who took the hat to the property room signed the bottom of the report. (*Id.*, PageID #1744 & #1846; ECF No. 104-4, PageID #3430.) The filter papers were put in a laboratory

envelope marked 281204 and filed in an evidence cabinet at the scientific investigation unit. (*Id.*)

Although the record confirms that the forensic lab tested Lacey's hat for gunshot residue, the results of that testing do not appear in the homicide file, the statement unit file, or the prosecutor's archived file.

According to the property unit sign-out log, Detective Masilonis signed the hat out on December 11, 1991. (ECF No. 128-4, PageID #13167.) On December 12, 1991, the hat was introduced into evidence at trial. (ECF No. 140-1, PageID #1382 & #1537.) The current whereabouts of Lacey's hat are unknown.

### C.5.c.ii. Fingerprints from the Crime Scene

On December 13, 1991, the scientific investigation unit determined that the latent fingerprints lifted from the crime scene at the Othello apartments did not match Mr. Jackson. (ECF No. 140-2, PageID #1677, #1726–28 & #2005–06; *see also id.*, PageID #1676.) Those fingerprints came from a pack of cigarettes and a broken bottle top, which Detective Malloy captured and brought to the lab. (*Id.*, PageID #1727 & #1730–31.) The envelope that stored the latent prints reflects that someone called the scientific investigation unit requesting confirmation whether the fingerprints matched Mr. Jackson. (*Id.*, PageID #1734.) The results of the fingerprint comparison do not appear in the homicide file, statement unit file, or the prosecutor's archived file.

### C.5.c.iii. Casings and Morgue Pellet

Four 9-millimeter casings were found outside the Othello apartments and one 9-millimeter casing was found in the hallway near the victim. (ECF No. 115-27,

PageID #6667 & #6679.)  On May 3, 1991, they were submitted to the forensic laboratory.  (ECF No. 104-2, PageID #1862-63.)  Detective Taliano signed the casings in, as reflected in the forensic lab logbook, and the casings were assigned the numbers 281440 and 281441.  (ECF No. 128-4, PageID #12742.)  Two separate notecards were made for the casings.  The single casing was labeled laboratory number 281440.  (ECF No. 104-2, PageID #1862.)  The four casings were labeled laboratory number 281441.  (*Id.*, PageID #1863.)  Both notecards contain the same set of initials, "TLL," "BPT," "DCR," and "VEK."  (*Id.*, PageID #1862–63.)  The first three sets of initials reference the three detectives who performed testing on the casings.  (*Id.*, PageID #1714.)  The last set of initials stands for Vic Kovacic, the supervisor who verified the tests.  (*Id.*)

Examiners performed a comparison test on the casings.  (*Id.*)  Using a comparison microscope, they determined that the four casings found outside the Othello apartments were fired from the same firearm.  (*Id.*; *id.*, PageID #1863.)  Examiners were then able to determine that the single casing found inside was fired from the same firearm that fired the four casings found outside.  (*Id.*, PageID #1714–15; *id.*, PageID #1862.)  The notecards also note the results of these comparisons.  (*Id.*, PageID #1862–63.)

On the back of each card, a sticker documents whether the evidence was signed out for trial, and the stickers include the following lines:  name; badge #; signature; unit #; date; time; to courtroom; CR #; lab initials; returned by; date; time; and lab initials.  (*Id.*, PageID #1862–63.)  Both cards have only two lines filled out, name and badge number.  For each, Detective Masilonis, badge number 1957, signed out the

evidence.  (*Id.*)  Missing from the sticker is any account of the date on which the evidence was signed out, the time the evidence was signed out, and when the evidence was returned.  (*Id.*)

Additionally, a pellet from the morgue was submitted to the forensic laboratory on April 9, 1991.  (*Id.*, PageID #1866.)  This evidence was labeled laboratory number 280581.  (*Id.*)  The only test documented for this pellet is weighing it and a jacket fragment.  (*Id.*)  The sticker on the back of the card for this pellet looks the same as the cards for the casings.  On the back, only two lines are filled out, name and badge number.  (*Id.*)  Detective Masilonis, badge number 1957, signed out the morgue pellet. (*Id.*)  Missing from the sticker is any account of the date on which the evidence was signed out, the time the evidence was signed out, and when the evidence was returned.  (*Id.*)

### C.6.    Policies and Procedures

In 1991, the policies and procedures of the Cleveland police included general police orders (also known as GPOs), a manual of rules dating to 1986, a 1970 detective manual, and a 1990 criminal investigation procedural manual.  (ECF No. 116-5, PageID #7080; ECF No. 116-12; ECF No. 116-22; ECF No. 116-29, PageID #7458.) Additionally, police officers received periodic reminders of policies and other information in the form of divisional notices.  (*See, e.g.*, ECF No. 116-28; ECF No. 116-1, PageID #6817–18.)  In deposition, the City testified that the individual officers named as Defendants acted consistently with their training and in line with the police policies, practices, and procedures in effect at the time.  (ECF No. 115-3, PageID #6303–05.)

### C.6.a. Relevant Policies

Under Cleveland police policy, "[t]he primary purpose of investigations prior to an arrest is to identify and apprehend the criminal suspect." (ECF No. 116-12, PageID #7207; ECF No. 116-3, PageID #6991.)  For detectives, "obtaining and reporting the information which is the basis of the files and indices [in the record room and scientific investigation unit] is the responsibility of the investigating officers." (ECF No. 116-12, PageID #7227.)  Instead, "it is the responsibility of the investigating officer to examine the basic record or report indicated by an index card to determine the connection between the file information and his present investigation." (*Id.*)  Because "[o]fficial reports not only reveal the activity of the investigators to the reviewing superior officers, but also serve as a permanent file record of the facts and evidence obtained by the [d]epartment since the receipt of the complaint[,]" "[e]ach file must be complete and up-to-date." (*Id.*, PageID #7225.)  Detectives had an obligation to prepare daily summary reports of investigative activity (*id.*, PageID #7185), and corrections to reports were made by interlineation (*id.*, PageID #6993).

Regarding witness interviews, police policy provided that "[t]he purpose of the interview is to obtain all the testimony available, but the investigator must be careful not to suggest what he wants or expects the witness to say. . . . When a witness is checked for reliability . . . every detail of his testimony should be recorded and examined." (*Id.*, PageID #7223–24.)  All items submitted to the scientific investigation unit for examination required a report of explanation. (ECF No. 116-3, PageID #6985.)

52

Effective August 22, 1990, Cleveland police policy required the investigating officers to turn over the detectives' file to the statement unit within seven days after a suspect is charged or released.  (ECF No. 116-29, PageID #7549.)  Then, the statement unit provided these documents to the prosecutor's office within seven days of a suspect's arrest or indictment.  (*Id.*, PageID #7558.)  Although Defendants maintain that in 1991, the policy of the Cleveland police required homicide detectives to transmit reports, witness statements, and other investigatory materials directly to the prosecutor (ECF No. 140, PageID #15297), the policy at issue does not so provide or support such a practice (ECF No. 116-29, PageID #7549–50; ECF No. 109-16).

*Lineups.*

In 1991, the Cleveland police had procedures governing lineups.  (ECF No. 116-30, PageID #7596.)  A former Cleveland police chief testified that these procedures also applied to photo arrays, though nothing on their face corroborates that testimony and he ultimately conceded that "[t]here were no specific policies" for photo arrays or the use of a single photo to identify a suspect.  (ECF No. 116-3, PageID #7031; ECF No. 116-2, PageID #6890.)  At the time, the practices and training of the Cleveland police emphasized the governing case law, which underscores concern about suggestive procedures (ECF No. 116-30, PageID #7596 & 7599; *see also* ECF No. 116-2, PageID #6956), and the need for an officer to be impartial (ECF No. 116-30, PageID #7598).  Failure to conduct a lineup (or photo array, according to the former Cleveland police chief's testimony) impartially "[o]ften results in a false identification."  (*Id.*)

*Brady*.

In the 1970s, the Cleveland police had a policy and practice that might permit the police to withhold exculpatory witness statements.  (ECF No. 116-26; *see Jackson*, 925 F.3d 793, 830–31 (6th Cir. 2019).)  In 1987, the Cleveland police changed this policy.  (ECF No. 116-27; ECF No. 116-2, PageID #6947–49.)  This policy, which remained in effect through 1991, regulated compliance with criminal discovery, specifically authorized the withholding of certain information, and did not expressly require the disclosure of all *Brady* material.  (ECF No. 116-27, PageID #7387.)  At roughly the same time that the police changed this policy, the police chief signed an order directing officers not to disclose discovery directly to defense lawyers.  (ECF No. 116-28.)  No police policy or order in the record advises officers that they had obligations to disclose exculpatory or impeachment evidence.  (*See* ECF No. 150.)

### C.6.b. Training

Cleveland police began training in the academy and continued through their service.  (ECF No. 116-2, PageID #6957; ECF No. 116-3, PageID #7020; ECF No. 128-3, PageID #9420 & #9532.)  In 1990, cadets received 477 hours of training, plus 187 hours on departmental procedural.  (ECF No. 116-30, PageID #7673–77.)  Of those training hours, 24 were spent on notetaking and writing reports.  (ECF No. 116-2, PageID #6912–13.)  Each recruit received a hard copy of the various policies and procedures of the Cleveland police.  (ECF No. 116-3, PageID #7014–15.)

Once on the force, police officers completed field training.  (*See, e.g.*, ECF No. 104-3, PageID #2122.)  For their first six months, new officers trained with one or two more senior officers.  (ECF No. 116-30, PageID #7706.)  Officers Taliano and

Reese led in-service training programs.  (*Id.*, PageID #7739.)  At daily roll call, supervising officers distributed new policies and procedures and provided updates on cases.  (ECF No. 107-1, PageID #3564–65; ECF No. 112-1, PageID #4593–94.)  After five years of service, police officers could seek a transfer to the homicide unit.  (ECF No. 128-3, PageID #10086.)  Supervisors had responsibility for communicating police policies and procedures to personnel in their units.  (ECF No. 115-1, PageID #6132.)  Still, on-the-job training provided "the real training" for homicide detectives.  (ECF No. 109-2, PageID #4304; ECF No. 134-1, PageID #15086.)

With respect to the use of photo arrays, the police received on-the-job training from other officers.  (ECF No. 104-3, PageID #2144; ECF No. 116-2, PageID #6886–87.)  That training directed officers to pick six or seven relevantly similar photos from the scientific investigation unit.  (ECF No. 104-3, PageID #2152; *see also* ECF No. 107-1, PageID #3614.)  If a witness identified a suspect in a photo array, the officer wrote his or her badge number on the back of the photograph selected.  (ECF No. 104-3, PageID #2153.)  Then, in practice, all the photos were kept in the case file.  (ECF No. 110-1, PageID #4450.)

But if a witness thought he knew the suspect or information about a suspect, such as the suspect's nickname or where he lived or "had some understanding of who that individual was," then the police used a single photo, also known as a "cold stand" or a "single suspect confrontation."  (ECF No. 116-2, PageID #6889; ECF No. 115-2, PageID #6165.)  In these circumstances, the "normal procedure" involved using a single photo to identify a suspect.  (ECF No. 116-3, PageID #7037; ECF No. 104-3,

PageID #2147; ECF No. 109-2, PageID #4292.)  Further, in these circumstances, the police used pictures that did not come from the scientific investigation unit.  (ECF No. 109-2, PageID #4290–91.)  No written policy for this practice appears in the record; and, from 1985 to 1995, the Cleveland police did not train officers with respect to this practice.  (ECF No. 116-2, PageID #6890.)

With respect to disclosure of exculpatory evidence or impeachment material, the record contains no evidence that officers received training materials during the relevant time periods.  (*See* ECF No. 128; *see also, e.g.*, ECF No. 104-3, PageID #2163; ECF No. 107-1, PageID #3605; ECF No. 113-1, PageID #5236.)

### D.      The Trial and Conviction of Charles Jackson

On May 16, 1991, a grand jury returned an indictment against Charles Jackson for the aggravated murder of Joe Travis and the attempted aggravated murder of Ronald Lacey.  (ECF No. 104-4, PageID #3361–62.)  Detective Adrine presented the case to the grand jury.  (ECF No. 115-25, PageID #6465.)  Two prosecutors principally handled the case:  Winton Grays and Thomas Rein, who was a new prosecutor at the time.  (*See* ECF No. 104-4, PageID #3126; *id.*, PageID #2818.)

### D.1.   Trial Preparation

Prosecutor Grays wanted to interview the principal witnesses in the case.  On November 13, 1991, he talked with Ronald Lacey.  (ECF No. 110-12, PageID #4545.)  Omelia "Rita" Tucker moved and could not be located.  (*Id.*)  But less than two months before trial, Tucker was indicted on multiple felony charges for drug trafficking at the Othello apartments.  (ECF No. 151-1, PageID #19312–13.)

In December 1991, Thomas Salvano, who was present at the Othello apartments on the night of the murder, was incarcerated at the Lorain Correctional Institution but "got shipped back" to the Cuyahoga County jail. (ECF No. 159-1, ¶ 4.p., PageID #24554.) He claims that two Cleveland homicide detectives came to talk to him. (*Id.*, ¶ 4.q.) According to Salvano, the detectives showed him a single photo of Mr. Jackson and said "that I needed to testify against him at trial and say that he killed Joe Travis." (*Id.*, ¶ 4.r.) He claims that they offered him a deal on his case and that he responded that he needed to talk to his lawyer. (*Id.*) Later, two different Cleveland homicide detectives met with Salvano at the jail while his lawyer was present. (*Id.*, ¶ 4.s.) They showed him a six-pack of photos that included a photo of Mr. Jackson, and Salvano "did not identify anyone in the six-pack as the killer." (*Id.*) Salvano refused to testify against Mr. Jackson, telling detectives that Mr. Jackson was not the shooter. (*Id.*, ¶ 4.t., PageID #24554.)

On December 10, 1991, Prosecutor Grays requested photographs from the photography lab. (ECF No. 140-2, PageID #2013.) Consistent with the policy of the Cleveland police at the time, Detective Masilonis, as one of the lead detectives on the case, signed the forensic evidence out of the scientific investigation unit or out of the Cleveland police property room for trial. (ECF No. 140-2, PageID #1712–13, #1716–19 & #1784–85; ECF No. 115-2, PageID #6211–13 & #6215.) Detective Masilonis signed out Lacey's hat (*see, e.g.,* ECF No. 128-4, PageID #12778 & #13167), and signed out photographs of the crime scene, bullet casings, a pellet from the morgue, and several corresponding reports (*see, e.g.*, ECF 104-2, PageID #1712 &

57

#1784–85).  There is no record that he signed out the forensic testing on Lacey's hat or the fingerprint comparison.

Before trial, defense counsel for Mr. Jackson moved for discovery and inspection of exculpatory and mitigatory material.  (ECF No.104-4, PageID #3324.)  They also moved for a bill of particulars.  (*Id.*, PageID #3327.)

### D.2.    Pretrial Discussions with the State Trial Court

On Wednesday, December 11, 1991, the trial began.  (ECF No. 104-1, PageID #1164.)  At the outset of the trial, when discussing various preliminary matters with counsel, the State trial court inquired:  "Mr. Grays, have you given to the defense anything in the nature of exculpatory evidence that you have come across?"  (*Id.*, PageID #1174).  In response, the prosecutor flatly represented that "[t]here is no exculpatory evidence, Judge."  (*Id.*)

Additionally, the State trial court asked whether the prosecution made "a complete disclosure to the defense of the evidence that you intend to offer, as the physical evidence that you intend to offer[?]"  (*Id.*, PageID #1172.)  In response, the prosecutor identified:  (1) casings from a 9-millimeter gun; (2) photographs; (3) evidence from the coroner; (4) a hat (that the prosecutor stated "belonged to the defendant" but was most likely Lacey's hat); and (5) possibly "a pellet that was recovered from a tire" on a car parked outside the Othello apartments, on which detectives were still checking.  (*Id.*)  The prosecutor advised the State trial court that he learned of the pellet that morning.  (*Id.*, PageID #1173.)  According to records from the property unit sign-out log, Detective Masilonis signed the tire out on December 11, 1991.  (ECF No. 128-4, PageID #13167.)

Defense counsel represented that they previously knew of a shell casing, but not the pellet.  (ECF No. 104-1, PageID #1173.)  According to the prosecutor, the owner of the car (Omelia "Rita" Tucker) said that a pellet was recovered from the tire of her car but that the detective said no pellet was recovered.  (*Id.*, PageID #1172.)  After conferring with Mr. Jackson, the defense preferred to proceed with trial rather than take a continuance.  (*Id.*, PageID #1173–74.)  The tire was not introduced into evidence at trial.  During the trial, the record demonstrates that the tire was kept in the homicide unit's temporary or "junk" room.  (ECF No. 115-2, PageID #6199–6200.)

### D.3.  Voir Dire on Photo Array

After jury selection, but before opening statements and outside the presence of the jury, the State trial court permitted examination of Detective Nolan on the "photograph array from which the identification was made" of the suspect.  (ECF No. 104-1, PageID #1297.)  Detective Nolan recounted meeting Ronald Lacey for the first time in early 1991 when he arrested Lacey and his mother for drug crimes.  (*Id.*, PageID #1298.)  A few months later, Detective Nolan became aware of the murder of Joe Travis and heard that Lacey might have been shot at as well.  (*Id.*)  Detective Nolan testified that the strike force unit arrested Lacey and questioned him about the night of the murder of Joe Travis.  (*Id.*, PageID #1298–99.)  In recounting Lacey's story, Detective Nolan testified that Lacey's "hat came off his head because the bullet pierced his hat and there's a hole through his hat."  (*Id.*, PageID #1299.)

Then, the prosecutor asked Detective Nolan if he "ha[d] occasion to show Ronald Lacey a group of photographs."  (*Id.*, PageID #1299–1300.)  Detective Nolan responded, "yes."  (*Id.*, PageID #1300.)  The prosecutor asked "how many

photographs[,]" and Detective Nolan responded "probably between five and seven photographs." (*Id.*) When the prosecutor asked whether Lacey was able to identify the suspect, Detective Nolan responded "[y]es" and "identified Charles Jackson" then said, "I think it was Charles Jackson." (*Id.*) Detective Nolan identified the photo as "the picture that Ronald Lacey immediately identified from the photo array that we had showed him." (*Id.*, PageID #1300–01.)

On cross-examination, Detective Nolan testified that he did not have with him the other photographs from the array shown to Lacey because he was only just notified of the hearing. (*Id.*, PageID #1303.) Then, Detective Nolan explained that Lacey picked the photograph of Mr. Jackson out of a group of five to seven other photographs. (*Id.*, PageID #1304.) When asked whether he could obtain the other photographs, Detective Nolan responded, "I'm not sure I can or not." (*Id.*, PageID #1306.) But he said that he "probably could find" the other photographs shown to Lacey. (*Id.*, PageID #1307.) In response to a question from the court, Detective Nolan testified that the other photographs used in the array were not segregated except that the detectives only had about a dozen 35-millimeter photographs. (*Id.*, PageID #1307–08.) The court continued the voir dire until the next day for Detective Nolan to bring the remaining photographs used in the array. (*Id.*, PageID #1309.)

On December 12, 1991, the voir dire of Detective Nolan resumed. (ECF No. 104-1, PageID #1310.) Detective Nolan brought seven additional photographs with him, labeled exhibits two through eight. (*Id.*, PageID #1310–11.) He testified that he retrieved these photos from a file relating to Lacey. (*Id.*, PageID #1311.)

Then, defense counsel inquired into the circumstances of Lacey's questioning, which resulted from an arrest for "loitering for drugs." (*Id.*, PageID #1311–12.) But Detective Nolan could not say whether Lacey was convicted of that charge or whether he had a prior criminal record. (*Id.*, PageID #1312.)

Again, Detective Nolan explained that he showed Lacey the full array of photos from the personal files of the detectives, asking whether Lacey could pick out the person who shot at him. (*Id.*, PageID #1317–18.) While defense counsel pursued a line of questioning that the photographs in the array looked nothing alike, Detective Nolan insisted that they were similar. (*Id.*, PageID #1319–26.) Detective Nolan also testified that these were the exact photos shown to Lacey. (*Id.*, PageID #1326.) Ultimately, the record shows that Detective Nolan did not testify about the photographs in front of the jury. (*Id.*, PageID #1160.)

### D.4.  Trial

Following opening statements, the State presented the testimony of five witnesses, as did the defense. (*Id.*) The State called the following witnesses:

Dr. Robert Challener, the coroner,

Ronald Lacey,

Omelia "Rita" Tucker,

Detective Donald Malloy, and

Detective Bruce Taylor.

(*Id.*) The defense called the following witnesses:

Dorothy Foster, Mr. Jackson's sister,

Patricia Row, a friend of Mr. Jackson,

61

Veronica Lawson, a friend of Mr. Jackson, and

Nenita Readus, Mr. Jackson's girlfriend.

(*Id.*)  Additionally, Mr. Jackson testified in his defense.  (*Id.*)

### D.4.a. The State's Witnesses

### i. Coroner's Testimony

The State's first witness was Dr. Robert Challener, the coroner.  (*Id.*, PageID #1354.)  Dr. Challener's office performed the examination on the body of the victim, Joe Travis.  (*Id.*, PageID #1356–57.)  He testified that the gun was "six inches or less" away from the face of the victim and that the bullet entered the right side of the face and passed through to the left side of the neck.  (*Id.*, PageID #1362–63.)  Through Dr. Challener, the bullet that killed Joe Travis and the autopsy were entered into evidence.  (*Id.*, PageID #1364–65.)

The prosecutor's direct examination addressed the internal and external autopsy examination of Joe Travis's body (*id.*, PageID #1356–58), visual inspection of fouling and stippling on Joe Travis's face (*id.*, PageID #1358, #1361 & #1363), and the toxicology test results from Joe Travis (*id.*, PageID #1364–65).  Both the cross- and redirect examinations involved Dr. Challener's opinions on fouling and stippling on clothing, generally.  At no point during the examination did counsel or Dr. Challener mention Lacey's hat or the results of the gunshot residue tests.  (*Id.*, PageID #1367–69.)

### ii. Ronald Lacey's Testimony

Next, the State called the surviving victim, Ronald Lacey.  (*Id.*, PageID #1370.)  At the outset of his testimony, Lacey testified that he knew a person named Charles

Jackson and that Mr. Jackson used the nickname Sweetman. (*Id*.)  Then, Lacey identified Mr. Jackson as Sweetman and pointed him out in courtroom. (*Id*., PageID #1371–72.)  Lacey testified that he, Joe Travis, and a person named Jerome were selling drugs in the second-floor hallway of the Othello apartments between 1:30 am and 2:30 am on April 7, 1991. (*Id*., PageID #1372.)  Charles "Dog" Davis came in, drunk, accused Thomas Salvano of running someone over, and punched out a window. (*Id*., PageID #1373–74.)  Charles "Dog" Davis yelled for everyone to get out of the hallway because he was going to start shooting. (*Id*., PageID #1374.)  Lacey testified that the men cleared the hallway, and he heard gunshots. (*Id*., PageID #1374–75.)

Later, around 4:30 am or 5:00 am, Lacey heard a door slam, went out into the hallway, and saw Sweetman and Charles "Dog" Davis's brother, Don Davis. (*Id*., PageID #1375.)  The two men approached Travis and Lacey, and Sweetman said, "You know me[.]  I'll shoot up anything." (*Id*., PageID #1377.)  Then, Lacey testified that Sweetman came around, put a gun to the back of his head, and pulled the trigger. (*Id*., PageID #1377–78.)  Lacey fell and pretended to be dead. (*Id*., PageID #1378–79.)

Then, instead of continuing to refer to the suspect as Sweetman as Lacey did during his testimony, Prosecutor Grays asked Lacey, "[a]fter you fell, what did the defendant, Charles Jackson, do?" (*Id*., PageID #1379.)  Lacey testified that he "jumped to the next landing, shot Joe in the head." (*Id*.)  Prosecutor Grays asked what gun "the defendant" had, and Lacey said a 9-millimeter gun. (*Id*.)  Next, Prosecutor Grays asked, "[a]fter the defendant shot Joe Travis, what did he do?" (*Id*.)  Lacey testified that "[h]e left the building." (*Id*., PageID #1380.)  Defense counsel did

not object to the phrasing of the questions.  Also, the State introduced Lacey's hat into evidence, and Lacey identified where the bullet tore a piece of the strap off the hat.  (*Id.*, PageID #1382.)

During cross-examination, defense counsel asked Lacey if the police showed him "[a] whole series of pictures."  (*Id.*, PageID #1392.)  Lacey confirmed that they did.  (*Id.*)  Plaintiff highlights that Lacey did not testify about the single photo that detectives showed to him to identify the suspect.  (ECF No. 161, PageID #24586.)

At the end of cross-examination, defense counsel showed Lacey a photograph and asked him to identify the man in the photograph.  (ECF No. 104-1, PageID #1393.)  Lacey identified the man as Mr. Jackson.  (*Id.*)  Actually, however, the photograph was a picture of James Morris, which defense counsel emphasized in closing argument.  (*Id.*, PageID #1523.)  The parties agree that Lacey incorrectly identified Mr. Jackson as the man in the photograph.  (ECF No. 161, PageID #24586; ECF No. 140-1, PageID #15259.)

Plaintiff argues that defense counsel did not cross-examine Lacey about his statement to police that he saw the suspect shoot Travis "in the forehead" (ECF No. 115-27, PageID #6657; ECF No. 115-28, PageID #6729; ECF No. 104-4, PageID #3364) because Defendants never produced that statement (ECF No. 161, PageID #24587).  Plaintiff argues that Lacey's statement contradicts "the State's own evidence that Travis was shot in the temple."  (*Id.*)  However, Dr. Challener testified that the gunshot wound entrance "is located about seven/eighths inch above the lower attachment of the ear and seven/eighths inch in front of it[,]" which does not describe

64

the temple area.  (ECF No. 104-1, PageID #1359.)  In any event, the prosecutor's archived file contains Lacey's statement to Detectives Masilonis and Taliano that Travis was shot in the forehead (ECF No. 104-4, PageID #3365 & #3378), as does the statement unit file (ECF No. 115-28, PageID #6710, #6713, & #6728).

### iii. Omelia "Rita" Tucker's Testimony

Next, Omelia "Rita" Tucker testified as a witness to the crime.  (ECF No. 104-1, PageID #1394.)  Tucker explained that she lived at the Othello apartments at the time of the murder and owned a blue Ford Bronco.  (*Id.*, PageID #1395.)  She testified that she saw Charles "Dog" Davis on the night of the murder between 4:00 am and 4:30 am in the hallway at the Othello apartments; he was drunk and making a lot of noise.  (*Id.*, PageID#1395–96.)  After she got into an argument with him, Charles "Dog" Davis went downstairs and broke some windows.  (*Id.*, PageID #1396.)  She called the police, who arrived about ten minutes later.  (*Id.*)  According to Tucker, the police made a report, which included a statement that she shot Charles "Dog" Davis in the hand and that he said he would be back.  (*Id.*, PageID #1397.)  About twenty or thirty minutes after the police left, Tucker testified that she heard several shots, then the alarm to her truck went off.  (*Id.*, PageID #1397–98.)  When she heard the alarm, Tucker said that she looked outside and saw Sweetman.  (*Id.*, PageID #1398.)  In the courtroom, she identified Charles Jackson as Sweetman.  (*Id.*)

When she saw Sweetman, he was getting into a gray Dynasty to leave the scene.  (*Id.*, PageID #1399.)  Tucker ran outside to see why her truck's alarm was going off.  (*Id.*, PageID #1401.)  When she got to the hallway, she found the dead body of Joe Travis.  (*Id.*, PageID #1401–02.)  She screamed, returned to her apartment,

and called the police. (*Id.*, Page ID#1402.) When the police arrived, she told them who killed Joe Travis. (*Id.*) Tucker testified that, after the events of that night, she saw that the front tire on the driver's side was shot out. (*Id.*, PageID #1401.)

Tucker testified that she had never been convicted of a State or federal offense. (*Id.*, PageID #1401.) Shortly before trial, Tucker was indicted in State court on multiple felony charges for drug trafficking at the Othello apartments. (ECF No. 151-1, PageID #19312–13.) After her testimony, the case against Tucker was continued and she pled guilty to a single count. (ECF No. 151-1.) She was sentenced to one year in prison but released early on shock probation. (*Id.*) Plaintiff argues that Defendants failed to disclose Tucker's criminal history and the fact that she was under indictment when she testified. (ECF No. 161, PageID #24589–90.) Defendants do not dispute that the statement unit file and the prosecutor's archived file do not contain Tucker's criminal history. (ECF No. 174, PageID #26335.)

Additionally, Plaintiff argues that Defendants suppressed Tucker's three previous statements that she could not identify the suspect, contradicting the identification of Mr. Jackson that she made during trial. (ECF No. 161, PageID #14587.) In response, Defendants point out that the three police reports memorializing that Tucker could not identify the shooter appear in the statement unit file (ECF No. 115-28, PageID #6717; ECF No. 115-29, PageID #6749 & #6743–44) and the prosecutor's archived file (ECF No. 104-4, PageID #3368, #3259–60 & #3264). (ECF No. 174, PageID #26334.)

66

### iv. The Testimony of the Detectives

Following Tucker's testimony, Detective Donald Malloy, the crime scene detective for the Joe Travis homicide, took the stand on the afternoon of December 12, 1991.  (ECF 104-1, PageID #1415.)  Through Detective Malloy's testimony, crime scene photographs and shell casings from the crime scene were presented to the jury and entered into evidence.  (*Id.*, PageID #1418-26.)  When asked what he did at the scene of the murder, Detective Malloy responded, among other things, "tried to get fingerprints in some cases."  (*Id.*, PageID #1418.)  There was no other mention of fingerprints during this examination.

The prosecution's final witness was Detective Bruce Taylor, who ran firearm tests at the forensics lab in the Joe Travis homicide case.  (*Id.*, PageID #1429.)  He compared casings from the crime scene and determined that the casings were fired from the same weapon.  (*Id.*, PageID #1433.)

### v. Fingerprint Comparison (December 13, 1991)

Two days after the trial began, on December 13, 1991, the fingerprint unit was asked to compare the latent print lifted at the crime scene to Mr. Jackson.  (ECF No. 104-2, PageID #1787.)  That comparison found no match between the fingerprints found at the crime scene and Mr. Jackson.  (*Id.*, PageID #1734–35.)  No record or evidence suggests that this comparison, completed on December 13, 1991, was ever signed out from the scientific investigation unit or delivered to the prosecutor's office.  (*Id.*)

This comparison is not documented or referenced in the homicide file, the statement unit file, or the prosecutor's archived file.  Instead, the back of the latent

print envelope that contained prints from the bottle and cigarette pack has a notation reading "12-13-91 not ident [*sic*] with Charles Jackson" accompanied by the number 187044, which appears to reference the number associated with a mugshot of Mr. Jackson that detectives used in the investigation.  (*Id.*, PageID #1727; *id.*, PageID #2006.)  The initials "C.M." also appear on the envelope, and "C.M." would have been responsible for performing the analysis.  (*Id.*, PageID #1728.)  To determine whether the prints were a match with Mr. Jackson, the analyst used a loop, a magnifier tool used by fingerprint examiners.  (*Id.*, PageID #1729.)  With the assistance of a loop, examiners looked for points of comparison, to see whether the prints were a match. (*Id.*)  The examiner determined that Mr. Jackson's prints did not match the prints recovered from the scene.  (*Id.*, PageID #1728.)  The record does not indicate who requested this analysis.

### D.4.b. Defense Witnesses

At trial, the defense presented four witnesses who knew Charles Jackson well. His sister, a friend, and his girlfriend all testified on his behalf.  Each testified how they knew Mr. Jackson and was then asked about James Morris.  (ECF No. 104-1, Page ID #1442–56.)  Defense counsel had two photographs with James Morris and had each witness identify him in both photographs.  (*Id.*)  One photograph had both Mr. Jackson and James Morris.  (*Id.*)  The last of the four witnesses to testify was Mr. Jackson's girlfriend, Nenita Readus.  (*Id.*, PageID #1453.)  Readus testified about the photographs, too, but she also testified as Mr. Jackson's alibi.  (PageID #1454–55.) She explained that, on the night of April 6, 1991, she and Mr. Jackson went together to a baby shower then, around 11:30 p.m., to a party, which they left around 2:30 or

3:00 a.m. on April 7, 1991. (*Id.*) When they left the party, Readus testified that they returned home together. (*Id.*, PageID #1454.) On cross-examination, Readus testified that Mr. Jackson drove a burgundy Monte Carlo and did not have a gray car. (*Id.*, PageID #1461–62.)

As the defense's final witness, Mr. Jackson testified. (*Id.*, PageID #1465.) At the time, he was 28 years old. (*Id.*, PageID #1466.) On the night of April 6, 1991, Mr. Jackson testified that he spent the night with his girlfriend, Nenita Readus. (*Id.*, PageID #1469.) Also, he identified James Morris in a photograph. (*Id.*, PageID #1472.) Mr. Jackson denied knowing Joe Travis and Ronald Lacey and maintained his innocence. (*Id.*, PageID #1474–75; *see also id.*, PageID #1480.) On cross-examination, Mr. Jackson testified that he drove a dark red 1980 Monte Carlo and also owned a beige truck. (*Id.*, PageID #1479.) He testified that Don Davis owned a gray Cadillac. (*Id.*; *see also id.*, PageID #1481.) Mr. Jackson admitted that his nickname was Sweetman but denied owning a 9-millimeter weapon. (*Id.*, PageID #1481.) Mr. Jackson's testimony at trial is largely consistent with his deposition in this case. (ECF No. 122-2, PageID #7887–7912.)

### D.4.c. Conclusion of the Trial

In closing argument on Friday, December 13, 1991, the prosecutor asked the jury to look at Lacey's hat and used it to bolster his identification of Mr. Jackson as the murderer:

> Take a look at this hat when you get to the jury room and you tell me how close Ron Lacey came.

> Remember when he told you that the bullet knocked the gold buckle off here, and you see a little crease here. Tell me how close he came.

He's going to forget who did that?  He's going to mistake the identity of the person who did it?  The person that he talked to in the hallway prior to it happening?  And then he saw the same person blow his friend's brains out right in front of him.

He's going to forget who did that?  He's going to blame the wrong person and have the person who tried to kill him still walking around out there some place who can come back and do it again?

Do you think he's going to blame it on someone else or do you think he'd want to get the right person?

(ECF No. 104-1, PageID #1537.)

On December 16, 1991, the jury found Mr. Jackson guilty of Count 1, the aggravated murder of Joe Travis, with a firearm specification, and Count 2, the attempted murder of Ronald Lacey.  (*Id.*, PageID #1586.)  During the trial, Mr. Jackson turned to the victim's family and said, "I did not kill your son." (*Id.*, PageID #1596.)  At sentencing the same day, Mr. Jackson addressed the State trial court and said: "I'd like to thank my family and God for your support, and they believe me.  They know I'm innocent.  One day, I'll prove it." (*Id.*, PageID #1598.)  Mr. Jackson was sentenced on Count 1 to a term of incarceration of twenty years to life, consecutive to three years for the firearm specification.  (*Id.*)  On Count 2, Mr. Jackson was sentenced to seven to twenty-five years, to be served consecutively.  (*Id.*)

### D.5.  Appeals and Exoneration

On appeal, the intermediate State appellate court affirmed Mr. Jackson's convictions for murder and attempted murder and his sentence.  *State v. Jackson*, No. 63167, 1993 WL 290120 (Ohio Ct. App. July 29, 1993).  In 1997, the State trial court denied Mr. Jackson's motion to vacate his sentence.  He appealed that decision, and the intermediate State appellate court affirmed.  *State v. Jackson*, No. 75875,

2000 WL 1739223 (Ohio Ct. App. Nov. 22, 2000).  On September 13, 2013, Jackson filed a motion to correct a void judgment, and the State trial court denied that motion.

In February 2016, pursuant to the Ohio Public Records Act, the Ohio Innocence Project requested documents from the Cleveland police relating to the investigation of Joe Travis's murder and the arrest of Mr. Jackson.  *See Jackson v. City of Cleveland*, 64 F.4th 736, 740 (6th Cir. 2023).  It received no response.  *Id.*  In June 2016, the Innocence Project renewed its request and filed a new records request with Cleveland's Law Department.  *Id.*  In August 2016, the Innocence Project sent another records request, this time to the Cuyahoga County Prosecutor's Office, which produced a heavily redacted file.  *Id.*

Nine months later, in May 2017, the City of Cleveland responded to the Innocence Project's initial request and produced its unredacted file.  *Id.* at 740–41.  As the Sixth Circuit noted, based on the pleading-stage nature of its review, "[t]he unredacted documents included significant exculpatory evidence."  *Id.* at 741.  They contained early statements by witnesses that contradicted their trial testimony, as well as reports revealing unduly suggestive identification and interview procedures, fabrication of evidence, witness statements that identified other potential suspects or that denied that Mr. Jackson was the killer, and attempts to coerce false testimony from witnesses.  *Id.*  In August 2017, the Prosecutor's Office produced an unredacted version of their file, which contained the same exculpatory police reports.  *Id.*

In May 2018, as counsel for Mr. Jackson, the Ohio Innocence Project sought post-conviction relief in the State trial court.  *Id.*  In his papers, Plaintiff relied on the

71

exculpatory information produced in response to the records requests.  *Id.*  In November 2018, the State trial court vacated Mr. Jackson's conviction and released him from custody on bond.  *Id.*  In August 2019, the State moved to dismiss the charges against him, and he was finally exonerated after spending 27 years in prison.  *Id.*  In this litigation, Defendants do not dispute Mr. Jackson's innocence.  (ECF No. 106, PageID #3479–80.)

## STATEMENT OF THE CASE

Plaintiff Charles Jackson filed this civil-rights lawsuit against various members of the Cleveland police who were involved in investigating the case against him, the City of Cleveland, the prosecutor who handled his post-conviction records requests, and Cuyahoga County.  (ECF No. 1.)  All Defendants other than the individual police officers moved to dismiss or for judgment on the pleadings.  (ECF No. 11; ECF No. 12; ECF No. 38.)  The Court denied the motions, except with respect to a claim against Cuyahoga County for inadequate training or supervision.  (ECF No. 31, PageID #357; ECF No. 47.)  On appeal, the Sixth Circuit reversed with respect to the claims against the prosecutor and granted qualified immunity to her.  (ECF No. 66.)  The parties filed a joint motion to dismiss Cuyahoga County with prejudice.  (ECF No. 95.)  Based on that motion, the Court dismissed Cuyahoga County.  (ECF No. 99.)

Later, the Court substituted the estates of two named Defendants (Detective Adrine and Officer Reese) and amended by interlineation to add the name of one Defendant, John Petranek, previously identified only by a signature on a police

72

report. (*See* ECF No. 45.) Following discovery, on motion of the parties, the Court dismissed Defendant John Petranek. (ECF No. 121.)

### A. Motion to Drop a Party and Certain Claims

Plaintiff moves to drop the Estate of Samuel Reese as a party to this action and to dismiss Count 4 (False Arrest), Count 6 (Denial of Access to Courts), and Count 11 (Ohio State Law Negligence: Willful, Wanton, and/or Reckless Conduct) against all Defendants. (ECF No. 142, PageID #15336.) A plaintiff seeking to dismiss fewer than all claims or parties must do so under Rule 21. *See Philip Carey Mfg. Co. v. Taylor*, 286 F.2d 782, 785 (6th Cir. 1961); *Sheet Metal Workers' Nat'l Pension Fund Bd. of Trustees v. Courtad, Inc.*, No. 5:12-cv-7238, 2013 WL 3893556, at *4 (N.D. Ohio July 26, 2013).

Rule 21 provides, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against any party." Fed. R. Civ. P. 21. Unless the parties agree otherwise, the Court generally drops a party under Rule 21 without prejudice. *See Michaels Bldg. Co. v. Ameritrust Co. N.A.*, 848 F.2d 674, 682 (6th Cir. 1988). Generally, dismissal under Rule 21 requires courts to consider prejudice to the non-moving party. *Dix v. Atos IT Sols. & Servs., Inc.*, No. 1:18-cv-275, 2020 WL 6064646, at *2 (S.D. Ohio Mar. 17, 2020) (citing *Wilkerson v. Brakebill*, No. 3:15-cv-435, 2017 WL 401212, at *2 (E.D. Tenn. Jan. 30, 2017)); *United States v. Roberts*, No. 5:19-cv-234-JMH, 2019 WL 6499128, at *2 (E.D. Ky. Dec. 3, 2019) (same). To do so, the "plain legal prejudice" factors used for motions under Rule 41 come into play. *Dix*, 2020 WL 6064646, at *2. To determine whether a defendant will suffer plain legal prejudice, courts consider factors such as: (1) "the defendant's

effort and expense of preparation for trial," (2) "excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action," (3) "insufficient explanation for the need to take a dismissal," and (4) "whether a motion for summary judgment has been filed by the defendant." *Grover by Grover v. Eli Lilly & Co.*, 33 F.3d 716, 718 (6th Cir. 1994) (citation omitted).

Applied to Plaintiff's motion, those factors support dismissal with prejudice. As to the fourth factor, Defendants moved for summary judgment on those claims. Before doing so, they expended significant effort and expense to answer Plaintiff's complaint and complete discovery. Accordingly, the Court finds that dismissal with prejudice of the Estate of Samuel Reese and of Count 4, Count 6, and Count 11 as to all Defendants is appropriate under the circumstances.

### B.    Plaintiff's Claims

After accounting for these dismissals, Plaintiff brings the following claims under 42 U.S.C. § 1983 against the police officers who remain as Defendants (other than Lt. Tekancic):

| Count | Claim |
|---|---|
| 1 | *Brady* Violations |
| 2 | Fabrication of Evidence |
| 3 | Unconstitutional Identification |
| 5 | Malicious Prosecution |
| 7 | Failure to Intervene |

74

(*See generally* ECF No. 1, ¶¶ 260–362, PageID #45–61.) Plaintiff asserts these claims

against the following Defendants, who, based on the foregoing statement of facts, had

the following roles in the investigation:

| Defendant | Role |
|---|---|
| Joseph Masilonis | Lead Detective. Homicide unit. Took Ronald Lacey's second statement and conducted a single-photo photographic identification with Lacey.<br><br>Requested a comparison of Mr. Jackson's mugshot and the single photo of Mr. Jackson before bringing the case to the prosecutor. Then, requested that a photo array with Mr. Jackson's mugshot be shown to Lacey for positive identification before going to the prosecutor.<br><br>Signed out evidence from the property unit for use at trial, including Lacey's hat. The current whereabouts of the hat are unknown. Did not sign out the results from the forensic testing on Lacey's hat or the fingerprint comparison for trial. |
| Michaelene Taliano | Lead Detective. Homicide unit. Took Ronald Lacey's second statement and conducted a single-photo photographic identification with Lacey. Took Lacey's hat to the forensic lab for gunshot residue testing.<br><br>Requested a comparison of Mr. Jackson's mugshot and the single photo of Mr. Jackson before bringing the case to the prosecutor. Then, requested that a photo array with Mr. Jackson's mugshot be shown to Lacey for positive identification before going to the prosecutor. |
| Frank Gedeon | Detective. Strike force unit. Learned Ronald Lacey was at scene of murder. Took Lacey's first statement and conducted a single-photo photographic identification with Lacey. Based on Lacey's description of the suspect's car, found a personal photo of a man (Mr. Jackson) and showed that single photo to Lacey to identify the suspect.<br><br>Testified that he never used photo arrays and that he used a single photo on one occasion, in this case. |

75

| | |
|---|---|
| William Nolan | Detective.  Strike force unit.  Learned Ronald Lacey was at scene of murder.  Took Lacey's first statement and conducted a single-photo photographic identification with Lacey.  Based on Lacey's description of the suspect's car, found a personal photo of a man (Mr. Jackson) and showed that single photo to Lacey to identify the suspect.<br><br>Before opening statements, was examined about the photo array.  Testified that he tested Lacey's identification using a photo array and that this is the only time that he used a photo array in his career.  Did not testify about the photo array in front of the jury. |
| John Healy | Detective.  Presented the case to the prosecutor.  Made copies of the statement unit file and delivered one copy to the prosecutor.<br><br>After presenting the case to the prosecutor and after Mr. Jackson's arrest, interviewed Omelia "Rita" Tucker and Ronald Lacey, and may have shown a photo array to Lacey. |
| Parker Adrine (Estate) | Detective.  Interviewed Omelia "Rita" Tucker and Joe Travis's mother, among others, in the days after the murder.<br><br>Conveyed Ronald Lacey's hat to the scientific investigation unit for forensic testing.  Requested Mr. Jackson's most recent mugshot before the case was presented to the prosecutor.  Testified before the grand jury. |
| Robert Moore | Detective.  Did some work at the Othello apartments with Detective Adrine regarding drug activity there. |

In Count 8, Plaintiff asserts a claim of supervisory liability under Section 1983 against Lt. Henry Tekancic.  (*Id.*, ¶¶ 341–46, PageID #58.)  In addition to overseeing the investigation, the report by Detectives Gedeon and Nolan about Lacey's photo identification of the suspect was directed to, but not signed by, Lt. Tekancic.

In Count 9, Plaintiff brings a claim under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), against the City of Cleveland for failure to adequately train, supervise, monitor, and discipline the officers who allegedly violated his constitutional rights.  (*See id.*, ¶¶ 347–54, PageID #59–60.)

The parties filed cross-motions for summary judgment.  (ECF No. 140; ECF No. 161.)  All remaining Defendants seek a summary judgment on each remaining claim.  (ECF No. 140.)  In addition to arguing that the claims fail as a matter of law, the individual Defendants raise qualified immunity as a defense.  (*Id.*)  Plaintiff seeks judgment as a matter of law on his claims for *Brady* violations (Count 1), failure to intervene (Count 7), failure to supervise (Count 8), and *Monell* liability (Count 9).

## EVIDENTIARY OBJECTIONS

In opposing Plaintiff's motion for summary judgment, Defendants raise three objections to the evidence under Rule 56(c)(2), and Plaintiffs raise five.  Before turning to substantive analysis of the parties' cross-motions, the Court takes up each objection in turn.

### 1.     Defendants' Objections

#### 1.a.    Declaration of Thomas Salvano (March 21, 2024)

In this declaration, Thomas Salvano reaffirms a prior affidavit from May 2, 2018 and his statements in a previous videotaped interview.  (ECF No. 159-1, ¶¶ 2 & 3, PageID #24552.)  In addition to describing the events of the night of the murder of Joe Travis (*id.*, ¶¶ 4.a–4.n, PageID #24552–53), he describes being in jail in December 1991 (*id.*, ¶ 4.p., PageID #24554).  He attests that two homicide detectives, whom he is unable to identify, approached him and offered him a deal in exchange for testifying

77

that Charles Jackson murdered Joe Travis.  (*Id.*, ¶¶ 4.q.–4.t.)  Later, two different detectives showed him six photos while his lawyer was present.  (*Id.*)  In his declaration, Salvano says that he did not testify against Mr. Jackson and that he "told the detectives . . . that I would not testify against Sweetie D because he didn't do it." (*Id.*, ¶ 4.t.)  Defendants make several arguments to exclude Salvano's declaration from consideration on summary judgment.  (ECF No. 174, PageID #26336–43.)

### 1.a.i.  Identification of the Detectives

*First*, Defendants argue that Salvano's declaration is inadmissible because he cannot identify the homicide detectives involved in this incident.  (*Id.*, PageID #26336.)  Defendants note, correctly, that a determination of liability turns on the actions of each defendant and must be made individually.  *Taylor v. Davidson Cnty. Sheriff's Dep't*, 832 F. App'x 956, 960 (6th Cir. 2020); *Williams v. City of Chattanooga, Tenn.*, 772 F. App'x 277, 280 (6th Cir. 2019).  But Salvano's inability to identify the specific detectives with whom he claims he talked before the trial of Mr. Jackson does not render his statement inadmissible.  If anything, his inability to identify any defendant in his declaration helps Defendants by underscoring a potential gap in Plaintiff's proof.

### 1.a.ii. Hearsay

*Second*, Defendants contend that the out-of-court statements of the detectives are inadmissible hearsay.  (ECF No. 174, PageID #26338.)  Hearsay means an out-of-court statement offered to prove the truth of the matter asserted.  Fed. R. Evid. 801(c). Certain statements within the declaration meet this definition, but the Federal Rules of Evidence defines them as not hearsay.  This is so because they are the statements

of a party opponent.  Fed. R. Evid. 801(d)(2).  The statements at issue (those in Paragraphs 4.q.i., 4.r., and 4.t.) were made "by a person whom the party authorized to make a statement on the subject" and "by the party's agent or employee on a matter within the scope of that relationship."  Fed. R. Evid. 801(d)(2)(C) & (D).  This exception applies whether the opposing party means the City of Cleveland or the individual detectives.  Indeed, Defendants list each of the candidates for the detectives who could have participated in such a conversation with Salvano.  (ECF No. 174, PageID #26336–37.)

To argue against the admissibility of the declaration on this basis, Defendants rely on *Guindon v. Township of Dundee*, 488 F. App'x 27, 38 (6th Cir. 2012).  There, the plaintiffs claimed that a municipality retaliated against them in a zoning dispute. To support that claim, the plaintiffs submitted the declaration of a third party, which states "that he was told by an unidentified Village of Dundee employee that the reason Guindon was not hired for certain jobs was because of threats made by the Township against a non-party third person."  *Id.*  Because the declarant could not identify the source of his information, the Sixth Circuit affirmed the district court's exclusion of this evidence on summary judgment.  *Id.*  Without question, *Guindon* was correctly decided.  There, a third-party business or an employee of the township would need to come into court and testify about the alleged retaliation.  The evidentiary deficiency was that the plaintiffs had a declaration attest to what amounts to a rumor.  *See also Williams v. Union Underwear Co.*, 614 F. App'x 249, 255 (6th Cir. 2015) (noting that the only evidence the plaintiff had that he was

79

replaced with a younger employee was that the plaintiff "heard [it] from '[s]omeone out there[.]'"). In contrast, Salvano will come into court and testify to events in which he participated with parties to this litigation.

### 1.a.iii. Inconsistent Statements

*Third*, Defendants argue that Salvano previously attested to three conversations with detectives about the Travis murder in his 2018 affidavit. (ECF No. 174, PageID #26339.) In doing so, they point out inconsistencies in his statements and the timeline. (*Id.*, PageID #26339–40.) Defendants use these inconsistencies to argue that the prosecutor knew about Salvano's exculpatory evidence. (*Id.*, PageID #26341.) These are perfectly fine arguments for a jury. *See, e.g.*, Fed. R. Evid. 806. They involve classic credibility determinations that are the province of the finder of fact and do not warrant exclusion of the declaration.

### 1.a.iv. Sham Affidavit

*Fourth*, Defendants argue that Salvano's declaration is inadmissible as a sham affidavit. (ECF No. 174, PageID #26341.) On summary judgment, Rule 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Under this Rule, "a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 842 (6th Cir. 2021) (quoting *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th

Cir. 1986)). Self-serving affidavits alone will not create an issue of fact sufficient to survive summary judgment. *See France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (quoting *Aerel, S.R.L.*, 448 F.3d at 908–09); *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). The Court can strike or disregard an affidavit that "constitute[s] an attempt to create a sham fact issue," *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908–09 (6th Cir. 2006), as well as any unsupported legal conclusions contained in an affidavit, *Sigmon v. Appalachian Coal Props.*, 400 F. App'x 43, 49 (6th Cir. 2010); Alan A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (4th ed. 2023).

In determining a declaration's admissibility at summary judgment, the district court must first consider "whether the [declaration] 'directly contradicts the nonmoving party's prior sworn testimony,'" and, "[i]f so, absent a persuasive justification for the contradiction, the court should not consider the [declaration]." *Reich v. City of Elizabethtown*, 945 F.3d 968, 976 (6th Cir. 2019) (quoting *Aerel, S.R.L.*, 448 F.3d at 905). Sixth Circuit precedent suggests "a relatively narrow definition of contradiction." *Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006) (citing *Aerel, S.R.L.*, 448 F.3d at 907).

"If the affidavit does not directly contradict prior sworn testimony, it should be stricken if it is 'an attempt to create a sham fact issue.'" *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (quoting *Aerel, S.R.L.*, 448 F.3d at 908–09). In determining whether an affidavit is attempting to create a sham issue of fact, courts consider the following factors: (1) "whether the affiant was cross-examined during his earlier

81

testimony," (2) "whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence," and (3) "whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Aerel, S.R.L.*, 448 F.3d at 909 (cleaned up).

Based on consideration of these factors and the record as a whole as it bears on Salvano's varying statements, his declaration submitted on summary judgment does not constitute a sham affidavit. At bottom, both Salvano's affidavit and his declaration relate a story that detectives asked him to testify against Mr. Jackson, identifying him as the murderer, in exchange for leniency. That core of his statements remains unchanged and does not directly contradict his prior position. To the extent Defendants complain about the inconsistencies and changed details between Salvano's 2018 affidavit and his declaration in this case, cross-examination presents the appropriate method for resolving those disputes of fact.

*     *     *

For these reasons, the Court **OVERRULES** Defendants' objections to the consideration of Salvano's declaration in connection with summary judgment.

### 1.b.   The Rodgers Police Report

Defendants spend several pages arguing the merits why, in their view, the police report that Detective Gray prepared on April 7, 1991 summarizing an interview with Bobby Rodgers (variously spelled "Rogers") was not exculpatory and why the record shows it was disclosed to the prosecutors. (ECF No. 174, PageID #26343–48.) At the end of that argument, Defendants take the position in the alternative that the "statement is inadmissible double hearsay." (*Id.*, PageID #26348.) They argue that

Rodgers "was not an eyewitness to the shooting and was merely repeating information that he learned on the street." (*Id.*)

In response, Plaintiff argues that he does not offer the Rodgers report or the statements in it for their truth. Instead, he intends to use them to argue that they are exculpatory evidence Defendants withheld. Of course, Defendants contest that the report is exculpatory and that it was withheld. Those arguments go to the merits, not the admissibility of this evidence. No party addresses the ancient documents exception in Rule 803(16), which provides that "[a] statement in a document that was prepared before January 1, 1998" is not excluded by the rule against hearsay. That Rule appears to resolve one of Defendants' alternative double hearsay objections, and the purpose for which Plaintiff offers the document takes care of the other. That is, the truth of the statement does not matter in this litigation. If it did, *Guindon* would show why it is not admissible. The parties are free to make their arguments based on this report. As an evidentiary matter, then, the Court agrees with Plaintiff and **OVERRULES** Defendants' objection to the Rodgers report.

### 1.c.    Plaintiff's Police Practices Expert

Plaintiff offers the opinion of a police practices expert to rebut the presumption of probable cause arising from the indictment of Mr. Jackson, in the view of Defendants (ECF No. 174, PageID #26368–69), or to testify that the officers lacked probable cause in the first place, according to Plaintiff (ECF No. 175, PageID #26440–41). In their papers, no party directs the Court to the specific opinion(s) or testimony at issue. (*See* ECF No. 174, PageID #26368–69; ECF No. 175, PageID #26440–41.) Defendants provide a single citation to the record, but it references

83

another one of the briefs, which also does not relate to the proposition for which it is cited.  (ECF No. 174, PageID #23669.)  It is not the Court's job to search the record on summary judgment in any case, let alone one with a record this size, to identify the facts and evidence at issue.  Because Defendants bear the burden on their evidentiary objection and the Court is unable to assess the evidence for itself, the Court **OVERRULES** this objection.

### 2.  Plaintiff's Objections

#### 2.a.  Sham Affidavits

In support of their combined opposition to Plaintiff's cross-motion for summary judgment and reply in support of their motion (ECF No. 174), Defendants attach declarations from numerous officers who were previously deposed.  (*See* ECF No. 172-1 through ECF No. 172-8.)  Plaintiff objects to these declarations as sham affidavits.  To the extent any of these declarations contradicts the deposition testimony of the witness, the Court disregards the declaration and relies on the deposition testimony in its analysis of the record.  Therefore, the Court **SUSTAINS IN PART** this objection.

#### 2.b.  The Testimony of Carmen Marino

Defendants rely on the testimony of Carmen Marino, a former prosecutor in Cuyahoga County who supervised the major trial unit and served as the first assistant before retiring in 2002.  In 1991, Marino served as first assistant (ECF No. 140-4, PageID #2813), but he had no involvement in the case against Mr. Jackson (*id.*, PageID #2886).  His work in other cases is well known in this Circuit.  *See, e.g.*, *In re Lott*, 366 F.3d 431, 433 n.1 (6th Cir. 2004); *D'Ambrosio v. Bagley*, No. 1:00-cv-

84

2521, 2006 WL 1169926, at *10 (N.D. Ohio, Mar. 24, 2006), *aff'd*, 527 F.3d 489 (6th Cir. 2008).

Defendants generally rely on Marino's testimony regarding practices in the prosecutor's office in 1991 and to explain the types of documents and evidence delivered to the office.  Plaintiff objects to this testimony.  (ECF No. 161, PageID #24589 n.11; ECF No. 175, PageID #26441–42.)  Defendants do not respond to this objection.  However, Marino's testimony will help a jury determine the facts in issue by explaining the practices of the prosecutor, allocation of responsibilities with the police, and the types of files and documents the prosecutor's office maintained in 1991. *See* Fed. R. Evid. 701.  Of course, it will be up to the parties to tie that testimony to the facts of the case through their respective examinations and cross-examinations.  For these reasons, the Court **OVERRULES** this objection.

### 2.c.    The Prosecutor's Archived File

Plaintiff objects that Defendants cannot properly authenticate the prosecutor's archived file, making it inadmissible.  (ECF No. 161, PageID #24589 n.12; ECF No. 175, PageID #26442.)  Indeed, the two prosecutors who tried the case against Mr. Jackson passed away, and no one with first-hand knowledge of it appears available to say that it is a true and complete copy of the file (though with the passage of time, it is doubtful any person could truthfully so attest).  To authenticate the file, Defendants tendered the declaration of the prosecutor's chief information officer since 2010.  (ECF No. 104-4, PageID #2931–32.)  The declarant explains the chain of custody for the file from 1991 to present.

85

Rule 901(a) requires that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  The Court finds that Defendants' declaration authenticates the prosecutor's archived file under this definition.  At trial, the parties might be able to contest whether the file contained a particular document in 1991.  But for purposes of summary judgment, where the Court must construe the record in favor of the non-moving party, the declaration shows that the file is what Defendants say.  Therefore, the declaration authenticates the file and allows its use, and the Court **OVERRULES** this objection.

### 2.d.    Schroeder's Second Declaration

Plaintiff filed the declaration of a former prosecutor named Christopher Schroeder in support of his cross-motion for summary judgment.  (ECF No. 160-1.) This declaration relates to the contents of the prosecutor's archived file in 2018.  (*Id.*, ¶¶ 7 & 8, PageID #24563.)  Also, Schroeder attests to a recorded interview with Lacey in 2018 in which Lacey admitted that he did not see who shot Joe Travis.  (*Id.*, ¶ 12.) In response, Defendants submitted a second declaration from Schroeder.  (ECF No. 172-7.)  Plaintiff objects to consideration of this second declaration "[t]o the extent [it] conflicts with his last one, contains hearsay, supplies speculation or opinion testimony outside his knowledge concerning what hypothetical other prosecutors may have known or usually did, that testimony is inadmissible like Marino's."  (ECF No. 175, PageID #26442.)  That is the entirety of the argument.  Plaintiff fails to identify any specific statements to which he objects or that might constitute hearsay, be based on speculation, or the like.  Because Plaintiff fails to sufficiently develop the basis for this objection, the Court **OVERRULES** it.  In any event, to the extent that

Schroeder presents contradictory information about the prosecutor's archived file, a finder of fact must resolve those disputes.

### 2.e.    Defendants' Forensic Experts

Plaintiff brings two challenges to Defendants' forensic experts.  Each challenge raises somewhat different issues, which the Court takes up separately.

### 2e.i.    Handwriting Expert

First, Plaintiff objects to the opinions and testimony of Grant Sperry, Defendants' handwriting expert.  Sperry opines that Prosecutor Grays made certain markings and writings on various documents, confirming that the documents were in the possession of the prosecutor before trial.  (ECF No. 136-1.)  At the outset, the Court notes that Defendants rely on this expert in connection with two arguments. *First*, based on the expert's opinion that Grays wrote the name of Bobby Rodgers on a pretrial disclosure (ECF No. 136-1, PageID #15168), Defendants infer that Grays read the police report that included the statements from Rodgers and disclosed Rodgers's name to defense counsel (ECF No. 174, PageID #26345).  But there is no basis on the state of this record, where neither the statement unit file nor the prosecutor's archived file contains the police report, to support the logical leap from Grays knowing Rodgers's name to establishing that Grays read the police report that included the statements from Rodgers and disclosed Rodgers's name to defense counsel.  A finder of fact can make that leap.  Or a jury could find that the absence of the report from the prosecutor's archived file means that Grays did not see the report and that other explanations account for his handwriting on the document (if it is his handwriting).  On summary judgment, a court cannot determine the issue one way

or the other.  Put another way, notwithstanding the admissibility of the opinions and testimony of Defendants' handwriting expert, the parties concede no ground in their respective positions and arguments.

*Second*, in an inter-office memo dated May 9, 1991, an unnamed supervisor in the prosecutor's office directed the office to take the case against Mr. Jackson to a grand jury.  (ECF No. 104-4, PageID #3273.)  Undated handwriting on that memo reads, "Lab #281204 Cynthia Lewis"—the reference number of the forensic testing on Lacey's hat.  (*Id.*)  Sperry opines that the handwriting belongs to Grays.  (ECF No. 136-1, PageID #15160.)  Defendants argue that Grays' notation means that the scientific investigation unit disclosed the results of testing for gunshot residue on Lacey's hat to the prosecution.  (ECF No. 174, PageID #26355.)  Again, assuming the handwriting belongs to Grays, that fact alone establishes little.  That handwriting is undated.  The forensic lab's negative test results for Lacey's hat do not appear in the homicide file, the statement unit file, or the prosecutor's archived file.  On these facts, in addition to the others relating to the testing, the parties can make their respective arguments to a jury, with or without the testimony of the handwriting expert.  Again, the parties give no quarter based on the admissibility of the expert's testimony.

But those observations do not resolve Plaintiff's objection or whether Sperry may testify in the first place.  Turning back to Rule 901, non-expert opinion is an example of the type of evidence that will authenticate or identify handwriting:  "A nonexpert's opinion that handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation."  Fed. R. Evid. 901(b)(2).  Next, it lists an

88

expert's comparison: "A comparison with an authenticated specimen by an expert witness or the trier of fact." Fed. R. Evid. 901(b)(3). On their face, the Rules of Evidence contemplate expert testimony as one option for authenticating or identifying handwriting. That raises the question of whether the opinions of Sperry in particular or any handwriting expert in general meet the reliability requirement of Rule 702.

Previously, the Sixth Circuit approved under Rule 702 the admissibility of a handwriting expert's testimony. *United States v. Mallory*, 902 F.3d 584, 593 (6th Cir. 2018). But it did so before the 2023 amendment to Rule 702 took effect. This amendment "is especially pertinent to the testimony of forensic experts in both criminal and civil cases." Fed. R. Civ. P. 702, advisory committee notes to 2023 amendment. "Expert opinion testimony regarding the weight of feature comparison evidence (i.e., evidence that a set of features corresponds between two examined items) must be limited to those inferences that can reasonably be drawn from a reliable application of the principles and methods." *Id.*

"Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions." *Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655, 667 (6th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)). On the record presented, however, the Court is unable to discharge its gatekeeping responsibilities with respect to Sperry's opinions and testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael,*

89

526 U.S. 137, 149–53 (1999). Plaintiff places Sperry's reliability at issue, but the record on that point is not sufficiently developed to make such a determination. Because there is not an "adequate basis from which to determine the reliability and validity of the expert['s] opinion," the Court determines that an evidentiary hearing is necessary. *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001).

But resolving the admissibility of Sperry's opinions and testimony is not necessary for deciding the parties' cross-motions for summary judgment because it is not material to their resolution for the reasons already explained. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citation omitted); *see, e.g., Hale v. Ashley*, No. 14-cv-639, 2015 WL 4389586, at *4 n.3 (N.D. Ohio July 15, 2015) ("The evidence to which [d]efendants have raised objections was not necessary to this [c]ourt's determination on summary judgment and, therefore, the [c]ourt declines to rule on admissibility at this stage of the proceedings[.]"). Whether Sperry's testimony is admissible or not, a jury will have to decide the facts, and expert opinion, if reliable and otherwise satisfying Rule 702, might influence its determination.

Therefore, the Court **DEFERS** ruling on this objection and will schedule a hearing on the issue before trial. Following the hearing, the Court will provide the parties with the opportunity to file short supplemental memoranda based on the evidence adduced at the hearing so that the Court can make a final determination about the admissibility of Sperry's testimony.

90

### 2.e.ii. Fingerprint Expert

Finally, Plaintiff moves to strike the report of John Black, Defendants' fingerprint expert. (ECF No. 100.) After the close of fact discovery, Defendants timely disclosed Black's expert report. (ECF No. 100-1.) In his report, Black listed a number of materials that he reviewed that were not disclosed in discovery (*id.*, PageID #847; *see also* ECF No. 102, PageID #894), preventing Plaintiff from conducting additional investigation and diligence to determine whether he needed an expert of his own on the subject. Following a hearing on the matter (ECF No. 106), the Court addressed many of the arguments in Plaintiff's motion (ECF No. 103). However, the Court deferred ruling on one issue until it had the benefit of the full summary-judgment record. (*Id.*, PageID #1155.) The Court takes up that matter now.

Rule 26(a)(2)(B)(i) requires that an expert's report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Black's report, which describes work conducted with a colleague, opines that "none of the latent prints" found at the crime scene "are suitable for identification purposes." In its entirety, Black's report summarizes his conclusions:

> Therefore, based upon our examination and the background information provided above, it is our collective opinion that none of the latent prints in Items 1–3 are suitable for identification purposes. This is based primarily upon insufficient quality, quantity and rarity of the observed features, as well as the fragmentary and overlapping nature of many of the prints.

(ECF No. 100-1, PageID #848.) Put another way, based on Black's testimony, Defendants will argue that, even if the fingerprint analysis that was conducted

during Mr. Jackson's trial and found no match to him were not disclosed to the prosecution, no *Brady* violation occurred because those fingerprints were not suitable for identification purposes in any event.

In this respect, the parties' arguments look quite similar to those about Sperry. That is, with or without Black's opinion, Defendants maintain that no violation occurred—or, at least, that responsibility for any violation lies elsewhere. For his part, Plaintiff disputes that the forensic lab did not disclose the fingerprints to any person after confirming that they were not a match to Mr. Jackson. For purposes of summary judgment, then, this dispute matters little.

Based on the parties' briefs, arguments at the hearing on Plaintiff's motion, and review of the record as a whole, with particular attention to the fingerprint analysis, the Court finds that Black's report satisfies the disclosure requirements of Rule 26(a)(2)(B). Therefore, no automatic sanction of exclusion under Rule 37(c)(1) is available or appropriate. Further, fingerprint evidence has long been involved in this case. Therefore, Plaintiff has had the opportunity to develop expert testimony of his own on the subject.

For purposes of Plaintiff's cross-motion, then, the Court considers Black's opinions to the extent Defendants advance them. (*See* ECF No. 138-1.) But on Defendants' motion, the Court treats Black's opinions like any other disputed testimony on summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the claim or defense at issue. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 & n.12 (6th Cir. 1989); *Chappell v. City of Cleveland*, 584 F. Supp. 2d 974, 988 (N.D. Ohio 2008). After discovery, summary judgment is appropriate if the nonmoving party fails to establish "an element essential to that party's case and upon which that party will bear the burden of proof at trial." *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The Court's function at this stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Tokmenko*, 488 F. Supp. 3d at 576 (citing *Celotex Corp.*, 477 U.S. at

322). Then, the nonmoving party must "set forth specific facts showing there is a genuine issue for trial." *Id.* (citing *Anderson,* 477 U.S. at 250). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586.

If a genuine dispute exists, meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. *Tokmenko*, 488 F. Supp 3d at 576 (citing *Anderson*, 477 U.S. at 250). However, if "the evidence is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id.* The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48). "Just as a plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (cleaned up) (citations omitted). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)).

To determine whether a genuine dispute about material facts exists, it is not the Court's duty to search the record; instead, the parties must bring those facts to the Court's attention. *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th

94

Cir. 1996).  Ultimately, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251.

"[W]here, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).  Therefore, cross-motions for summary judgment do not warrant granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.  *Langston v. Charter Twp. of Redford*, 623 F. App'x 749, 755 (6th Cir. 2015).  Finally, the Court notes that the parties characterize the evidence differently.  But those characterizations do not create genuine disputes of material fact.

## ANALYSIS

Section 1983 provides a federal cause of action to a person whose rights "secured by the Constitution" are violated by an official acting "under color of [State law]." 42 U.S.C. § 1983.  In this respect, the statute does not create substantive rights but provides a means of redress.  *Dibrell v. City of Knoxville, Tennessee*, 984 F.3d 1156, 1160 (6th Cir. 2021).  Whether a defendant has violated a constitutional right turns on the meaning of the constitutional text; therefore, the "threshold inquiry" under Section 1983 is to identify the specific constitutional right at issue.  *Manuel v.*

95

*City of Joliet, Ill.*, 580 U.S. 357, 369–70 (2017); *Graham v. Connor*, 490 U.S. 386, 394 (1989).

"After pinpointing" the constitutional right at issue, "courts still must determine the elements of, and rules associated with, an action seeking damages for its violation." *Manuel*, 580 U.S. at 370. Under Section 1983, "the general 'common law of torts'" bridges the gap between a constitutional right and the elements of a cause of action. *Dibrell*, 984 F.3d at 1160 (citation omitted). In this way, Section 1983 "creates a species of tort liability" where State actors violate federal constitutional rights. *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (citation omitted).

## I. Claims Against the Individual Defendants

Defendants maintain that they enjoy qualified immunity against Plaintiff's claims. Qualified immunity protects public officials against lawsuits for civil damages where their conduct does not violate clearly established constitutional rights. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (quotation omitted). In evaluating a claim of qualified immunity, the Sixth Circuit directs a district court to undertake two inquiries, in either order. The Court must determine whether "the facts alleged make out a violation of a constitutional right." *Id.* Also, the Court asks if the right at issue was clearly established at the time "such that a reasonable officer would have known that his conduct violated it." *Id.* (citation omitted). The burden to show that qualified immunity does not protect a defendant rests on the plaintiff. *Chappell*, 585 F.3d at 907 (citation omitted). To meet this burden, he must satisfy both steps of the test. *Martin*, 712 F.3d at 957 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Therefore, the Court turns first to whether

the right allegedly violated was clearly established at the time of the events at issue in 1991.  Then, the Court analyzes whether the record creates a genuine dispute of material fact or entitles Plaintiff to judgment as a matter of law that Mr. Jackson suffered a constitutional violation.

### I.A.    Constitutional Violations

Plaintiff asserts five claims under 42 U.S.C. § 1983 against Detective Gedeon, Detective Nolan, Detective Masilonis, Detective Taliano, Detective Healy, Detective Moore, and the Estate of Parker Adrine for (1) *Brady* violations; (2) fabrication of false evidence; (3) unconstitutional identification; (4) malicious prosecution; and (5) failure to intervene.  Also, Plaintiff asserts a claim of supervisory liability under Section 1983 against Lt. Tekancic.

### I.A.1. *Brady* Violations

Defendants argue that Plaintiff's *Brady* claim fails as a matter of law.  (ECF No. 140-1, PageID #15260–69; ECF No. 174, PageID #26323–60.)  Plaintiff argues that he is entitled to judgment as a matter of law on his *Brady* claim or, alternatively, that genuine disputes of material fact require a jury trial.  (ECF No. 161, PageID #24607–13; ECF No. 175, PageID #26404–22.)

Before 1991, at least three circuits recognized that a police officer's failure to disclose exculpatory evidence to a prosecutor can support a *Brady* claim.  *See Clark v. Burke*, 440 F.2d 853, 855 (7th Cir. 1971) ("This is not to say that there can never be a due process violation if the prosecutor does not know that the police has in its possession evidence possibly favorable to the defendant"); *Smith v. Florida*, 410 F.2d 1349, 1351 (5th Cir. 1969) ("[I]t makes no difference if the withholding is by the

97

prosecutor of by officials other than the prosecutor."); *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964) ("Failure of the police to reveal such material evidence in their possession is equally harmful to a defendant whether the information is purposely, or negligently, withheld. And it makes no difference if the withholding is by officials other than the prosecutor."); *see also Jones v. Chicago*, 856 F.2d 985, 995 (7th Cir. 1988) ("*Brady v. Maryland* does not require the police to keep written records of all their investigatory activities; but attempts to circumvent the rule of that case by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated.").

In their briefs, Defendants do not dispute the authority of these decisions, point to any contrary authority from the Sixth Circuit, or identify any reason to believe that the law of this Circuit did not recognize this claim by 1991. Indeed, the Sixth Circuit later held that it was clearly established that police officers had a disclosure obligation to the prosecution as early as 1964. *See Moldowan v. City of Warren*, 578 F.3d 351, 376–82 (6th Cir. 2009) (noting that "[d]ecisions from other circuits recognizing the type of '*Brady-derived*' claims that [the plaintiff] asserts here date back as far as 1964" and denying qualified immunity on *Brady* claims because of disputes of fact); *see also Jackson*, 925 F.3d at 823–24. Instead of contesting that these authorities provide a basis for Plaintiff's claims as of the date of his trial in 1991, Defendants rely on cases holding that the disclosure obligation falls on the prosecution, not the police. (*See* ECF No. 140-1, PageID #15261.) As the Sixth Circuit has noted, however, "the duty to disclose evidence falls on the [S]tate as a whole and

98

not on one officer of the [S]tate particularly." *Jackson*, 925 F.3d at 824.  This obligation long predated Mr. Jackson's trial in 1991.  Therefore, the question on summary judgment becomes whether the officers communicated exculpatory information to the prosecutors—or, more accurately, whether the record would permit a reasonable jury to find that the officers did or did not provide material exculpatory evidence to the prosecutor.  If a rational jury finds that they did, then the officers would enjoy qualified immunity.

Defendants argue that the police officers complied with their disclosure obligations because they produced the exculpatory evidence to the prosecutors.  (ECF No. 140, PageID # 15262.)  Plaintiff argues that the officers might have provided some of the *Brady* materials, but that other evidence does not appear in the statement unit file or the prosecutor's archived file.  (ECF No. 161, PageID #24609–10.)  Because Defendants "urge[d] the Court to carefully check Plaintiff's citations to purported evidence" (ECF No. 174, PageID #26323), the Court reviewed the record in detail and separates the evidence into two categories to analyze Plaintiff's *Brady* claim: (1) evidence found in the prosecutor's archived file, and (2) evidence that does not appear there.

### I.A.1.a. Evidence in the Prosecutor's Archived File

Plaintiff argues that Defendants suppressed Ronald Lacey's pretrial statements that "contradict[ ] the physical evidence showing where Travis was shot." (ECF No. 161, PageID #24587.)  Elsewhere in his brief, Plaintiff addressed that "contradiction," stating that Lacey saw Travis get shot "in the forehead" when the bullet hole was "in his temple."  (*Id.*, PageID #24622.)  Under the circumstances of

99

the shooting, that is a distinction without a difference. Also, Plaintiff argues that Defendants suppressed Omelia "Rita" Tucker's prior statements that she could not identify the suspect as he left the building, which differed from her testimony at trial. (*Id.*, PageID #24588.) The Court reviewed the summary-judgment record to see whether Lacey's pretrial statements or Tucker's pretrial statements appear in the prosecutor's archived file.

The prosecutor's archived file contains the following pretrial statements from Lacey and Tucker:

- the April 7, 1991 original investigation report by Detectives Masilonis and Taliano with Tucker's interview (ECF No. 104-4, PageID #3366–74);

- the April 8, 1991 supplementary report by Detectives Adrine and Reese with Tucker's statement (*id.*, PageID #3259–60);

- the April 26, 1991 report by Detectives Gedeon and Nolan regarding Lacey's first statement and photographic identification of the suspect (*id.*, PageID #3377);

- Lacey's verbatim signed statement from April 27, 1991 with Detectives Masilonis and Taliano regarding his second statement and photographic identification of the suspect (*id.*, PageID #3378–79);

- the April 27, 1991 supplementary report by Detectives Masilonis and Taliano regarding Lacey's second statement and photographic identification of the suspect (*id.*, PageID #3364–65.); and

- the May 8, 1991 supplementary report by Detective Healy regarding his interviews of Tucker and Lacey (*id.*, PageID #3264).

Accordingly, Plaintiff may not base his *Brady* claim on this evidence, which the record shows was turned over to the prosecutors.

100

### I.A.1.b. Evidence Not in the Prosecutor's Archived File

Plaintiff argues that other evidence supports his *Brady* claim.  The Court focuses on what it views as the three key pieces of evidence on the record presented: (1) the results of the forensic testing on Lacey's hat; (2) the results of the fingerprint comparison; and (3) evidence identifying alternative suspects.

*First*, by May 17, 1991, Lacey's hat was tested and found negative for gunshot residue.  (ECF No. 104-4, PageID #3430; *see also* ECF No. 104-2, PageID #1742–43 & #1846.)  The test results are not in the prosecutor's archived file.  There might be any number of good reasons why the hat did not or even should not have tested positive, as Defendants maintain.  But that is not the point.  Lacey was one of two eyewitnesses who testified for the State, and Lacey's hat was used as physical evidence in the State's case at trial.  These test results are material impeachment evidence that should have been turned over to defense counsel, who could have used the forensic testing to attack the State's case or undermine Lacey's credibility at trial.  Because they are not in the prosecutor's archived file, a reasonable jury could find that the police did not provide this information to the prosecutors to disclose to the defense.  If a rational jury determines otherwise, then the officers have qualified immunity.  Moreover, the outstanding disputes regarding Defendants' handwriting expert, which are not appropriate for resolution on summary judgment, bear on the availability of qualified immunity.  However, whether the handwriting expert's testimony is reliable and admissible under Rule 702 or not does not affect the determination of qualified immunity as a matter of law.  Even if the handwriting belongs to Prosecutor Grays, its presence does not resolve the parties' disputes about

101

when he made the note, what it means, or when it ended up in the prosecutor's archived file.

*Second*, on December 13, 1991, during the trial, the scientific investigation unit determined that the latent fingerprints lifted from the crime scene did not match Mr. Jackson. (ECF No. 104-2, PageID #1677, #1726–28 & #2005–06; *see also id.*, PageID #1676.) The test results are not in the prosecutor's archived file. Again, Defendants advance many arguments why these test results did not rule out Mr. Jackson as a suspect. But the fact remains that these test results are exculpatory evidence that should have been turned over to defense counsel, who could have used the fingerprint comparison to argue to the jury that Mr. Jackson was not at the crime scene. At least a reasonable jury could so find. If the finder of fact decides to the contrary, then qualified immunity protects the officers.

*Third*, the record contains several police reports as well as tips received by Crime Stoppers that identify alternative suspects. Plaintiff argues that Defendants suppressed records identifying other suspects and the identities of the individuals who named them. (ECF No. 161, PageID #24588.) Defendants maintain that the police reports were given to the prosecutor and are in the prosecutor's archived file. (ECF No. 140, PageID #15264–65.) The April 9, 1991, April 16, 1991, and April 18, 1991 reports by Detectives Adrine and Moore referencing the "DAVIS BROTHERS" and "CHARLES aka CHARLES DOG" (*id.*, PageID #3258) and "ALABAMA CHARLES" (*id.*, PageID #3375 & #3376) appear in the prosecutor's archived file. Lacey's verbatim signed statement from April 27, 1991 referencing "Don" and Don's

102

brother Charles is in the prosecutor's archived file.  (*Id.*, PageID #3378–79.)  The April 27, 1991 supplementary report by Detectives Masilonis and Taliano regarding Lacey's second statement also references "Don" and appears in the prosecutor's archived file.  (*Id.*, PageID #3364–65.)  Therefore, the record does not permit a finding of liability on this evidence.

But other reports identifying alternative suspects are not found in the prosecutor's archived file.  For example, neither Bobby Rodgers's statement nor any anonymous tip received by Crime Stoppers appears in the prosecutor's archived file.  On April 7, 1991, Detective Gray interviewed Bobby Rodgers and reported that Rodgers "heard on the streets that CHARLES [*sic*] NEPHEW KILLED JOE, WITH CHARLES [*sic*] BROTHER ALSO THERE, BECAUSE CHARLES GOT SHOT DURING THE FIRST EXCHANGE."  (ECF No. 115-27, PageID #6668; ECF No. 115-29, PageID #6745.)  On May 2, 1991, an anonymous tip received by Crime Stoppers claimed that "Chuck 'Sweet Man' is the nephew of Don Davis, they both were involved[.]"  (ECF No. 115-26, PageID #6550.)  A reasonable jury could find this evidence exculpatory because it points to suspects other than Mr. Jackson, though it conflates his nickname with James Morris.  Or it could find that it is not exculpatory because of the use of the nickname.  Additionally, a reasonable jury could find that this evidence provides different information than what is in the prosecutor's archived file, such that the defense might have changed its investigation or trial strategy.  Obviously, it could find otherwise, which would result in the protections of qualified immunity applying.  But disputes of fact preclude such a conclusion now.  Moreover,

as the Court previously explained, the outstanding disputes regarding Defendants' handwriting expert, which are not appropriate for resolution on summary judgment, bear on the availability of qualified immunity. But the reliability and admissibility of the handwriting expert's testimony will not affect the determination of qualified immunity as a matter of law. Even if Prosecutor Grays wrote Bobby Rodgers's name on a pretrial disclosure, that does not say anything about when he wrote it—before trial, during trial, or after.

Defendants argue that the police produced to the prosecutor the reports that indicated Lacey's hat was confiscated and conveyed to the scientific investigation unit for forensic testing. (ECF No. 140-1, PageID #15267.) They maintain that an undated, unsigned handwritten note shows that the prosecutor knew the results of the fingerprint comparison, arguing that the police complied with their obligations under *Brady*. (ECF No. 174, PageID #26324.) Once the case was presented to the prosecutor, a reasonable jury could find that the prosecutor had the burden to check on the results of the forensic testing and the fingerprint comparison. The record suggests that both lead detectives and the prosecutors could request test results from the scientific investigation unit. (ECF No. 104-2, PageID #1621–22 ("[W]hoever wanted to find out the results" could get the results of the fingerprint comparison, "whether it be the homicide detectives, or the prosecutors involved."); *see also id.*, PageID #1697 ("The training that we received in the technical section was to relay the results when asked by prosecutors and detectives"); *id.*, PageID #1744 ("[T]hese lab results are available to the detectives as well as the prosecutors.").)

104

If Defendants want to place that responsibility on the prosecutor, the record provides support for such a position.  (ECF No. 104-4, PageID #2868–69 (it was "usual" for members of the prosecutor's office to directly contact the scientific investigation unit about tests or test results.).)  By the same token, the record would allow a rational trier of fact to agree with Plaintiff that the responsibility for disclosing those test results fell to the police.  (ECF No. 140-1, PageID #15303 ("Under Det.R. 3.50, it was the responsibility of the investigating homicide or other as applicable officers to determine if the requested SIU examination was made, and what the result was of such examination.") (cleaned up); ECF No. 104-2, PageID #1780 (It was "not unusual" for homicide detectives to call the scientific investigation unit to get "verbal reports on test results[.]").)  Whatever the case, the facts necessary to resolve who bore responsibility for obtaining these test results—the police or the prosecutors—are disputed, sharply.  A jury must make that determination, which will determine the availability of qualified immunity.  Accordingly, the Court need not weigh into the additional disputes of fact that bear on this determination.

Therefore, the Court determines that Plaintiff's *Brady* claim may proceed against Defendants Masilonis and Taliano as the lead detectives on the case and the ones who confiscated Lacey's hat; the Estate of Parker Adrine, who conveyed Lacey's hat to the scientific investigation unit for forensic testing; and Detective Healy, who presented the case to the prosecutor.  A reasonable jury could find that each of these Defendants could have or should have followed up on the forensic testing to communicate the results to the prosecutor.  Nor does undisputed evidence show that

105

this evidence was readily available to the prosecutors from an independent source. Further, the Court **GRANTS IN PART** Defendants' motion for summary judgment on Plaintiff's *Brady* claim against Defendants Gedeon, Nolan, and Moore.

### I.A.2. Unconstitutional Identification

Defendants argue that Plaintiff's claim for unconstitutional identification fails as a matter of law. (ECF No. 140-1, PageID #15269–73; ECF No. 174, PageID #26363–67.) Plaintiff argues that genuine disputes of material fact require a jury trial. (ECF No. 161, PageID #24617–23; ECF No. 175, PageID #26426–30.)

"[I]t has been clearly established since 1967 that '[c]riminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." *Gillispie v. Miami Twp., Ohio*, 18 F.4th 909, 921 (6th Cir. 2021) (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 746 (6th Cir. 2006) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967))). "[I]dentifications arising from single-photograph displays may be viewed in general with suspicion." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (citing *Simmons v. United States*, 390 U.S. 377, 383 (1968)). The danger of misidentification "will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs . . . ." *Simmons*, 390 U.S. at 383. Further, "[t]he danger inherent in eyewitness identification has long been a subject of grave concern." *Marshall v. Rose*, 499 F.2d 1163, 1165 (6th Cir. 1974).

If an identification procedure was unnecessarily suggestive, the court "must ask 'whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification.'" *Haliyam v. Mitchell*, 492, F.3d 680, 704 (6th Cir. 2007) (quoting *Manson*, 432 U.S. at 107). To evaluate the likelihood of misidentification, courts look to the "totality of the circumstances." *Neil v. Biggers*, 409 U.S. 188, 199 (1972). The factors to be considered include (1) "the opportunity of the witness to view the criminal at the time of the crime"; (2) "the witness' degree of attention"; (3) "the accuracy of the witness' prior description of the criminal"; (4) "the level of certainty demonstrated by the witness at the confrontation"; and (5) "the length of time between the crime and the confrontation." *Id.* at 199–200.

The Court views Lacey's identification as having three distinct parts: (1) the detectives showing Lacey a single photo to identify the suspect; (2) the detectives' use of Mr. Jackson's name in their reports regarding Lacey's statements; and (3) the confirmatory photo array. Of these steps involved in Lacey's identification, this claim implicates only the detectives' use of a single photo with Lacey.

The record is clear that Detectives Gedeon and Nolan showed a single photo to Lacey to identify the suspect. (*See, e.g.*, ECF No. 104-4, PageID #3377.) Also, the record leaves no doubt that Detectives Masilonis and Taliano showed the same single photo to Lacey to identify the suspect. (ECF No. 115-28, PageID #6711 & #6714; ECF No. 104-4, PageID #3379.) A reasonable jury could find that the repeated use of the single photo increased the risk of Lacey misidentifying the man in the single photo

107

(Mr. Jackson) as the suspect.  If the finder of fact determines otherwise, then qualified immunity protects the officers.

Further, if a reasonable jury finds that the identification procedure was unnecessarily suggestive, it would need to weigh the five non-exclusive factors to determine whether the suggestive procedure gave rise to a substantial likelihood of misidentification.  It is up to the jury to assign the appropriate weight to each factor to resolve the underlying questions of fact.  For at least one factor, the witness's opportunity to view the suspect at the time of the crime, the parties dispute the facts.  Some factors favor Defendants.  For example, Lacey demonstrated a high level of certainty at the time of the identification.  When shown the single photo, Detective Gedeon reported that Lacey replied "[t]hat's definitely him, you don't forget someone that tries to kill you."  (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377.)  Some factors favor Plaintiff.  For example, Lacey provided only a few details about the suspect to Detectives Gedeon and Nolan.  (*Id.* (they "should be familiar with the guy because he used to be a regular in the neighborhood" and a description of his car).)  But Lacey provided a detailed physical description of the suspect to Detectives Masilonis and Taliano.  (ECF No. 115-28, PageID #6711 & #6714; ECF No. 104-4, PageID #3379 ("[B]lack male, heavy-set, about 160 or 170, he's about 5'6", he's brown skinned, he wears his hair cut short.").)  Lacey's more detailed description of the suspect occurred before Detectives Masilonis and Taliano showed Lacey the single photo of Mr. Jackson but *after* Detectives Gedeon and Nolan showed him the single photo.

108

Also, nearly three weeks passed between the crime and the identification.  The murder occurred on April 7, 1991 (ECF No. 115-27, PageID #6669; ECF No. 115-29, PageID #6746; ECF No. 104-4, PageID #3366), and Lacey was first interviewed by the police on April 26, 1991 (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4., PageID #3377).

Because there are genuine disputes of material fact, and because jurors are entitled to weigh the non-exclusive factors as they see fit, it is up to the jury to decide whether showing a single photo to Lacey to identify the suspect violated Mr. Jackson's constitutional rights.  Therefore, the Court determines that Plaintiff's claim for unconstitutional identification may proceed against Defendants Gedeon, Nolan, Masilonis, and Taliano as the detectives on the case who showed Lacey a single photo to identify the suspect.  Further, the Court **GRANTS IN PART** Defendants' motion for summary judgment on Plaintiff's claim for unconstitutional identification against Detectives Healy and Moore and the Estate of Parker Adrine.

### I.A.3. Fabrication of Evidence

Defendants argue that Plaintiff's claim for fabrication of evidence fails as a matter of law.  (ECF No. 140-1, PageID #15274–75; ECF No. 174, PageID #26360–63.)  Plaintiff argues that genuine disputes of material fact require a jury trial.  (ECF No. 161, PageID #24614–16; ECF No. 175, PageID #26422–26.)

In 1991, it was clearly established that introducing fabricated evidence violates the Constitution.  "[A]s far back as 1935, the Supreme Court recognized that the introduction of fabricated evidence violates 'the fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *Jackson*, 925 F.3d at 825

109

(quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).  To succeed on a claim for fabrication of evidence under Section 1983, a plaintiff must demonstrate that "a defendant 'knowingly fabricated evidence against a plaintiff, and that there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'"  *Mills v. Barnard*, 869 F.3d 472, 484 (6th Cir. 2017) (cleaned up) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)).

### I.A.3.i. Use of Mr. Jackson's Name

In at least one report, the record shows that the detectives replaced Lacey's references to the suspect as Sweetman with Mr. Jackson's name.  In their supplementary report regarding Lacey's second statement, Detectives Masilonis and Taliano reported that "[h]e said that Charles Jackson had a 9mm pistol."  (ECF No. 115-27, PageID #6656; ECF No. 115-28, PageID #6728; ECF No. 104-4, PageID #3364.)  However, the record contains Lacey's signed statement, which Detective Taliano typed in real-time as Lacey spoke to capture what he said verbatim, which is "what the statement's for."  (ECF No. 104-3, PageID #2254.)  In Lacey's verbatim signed statement, Detective Masilonis asked "[w]hat kind of gun [*sic*] Sweet_Man [*sic*] have?" and Lacey responded "a 9mm."  (ECF No. 115-28, PageID #6710 & #6713; ECF No. 104-4, PageID #3378.)  By comparing the verbatim signed statement with the supplementary report, a reasonable jury could find that Detectives Masilonis and Taliano knowingly replaced Lacey's use of the nickname Sweetman with Mr. Jackson's name in their report.  Of course, a reasonable jury might not find that, in which case Defendants would be entitled to qualified immunity.

110

Relatedly, the parties dispute whether the detectives initially introduced Mr. Jackson's name into the investigation.  In the narrative section of his verbatim signed statement, Lacey only referred to the suspect as Sweetman.  (*Id.*)  In the question-and-answer section, the detectives asked questions, and Detective Masilonis's first question to Lacey was, "[y]ou know Charles Jackson as Sweet-Man and you talk about Charles coming to the apartment building and punching out the window, are these males the same?"  (*Id.*)  Lacey responded, "[n]o, [t]he first Charles is Don's brother and I dont [*sic*] know their last names, and the second Charles is Charles Jackson and I know his [*sic*] as Sweet-Man."  (*Id.*)  However, in their supplementary report regarding this exchange during the interview, Detectives Masilonis and Taliano reported that "[w]e asked him who Sweet Man was and he said Charles Jackson[.]"  (ECF No. 115-27, PageID #6657; ECF No. 115-28, PageID #6729; ECF No. 104-4, PageID #3364.)  A reasonable jury could find that the detectives introduced Mr. Jackson's name to Lacey and knowingly fabricated their report by mischaracterizing Lacey's statement.  Again, of course, a reasonable jury might not find that, in which case Defendants enjoy qualified immunity.

While the record contains Lacey's verbatim signed statement that corresponds with the report by Detectives Masilonis and Taliano regarding Lacey's second statement, the record does not contain verbatim statements that correspond with the report by Detectives Gedeon and Nolan regarding Lacey's first statement or the report by Detective Healy regarding his interview of Lacey.  However, discrepancies in the wording of these reports raise the factual question whether the detectives

111

accurately reported Lacey's statements or imposed their conclusions (and Mr. Jackson's name), attributing them to Lacey.

According to their report, Detectives Gedeon and Nolan retrieved their old photo of Mr. Jackson and "asked Lacey if Jackson was indeed 'Sweetman[,]'" and Lacey responded, "[t]hat's definitely him." (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377.)  However, at his deposition, Detective Nolan testified that he told Lacey that they were going to show him a photo, showed Lacey the photo, and asked, "do you know who this person is?" (ECF No. 113-1, PageID #5207.)  Lacey responded, "yes, Sweet Man." (*Id.*)  Similarly, Detective Healy reports Lacey's identification of the suspect using both Mr. Jackson's name and Sweetman.  Detective Healy reported that "[t]here is no doubt in his mind that it was JACKSON that put the gun to the back of his head.  He said that when JACKSON walked up behind him, he felt fear and as soon as he felt something pressed to the back of his head, he collapsed and pretended he was dead." (ECF No. 115-27, PageID #6641; ECF No. 115-28, PageID #6717; ECF No. 104-4, PageID #3264.)  But later in that report, Detective Healy reported that "RON [Lacey] saw several photos of the suspect and identified them as the man known to him as SWEET MAN and this is the one that shot at him and show JOE." (*Id.*)

Whatever one thinks of Lacey's story, a reasonable jury could find that Detectives Gedeon, Nolan, and Healy knowingly fabricated their reports by using Mr. Jackson's name in their reports when Lacey did not use it.  Of course, without

corresponding verbatim statements, a reasonable jury may find that the detectives accurately reported Lacey's statements, in which case they are entitled to qualified immunity.

### I.A.3.ii. Confirmatory Photo Array

The record does not establish one way or the other whether Detective Nolan actually presented Lacey with a confirmatory photo array.  During *voir dire*, outside the presence of the jury, Detective Nolan testified that Lacey was shown a confirmatory photo array.  (ECF No. 104-1, PageID #1300–01.)  However, the report by Detectives Gedeon and Nolan regarding Lacey's first statement does not mention a photo array.  (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377.)  At his deposition, Detective Gedeon testified that the strike force "did not use photo arrays" and that he never used one.  (ECF No. 114-1, PageID #5538.)  Detective Masilonis testified at his deposition that Detectives Gedeon and Nolan showed Lacey "one picture, not a photo array."  (ECF No. 104-3, PageID #2235.)  But, at his deposition, Detective Nolan testified that he used a photo array one time in his career, "in the arrest of Mr. Jackson."  (ECF No. 113-1, PageID #5132.)

There are only two reports regarding Lacey being shown photos in addition to the single photo of Mr. Jackson.  At the end of their supplementary report regarding Lacey's second statement, Detectives Masilonis and Taliano requested that a photo array with Mr. Jackson's mugshot be shown to Lacey.  (ECF No. 115-27, PageID #6657; ECF No. 115-28, PageID #6729; ECF No. 104-4, PageID #3364.)  In a report dated May 8, 1991, the day after he presented the case to the prosecutor, Detective

113

Healy reported that Lacey saw "several photos of the suspect and identified them as the man known to him as SWEET MAN." (ECF No. 115-27, PageID #6641; ECF No. 115-28, PageID #6717; ECF No. 104-4, PageID #3264.) Based on the reports, a reasonable jury could find that the detectives did not show Lacey a confirmatory photo array. However, in the homicide file, there is an envelope marked "photo array c/w Joe Travis" (ECF No. 115-26, PageID #6552) that contains several photographs (*id.*, PageID #6553–82).

Defendants argue that, even if Detective Nolan lied about a confirmatory photo array, "the alleged lie had no possible impact on the jury because Nolan never testified before the jury at trial—and the [p]rosecutor never introduced **_any_** evidence of the photographs shown to lacey into evidence at trial." (ECF No. 140, PageID #15274.) "But the relevant question is not whether the fabricated evidence was *shown* to the jury; it is whether the statement *affected* the decision of the jury." *Jackson*, 925 F.3d at 816. For example, "fabricated evidence that is used as the basis for a criminal charge can form the basis for a § 1983 claim because, absent that evidence, there would have been no jury." *Id.* (cleaned up).

Whatever the case, even if the confirmatory photo array occurred, though the evidence it did is slim, the confirmatory photo array did not affect the investigation, let alone affect the jury's decision. Detective Nolan first mentioned the confirmatory photo array *after* Detective Healy presented the case to the prosecutor and after the prosecutor independently decided to charge Mr. Jackson.

114

### I.A.3.iii. Tucker's Trial Testimony and Lacey's Hat

Plaintiff also argues that Defendants fabricated Omelia "Rita" Tucker's identification of Mr. Jackson as the suspect at trial and that Defendants fabricated the physical hat that Lacey said he wore when the suspect shot at him.  Plaintiff has the burden to prove that this evidence was fabricated.  The record contains no evidence that any Defendant took affirmative steps to make Tucker identify Mr. Jackson as the suspect at trial.  Similarly, Plaintiff does not point to any evidence in the record that the hat, which was confiscated by detectives, tested for gunshot residue, and introduced at trial, is not the hat that Lacey wore when the suspect shot at him.  Plaintiff argues that "no record reflects [Lacey] referring to a hat he was wearing during his arrest or taking one off and giving it" to the detectives.  (ECF No. 161, PageID #24616.)  Plaintiff accurately describes the record.  In the report by Detectives Gedeon and Nolan regarding Lacey's first statement, Lacey's verbatim signed statement, and the report by Detectives Masilonis and Taliano regarding Lacey's second statement, there is no mention of Lacey wearing the hat during his arrest or his interviews or of Lacey giving the hat to the detectives.  At Detective Nolan's deposition, Plaintiff asked if he ever saw Lacey's hat, and Detective Nolan responded no.  (ECF No. 113-1, PageID #5195–96.)  Still, no one testified that the hat was fabricated.  Indeed, Plaintiff did not ask that question of Detectives Gedeon, Nolan, Masilonis, or Taliano.  (*See* ECF No. 114-1; ECF No. 114-2; ECF No. 113-1; ECF No. 104-3; ECF No. 107-1.)  To prove that the hat was fabricated, Plaintiff relies on these reports being silent on the hat's provenance.  But the record provides, at

115

best, only a scintilla of evidence to support this claim and would not allow a rational finder of fact to find in Plaintiff's favor on it.

*     *     *

Therefore, the Court determines that Plaintiff's claim for fabrication of evidence may proceed against Defendants Gedeon, Nolan, Masilonis, Taliano, and Healy, for their use of Mr. Jackson's name in their reports.  Further, the Court **GRANTS IN PART** Defendants' motion for summary judgment on Plaintiff's claim for fabrication of evidence against Defendants Moore and the Estate of Parker Adrine.

### I.A.4. Malicious Prosecution

Defendants argue that Plaintiff's claim for malicious prosecution fails as a matter of law.  (ECF No. 140-1, PageID #15277–78; ECF No. 174, PageID #26367–70.)  Plaintiff argues that genuine disputes of material fact require a jury trial.  (ECF No. 161, PageID #24620–21; ECF No. 175, PageID #26430–33.)

In 1991, it was clearly established that people have a right to be free from malicious prosecution.  *See Jackson*, 925 F.3d at 820 (holding that defendant was not entitled to qualified immunity on the malicious prosecution claims related to a 1975 trial).  To succeed on a claim for malicious prosecution, a plaintiff must demonstrate that:  (1) a criminal prosecution was initiated against plaintiff and defendant "made, influenced, or participated in the decision to prosecute"; (2) the government lacked probable cause; (3) the proceeding caused plaintiff to suffer a deprivation of liberty; and (4) the criminal proceeding was resolved in plaintiff's favor.  *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010).  There is no dispute that Mr. Jackson suffered

116

a deprivation of liberty or that the criminal proceeding was ultimately resolved in his favor, albeit 27 years later.

Defendants argue that Plaintiff cannot overcome the presumption of probable cause from the grand jury indictment against Mr. Jackson.  (ECF No. 140-1, PageID #15277–78.)  To rebut the presumption, Plaintiff argues that Defendants knowingly or recklessly fabricated evidence that was material to the charges against Mr. Jackson.  (ECF No. 161, PageID #24621.)  Plaintiff argues that "the charging documents and the indictment were based upon Defendants' fabrications, so no presumption attaches."  (ECF No. 175, PageID #26430.)

The record shows that Prosecutor Hollern conducted an independent review and determined that there was probable cause to prosecute Mr. Jackson.  Beyond two reports, the record is not clear about which evidence Prosecutor Hollern reviewed in making her charging decision.  Because of her handwritten notation on the report, Prosecutor Hollern attested that she reviewed the supplementary report by Detectives Masilonis and Taliano requesting that a photo array with Mr. Jackson's mugshot be shown to Ronald Lacey.  (ECF No. 123-1, PageID #8048.)  She would not have made a handwritten notation on the report "without reading the typewritten contents."  (*Id.*, ¶¶ 7, 9, & 10, PageID #8042–43.)  Accordingly, the record shows that Prosecutor Hollern was aware of the detectives' concern about Lacey's identification, specifically whether they were obtaining papers on the right person.  Based on Detective Healy's report regarding his interview of Lacey, it is clear that Prosecutor Hollern was also aware of the scientific investigation unit's review under

117

magnification of the different photos of Mr. Jackson.  (ECF No. 115-27, PageID #6647; ECF No. 115-28, PageID #6722; ECF No. 104-4, PageID #3243.)  Detective Healy reported only that, "with the above information" about the scientific investigation unit's review of the photos, Prosecutor Hollern reviewed "papers and statements" and issued papers against Mr. Jackson.  (*Id.*)

Even if a jury found that the detectives fabricated evidence, there was probable cause to charge Mr. Jackson.  Lacey was the first person to associate the name Sweetman with the investigation.  (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377.)  Lacey made his first statement to Detectives Gedeon and Nolan.  (*Id.*)  Detectives Gedeon and Nolan wrote a report about that statement, but it does not appear to be verbatim. (*Id.*)  According to the report, Lacey stated that "a man he knew as Sweetman" entered the hallway at the Othello apartment, shot at him, and shot Joe Travis.  (*Id.*) In other words, Lacey identified the suspect as "Sweetman."  This report is in the prosecutor's archived file.  (ECF No. 104-4, PageID #3377.)  Because there is no dispute that Mr. Jackson used the nickname Sweetman at the time and that everyone in the neighborhood knew him by that nickname (ECF No. 122-2, PageID #7885–87), probable cause supported the charging decision.  This is so regardless of any fabricated evidence.  Accordingly, Plaintiff cannot satisfy that element of a claim for malicious prosecution.

Therefore, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's claim for malicious prosecution.

118

### I.A.5. Failure to Intervene

Defendants argue that Plaintiff's claim for failure to intervene fails as a matter of law. (ECF No. 140-1, PageID #15279–80; ECF No. 174, PageID #26370.) Plaintiff argues that he is entitled to judgment as a matter of law on his claim for failure to intervene or, alternatively, that genuine disputes of material fact require a jury trial. (ECF No. 161, PageID #24623–25; ECF No. 175, PageID #26433.)

In 1991, police officers had a duty to intervene, but it was limited to use of excessive force and unlawful arrest. Plaintiff cites *Bunkley v. City of Detroit, Michigan*, 902 F.3d 552, 566 (6th Cir. 2018), for the proposition that Defendants are liable for "any constitutional violation" that an officer observes or has reason to know about another officer committing. (ECF No. 161, PageID #24623.) Defendants correctly point out that *Bunkley* expanded police officers' duty to intervene from excessive force cases to unlawful arrests. 902 F.3d at 566. (ECF No. 174, PageID #26371.) Because the law in 1991 did not recognize a duty to intervene regarding *Brady* violations, unconstitutional identifications, or fabrication of evidence, Defendants enjoy qualified immunity against this claim. In any event, Plaintiff fails to allege that any specific officer observed a specific constitutional violation. (*See* ECF No. 1, PageID #56–57.)

Therefore, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's claim for failure to intervene.

### I.A.6. Supervisory Liability

Defendants argue that Plaintiff's claim for supervisory liability fails as a matter of law. (ECF No. 140-1, PageID #15280–82; ECF No. 174, PageID #26372.)

119

Plaintiff argues that he is entitled to judgment as a matter of law on this claim or, alternatively, that genuine disputes of material fact require a jury trial. (ECF No. 161, PageID #24625–27; ECF No. 175, PageID #26434–39.)

To state a claim against a governmental official in his individual-capacity, "a complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights." *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002). "[A] supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016). In other words, a supervisor or other governmental official is not vicariously liable for the violations of a person's civil rights that another commits. To state a claim under Section 1983 for the violation of a civil right, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Liability must be based on each defendant's own "active unconstitutional behavior." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). The plaintiff must allege facts suggesting that each defendant "did more than play a passive role in the alleged violation or showed mere tacit approval of the [challenged action]." *Id.*

At the very least, the individual defendant must have "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Essex v. County of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013) (quoting *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008)). A defendant must have

120

"encouraged the specific incident of misconduct or in some other way directly participated in it." *Id.* at 355 (quoting *Phillips*, 534 F.3d at 543).  To prevail on an individual claim for supervisory liability under Section 1983, a plaintiff must show that "the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)).  "[A] supervisor's failure to act, without more, is insufficient to establish supervisory liability." *Hollis v. Erdos*, 480 F. Supp. 3d 823, 833 (S.D. Ohio 2020) (citing *Peatross*, 818 F.3d at 241).  Mere failure to act cannot establish individual liability.  *Essex*, 518 F. App'x at 355 (citing *Gregory*, 444 F.3d at 751).

Plaintiff brings an individual supervisory liability claim against Defendant Lt. Tekancic regarding the report by Detectives Gedeon and Nolan about Lacey's identification of the suspect.  Initially, Defendants argued that Lt. Tekancic "played no role in the investigation other than to affix his signature as supervisor" to the report. (ECF No. 140-1, PageID #15254.)  Then, Defendants argued that "Tekancic's only involvement is that he may have received a single police report prepared by Gedeon and reviewed by a Sgt." (ECF No. 174, PageID #26372.)  Plaintiff argues that Lt. Tekancic "was the only person to receive and approve" the report, "[t]he unrebutted evidence is that Tekancic knew of and approved Nolan's and Gedeon's report," and he "knowingly approved" the identification process in the report.  (ECF No. 161, PageID #24626; ECF No. 175, PageID #26434.)

121

While the parties dispute the facts of the report, the record is clear. Lt. Tekancic did not sign the report. (ECF No. 112-7, PageID #5092.) The report was directed to him, but the report was examined and signed by Sgt. John Coules. (*Id*.; ECF No. 112-1, PageID #4625.) Further, Lt. Tekancic testified that "any report" by "every member of the unit, the detective bureau and the strike force and the vice unit" was directed to him. (ECF No. 112-1, PageID #4625.) Reports were "always" directed to him. (*Id*.) This report is the only specific incident involving Lt. Tekancic. Although Lt. Tekancic had supervisory responsibility for ensuring compliance with policies and procedures among the officers, Plaintiff only cites the single report by Detectives Gedeon and Nolan regarding Lacey's identification of the suspect in support of his claim of supervisory liability. One incident can be enough for supervisory liability. However, in the Court's view, seeking to hold Lt. Tekancic liable based on one report directed to him, as all reports were, falls on the wrong side of the line to support a claim for supervisory liability. That is, Plaintiff seeks to hold Lt. Tekancic liable for nothing more than overseeing others. Passive receipt of the report is not enough.

Therefore, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's claim for supervisory liability.

### I.B.    Qualified Immunity

"Government officials enjoy qualified immunity from suit under § 1983 unless their conduct violates clearly established law." *Zorn v. Linton*, 607 U.S. \_\_\_, 146 S. Ct. 926, 930 (2026) (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). A right is clearly established where a reasonable official "would have

122

understood that what he is doing violates that right." *Id.* A right is not clearly established "if existing precedent does not place the constitutional question beyond debate." *Id.* (cleaned up). To determine if a right is clearly established, "courts generally 'need to identify a case where an officer acting under similar circumstances. . . was held to have violated' the Constitution." *Id.* (quoting *Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (per curiam) (cleaned up)). "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Id.* (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up)).

Defendants argue that they are entitled to qualified immunity. (ECF No. 140-1, PageID #15260.) The Court determined that three of Plaintiff's claims for constitutional violations may proceed: *Brady* violations, unconstitutional identification, and fabrication of evidence. For each surviving claim, the Court summarizes the parties' disputes and identifies how a jury's resolution of those questions of fact affects the determination of qualified immunity.

### I.B.1. *Brady* Violations

For Plaintiff's *Brady* claim, there are genuine disputes of material fact that preclude a determination, one way or the other, whether Defendants Masilonis, Taliano, Healy, and the Estate of Parker Adrine enjoy qualified immunity. A jury needs to determine whose responsibility it was to retrieve the results from the forensic testing on Lacey's hat and the fingerprint comparison as well as whether the prosecutor was aware of the fingerprint comparison. Defendants argue that, once the case was submitted to the prosecutor, it was the prosecutor's responsibility to retrieve

123

test results.  But the record, and indeed Defendants themselves (*see* ECF No. 140-1, PageID #15303), suggest that it was the lead detectives' responsibility to retrieve the test results or, at minimum, that both the lead detectives and the prosecutors could request the results.  If the jury finds that it was the responsibility of the prosecutor, that weighs against a constitutional violation, in which case, Defendants would be entitled to qualified immunity.  If the jury finds that it was the responsibility of the lead detectives to get the results through the date that the results are completed or the responsibility of the detective who presented the case to the prosecutor to get the results before presenting the case, that weighs in favor of a *Brady* violation, in which case, Defendants would not be entitled to qualified immunity.  Further, the evidence of Defendants' handwriting expert, if reliable and admissible, bears on this inquiry.

### I.B.2. Unconstitutional Identification

For Plaintiff's claim for unconstitutional identification, there are genuine disputes of material fact that preclude a determination, one way or the other, whether Detectives Gedeon, Nolan, Masilonis, Taliano, and Healy enjoy qualified immunity. A reasonable jury could find that a reasonable officer, reading the operative precedents at the time, would have known that showing Lacey a single photo violated Mr. Jackson's rights by suggesting the identification of Mr. Jackson as the suspect. Of course, it might not so find.  But the record permits the finder of fact to make that determination.  Further, a jury needs to determine the totality of circumstances, and determine the relevant weight to give each circumstance, surrounding the identification procedure to determine whether it gave rise to a substantial likelihood of irreparable misidentification.  If the jury believes that too much time passed

between the murder and Lacey's identification or that Lacey did not have a good opportunity to view the suspect while playing dead, those facts might weigh in favor of misidentification and a constitutional violation, in which case Defendants would not be entitled to qualified immunity. If the jury believes that Lacey had a high degree of attention or demonstrated a high level of certainty at the identification, those facts might weigh against misidentification and against a constitutional violation, in which case Defendants would be entitled to qualified immunity.

### I.B.3. Fabrication of Evidence

For Plaintiff's claim for fabrication of evidence, genuine disputes of material fact preclude a determination, one way or the other, whether Detectives Gedeon, Nolan, Masilonis, Taliano, and Healy enjoy qualified immunity. A rational jury could find that the detectives knowingly created the suspect identification in their reports and that Lacey did not independently do so. If the jury determines that the detectives inserted Mr. Jackson's name or replaced Lacey's use of Sweetman with Mr. Jackson's name in their reports, those facts might weigh in favor of a constitutional violation, in which case Defendants would not be entitled to qualified immunity. If the jury determines that the detectives accurately reported Lacey's statements, that finding would weigh against a constitutional violation, in which case Defendants would be entitled to qualified immunity.

\*     \*     \*

In short, on this record, a jury must resolve the genuine disputes of material fact on which qualified immunity depends. On summary judgment, deciding qualified immunity is not proper where, as here, genuine disputes of material fact exist. *See*

125

*Gillispie*, 18 F.4th at 915–19.  That is, because finding a violation of Mr. Jackson's clearly established constitutional rights turns on disputed material facts, qualified immunity is not proper at this stage.  *See id.*  These and other disputed facts call into question the availability of qualified immunity.  Application of the law as it existed in 1991 involves disputed facts that a jury must first decide.  Therefore, determining qualified immunity on Plaintiff's claims for *Brady* violations, unconstitutional identification, and fabrication of evidence is premature.  *See id.*

## II.     *Monell* **Claim Against the City of Cleveland**

Defendants argue that they are entitled to judgment as a matter of law on Plaintiff's *Monell* claim.  (ECF No. 140-1, PageID #15287–312; ECF No. 174, PageID #26374–95.)  Plaintiff also argues that he is entitled to judgment as a matter of law on this claim.  (ECF No. 161, PageID #24627–42; ECF No. 175, PageID #26435–39.)

To prevail on a *Monell* claim under Section 1983, a plaintiff must demonstrate a constitutional violation and a policy, practice, or custom that causes the alleged constitutional violation.  *Johnson v. Hardin Cnty.*, 908 F.2d 1280, 1285 (6th Cir. 1990) (citing *Monell*, 436 U.S. at 690–91).  Under *Monell* and its progeny, there are four ways a plaintiff can demonstrate a policy, practice, or custom that could allow for municipal liability:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).  The first two are based on the illegality of the

126

municipal law, policy, or practice at issue—whether ordinances, other official enactments, or the appropriate official's ratification. *Pembauer v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *Feliciano*, 988 F.2d at 655. The latter involve deliberate indifference to the rights of those with whom municipal officials deal. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989); *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 384 n.2 (6th Cir. 2018) (citation omitted).

Under Section 1983, a municipality cannot be held vicariously liable on a theory of *respondeat superior* for a violation of an individual's constitutional rights that its officers, employees, or agents commit. *Thomas v. City of Chattanooga*, 398 F.3d 426, 432–33 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 694). Instead, a municipality has liability for a policy or practice that caused a constitutional injury "through its deliberate conduct." *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404–05 (1997). Even then, that policy or practice must have been "the 'moving force' behind the injury alleged" and must have "intentionally" deprived the plaintiff of a federally protected right. *Id.* at 404–05.

Previously, in denying the City of Cleveland's motion for judgment on the pleadings, the Court determined that Plaintiff states a claim for municipal liability against the City on each of the four theories available under *Monell*. (ECF No. 47, PageID #537.) Now, on the summary-judgment record, Defendants take the position that they followed the policies and trainings. (*See* ECF No. 115-3, PageID #6305 ("The City believes that they [the detectives who worked on this case] were in line with the protocols and the policies in place."); *see also id.* ("Yes[,]" the detectives

127

"act[ed] consistently with their CPD training up until that point in time.").)  Plaintiff, more or less, takes the same position.

The Court determined that three of Plaintiff's claims for constitutional violations survive summary judgement:  *Brady* violations, unconstitutional identification, and fabrication of evidence.  Those claims turn on genuine disputes of material fact that a jury must resolve.

### II.A.  *Brady* Violations

For Plaintiff's *Brady* claim, the record shows that certain exculpatory evidence is not in the prosecutor's archived file:  (1) the test results from the forensic testing on Lacey's hat; (2) the test results from the fingerprint comparison; (3) Bobby Rodgers's statement (ECF No. 115-27, PageID #6668; ECF No. 115-29, PageID #6745) and a tip received by Crime Stoppers (ECF No. 115-26, PageID #6550) that identify alternative suspects.  In 1991, the Cleveland police did not have any policy on *Brady* material, though as early as 1964 the police had disclosure obligations to the prosecutor.  *See Moldowan*, 578 F.3d at 376–82

In the 1970s, the Cleveland police had a policy or practice that might permit the police to withhold exculpatory witness statements.  (ECF No. 116-26.)  Because those policies were amended in 1987, the Sixth Circuit's decision in *Estate of Andrews v. City of Cleveland*, 112 F. 4th 436 (6th Cir. 2024) (involving policies from a 1974 murder), has little bearing.  But a change in policy does not necessarily mean that the practice of not turning over exculpatory evidence to prosecutors changed along with the policy.  For example, at roughly the same time that the Cleveland police rescinded that policy, the police chief signed an order directing officers not to disclose

discovery directly to defense counsel.  (ECF No. 116-28.)  That directive might have had the effect of confusing officers about their obligations under *Brady*, especially when Cleveland police did not have a policy on officers' obligations under *Brady*.

At their depositions, the detectives testified that they did not recall any trainings or orders regarding exculpatory evidence or an officer's corresponding obligations.  (*See* ECF No. 107-1, PageID #3605 ("I have never seen anything like that."); *see also* ECF No. 113-1, PageID #5236–37; *see also* ECF No. 114-1, PageID #5548–49.)  Moreover, at his deposition, Detective Masilonis testified that he does not think that he had any *Brady* obligations.  (*See* ECF No. 104-3, PageID #2156 ("I have nothing to do with exculpatory.  That's up to the prosecutor and probably the defense attorneys, and I'm not a lawyer."; *see also id.*, PageID #2157 ("I had nothing to do with exculpatory evidence.  Nothing at all."); *see also id.*, PageID #2158–59 (responding to whether Detective Masilonis had any responsibilities or obligations regarding exculpatory information, "[t]hat's up to the attorneys.").)

Further, the policies that did exist at the time did not identify one person who had the ultimate responsibility to check on test results.  Defendants argue that the prosecutor bore that responsibility.  Plaintiff argues that the police were responsible.  That practice allows each to point the finger at the other.  Therefore, if it finds a constitutional violation, a reasonable jury could find that the City's policies and practices allowed exculpatory evidence to slip through the cracks in this case.

### II.B.  Unconstitutional Identification and Fabrication of Evidence

Lacey's identification lies at the core of Plaintiff's claims for unconstitutional identification and fabrication of evidence.  As previously discussed, the detectives

showing Lacey a single photo to identify the suspect gives rise to Plaintiff's claim for unconstitutional identification, and the detectives' use of Mr. Jackson's name in their reports implicates Plaintiff's claim for fabrication of evidence.

For Plaintiff's claim for unconstitutional identification, Defendants argue that the Cleveland police's policies and procedures applying to lineups "equally applied" to "photo arrays[.]"  (ECF No. 140-1, PageID #15294.)  That argument finds no support on the face of the policy.  Even so, Defendants do not argue that the policies also applied to showing a single photo for identification.  Defendants define "photo arrays" as "a group of six pictures shown to a potential witness to the homicide." (*Id*.) Still, a reasonable jury could find that the Cleveland police's policy on lineups applied to photographic identifications, including photo arrays.  Alternatively, it could find that the show-up policy did not apply to photographic identifications.

Notwithstanding the policy, the record shows that the detectives involved in this case had a practice taking photos of suspects for their personal files with personal cameras.  (ECF No. 113-1, PageID #5127–32; ECF No. 114-1, PageID #5535–37; *see also* ECF No. 113-1, PageID #5128; ECF No. 114-1, PageID #5518.)  Further, there was little to no oversight of this practice.  At his deposition, Detective Nolan testified that he is "pretty sure" his supervisors knew about this practice, that he did not have any conversations with any supervisor about how these photos were being taken or used, and that regarding whether he "can" or "shouldn't" be taking these photos, "[i]t was never brought up."  (ECF No. 113-1, PageID #5165–66.)  In the absence of a policy on photographic identification, that practice of using a personal photo for a

photographic identification created the conditions that allowed for the identification, wrongly, of Mr. Jackson as the suspect by showing a single photo to Lacey. At least a rational jury could so find. On summary judgment, the multiple disputes of fact foreclose any ruling on this claim as a matter of law.

For Plaintiff's claim for fabrication of evidence, the record shows that the supplementary report by Detectives Masilonis and Taliano regarding Lacey's second statement does not mirror Lacey's verbatim signed statement. (*Compare* ECF No. 115-27, PageID #6656–57; ECF No. 115-28, PageID #6728–29; ECF No. 104-4, PageID #3364–65, *with* ECF No. 115-28, PageID #6710–11 & #6713–14; ECF No. 104-4, PageID #3378–79.) But the record does not contain corresponding verbatim statements for the report by Detectives Gedeon and Nolan regarding Lacey's first statement (ECF No. 115-26, PageID #6549; ECF No. 115-27, PageID #6655; ECF No. 115-28, PageID #6727; ECF No. 104-4, PageID #3377), or the report by Detective Healy regarding his interview of Lacey (ECF No. 115-27, PageID #6641; ECF No. 115-28, PageID #6717; ECF No. 104-4, PageID #3264). According to Cleveland police policy regarding witness interviews, "the investigator must be careful not to suggest what he wants or expects the witness to say[.]" (ECF No. 116-2, PageID #7223.) Moreover, "every detail of his testimony should be recorded and examined." (*Id.*, PageID #7224.) If the jury thinks that the detectives replaced Lacey's use of the nickname Sweetman with Mr. Jackson's name or imposed their conclusions (and Mr. Jackson's name), attributing them to Lacey, the jury must then consider whether doing so was pursuant to or in violation of the City's policies.

131

The record would permit a reasonable jury to find that the detectives acted pursuant to the practices of the Cleveland police at the time.  If so, the City would be liable.  On the other hand, if a jury were to decide that the detectives acted contrary to policies, that will have different consequences for the City's liability.

\*     \*     \*

Plaintiff's surviving constitutional claims require a trial on his *Monell* claim as well.  Because a jury must resolve the underlying questions of fact, no party is entitled to summary judgment as a matter of law on Plaintiff's *Monell* claim.

## CONCLUSION

For the foregoing reasons, the Court **DISMISSES WITH PREJUDICE** the Estate of Samuel Reese and Count 4, Count 6, and Count 11 as to all Defendants (ECF No. 142), **DENIES** Plaintiff's motion for summary judgement (ECF No. 161), and **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment (ECF No. 140).  Based on the foregoing analysis, the Court determines that the following claims proceed against the following Defendants:

132

| Count | Claim | Defendants |
|-------|-------|------------|
| 1 | *Brady* Violations<br>  Based on:<br> • Forensic testing on Lacey's hat<br> • Fingerprint comparison<br> • Evidence identifying alternative suspects, specifically the tips received by Crime Stoppers and Bobby Rodgers's statement | Masilonis<br>Taliano<br>Estate of Parker Adrine<br>Healy |
| 2 | Fabrication of Evidence<br>  Based on:<br> • Use of Mr. Jackson's name in their reports | Gedeon<br>Nolan<br>Masilonis<br>Taliano |
| 3 | Unconstitutional Identification<br>  Based on:<br> • Use of a single photo to identify the suspect | Gedeon<br>Nolan<br>Masilonis<br>Taliano<br>Healy |

Further, Plaintiff's *Monell* claim against the City of Cleveland also survives summary judgment.

**SO ORDERED.**

Dated:  April 26, 2026

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio

133